**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DALE G. CALDWELL, in his official capacity as LIEUTENANT GOVERNOR and SECRETARY OF STATE of NEW JERSEY,<br><br>Defendant. | Case No. 3:26-cv-2025-ZNQ-JTQ |

# BRIEF IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANTS OF MAKE THE ROAD NEW JERSEY, JAMIE Y. DING, AND DANIELLE LITWAK

**PEM LAW LLP**
Rajiv D. Parikh (NJ Bar # 032462005)
1 Boland Drive, Suite 101
West Orange, NJ 07052
T: (973) 577-5500
rparikh@pemlawfirm.com

**ELIAS LAW GROUP LLP**
Abha Khanna*
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

Omeed Alerasool (NJ Bar # 403712022)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
oalerasool@elias.law

* *Pro hac vice* motion forthcoming

*Counsel for Proposed Intervenors*

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 4

I. Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional principles of federalism. ..... 4

II. The Department of Justice has embarked on an unprecedented campaign to collect personal voter registration data held by the states. ..... 5

III. The Department of Justice sues New Jersey for its complete voter list. ..... 8

IV. DOJ's demands jeopardize sensitive personal information of Proposed Intervenors and MRNJ's members. ..... 11

LEGAL STANDARD ..... 17

ARGUMENT ..... 18

I. Proposed Intervenors are entitled to intervene as of right under Rule 24(a)(2). ..... 18

A. This motion is timely. ..... 18

B. Proposed Intervenors have an interest in protecting their sensitive and personal information from improper disclosure to DOJ. ..... 19

C. Existing parties do not adequately represent Proposed Intervenors. ..... 24

II. Alternatively, Proposed Intervenors should be granted permissive intervention. ..... 29

CONCLUSION ..... 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1789 Found. Inc. v. Fontes*,
No. CV-24-02987-PHX-SPL, 2025 WL 834919 (D. Ariz. Mar. 17, 2025) ....30

*ACR Energy Partners, LLC v. Polo N. Country Club, Inc.*,
309 F.R.D. 191 (D.N.J. 2015) .... 17, 24

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960) ....9

*Am. Farm Bureau Fed'n v. EPA*,
278 F.R.D. 98 (M.D. Pa. 2011) ....20

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ....4

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) ....26

*Bellitto v. Snipes*,
No. 16-CV-61474, 2016 WL 5118568 (S.D. Fla. Sept. 21, 2016) ....26

*Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa.*,
701 F.3d 939 (3d Cir. 2012) ....18

*Berger v. N.C. State Conf. of the NAACP*,
597 U.S. 179 (2022) .... 2, 25, 26

*Boutros v. Restrepo*,
321 F.R.D. 103 (D.N.J. 2017) ....19

*City of Chicago v. FEMA*,
660 F.3d 980 (7th Cir. 2011) ....28

*Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*,
974 F.2d 450 (4th Cir. 1992) ....28

*Dev. Fin. Corp. v. Alpha Hous. & Health Care, Inc.*,
54 F.3d 156 (3d Cir. 1995) ....................................................................23

*Doe v. Oberweis Dairy*,
456 F.3d 704 (7th Cir. 2006) ..................................................................20

*DOJ v. Reps. Comm. For Freedom of the Press*,
489 U.S. 749 (1989)..................................................................................20

*Fiandaca v. Cunningham*,
827 F.2d 825 (1st Cir. 1987)....................................................................28

*Foster v. Love*,
522 U.S. 67 (1997)......................................................................................4

*Fund for Animals, Inc. v. Norton*,
322 F.3d 728 (D.C. Cir. 2003)..................................................................25

*Husted v. A. Philip Randolph Inst.*,
584 U.S. 756 (2018)................................................................................4, 5

*In re Cendant Corp. Sec. Litig.*,
109 F. Supp. 2d 273 (D.N.J. 2000)..........................................................31

*In re Chocolate Confectionary Antitrust Litig.*,
No. CIV.A. 1:08-MDL-1935, 2008 WL 4960194 (M.D. Pa.
Nov. 18, 2008) ................................................................................. 20, 23

*In re Exch. Union Co.*,
No. 24-MC-91645-ADB, 2025 WL 894652 (D. Mass. Mar. 24, 2025) .......30

*In re Sealed Case*,
237 F.3d 657 (D.C. Cir. 2001).......................................................... 20, 23

*Issa v. Newsom*,
No. 2:20-CV-01044-MCE-CKD, 2020 WL 3074351 (E.D. Cal. June
10, 2020) ...................................................................................................23

*Jud. Watch, Inc. v. Ill. State Bd. of Elections*,
No. 24 C 1867, 2024 WL 3454706 (N.D. Ill. July 18, 2024) .......................23

*Kalbers v. U.S. Dep't of Just.*,
22 F.4th 816 (9th Cir. 2021) ....................20

*Kane Cnty., Utah v. United States*,
928 F.3d 877 (10th Cir. 2019) ....................28

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ....................9

*Kleissler v. U.S. Forest Serv.*,
157 F.3d 964 (3d Cir. 1998) .................... 17, 25, 28

*La Union del Pueblo Entero v. Abbott*,
29 F.4th 299 (5th Cir. 2022) ....................23

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*,
659 F.3d 421 (5th Cir. 2011) ....................22

*League of Women Voters of N.C. v. North Carolina*,
No. 1:13CV660, 2014 WL 12770081 (M.D.N.C. Jan 27, 2014) ....................30

*Michaels Stores, Inc. v. Castle Ridge Plaza Assocs.*,
6 F. Supp. 2d 360 (D.N.J. 1998) ....................19

*Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*,
72 F.3d 361 (3d Cir. 1995) ....................19

*Paher v. Cegavske*,
No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365 (D. Nev. Apr. 28, 2020) ....................23

*Pennsylvania v. President U.S.*,
888 F.3d 52 (3d Cir. 2018) .................... 19, 20, 24, 27

*Powell v. Benson*,
No. 20-CV-11023, 2020 WL 5229104 (E.D. Mich. Sept. 2, 2020) ....................22

*Pub. Int. Legal Found., Inc., v. Winfrey*,
463 F. Supp. 3d 795 (E.D. Mich. 2020) ....................30

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024) .....5

*United States v. Benson*,
No. 1:25-cv-01148, 2025 WL 3520406 (W.D. Mich. Dec. 9, 2025) .... *passim*

*United States v. Oregon*,
No. 6:25-CV-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) .....12

*United States v. Oregon*,
No. 6:25-cv-01666, 2025 WL 3496571 (D. Or. Dec. 5, 2025) .... 3, 21, 24, 27

*United States v. Weber*,
No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) .....12

**Statutes**

52 U.S.C. § 20507 .....4

52 U.S.C. § 20703 .....9

52 U.S.C. § 21083 .....5

52 U.S.C. § 21111 .....11

N.J. Stat. § 47:1A-5.3 ..... 1, 11, 16, 21

N.J. Stat. § 47:1A-1.1 ..... 1, 11, 16, 21

U.S. Const. art. I, § 4, cl. 1 .....4

**Rules**

Fed. R. Civ. P. 24(a) .....2, 28

Fed. R. Civ. P. 24(b) ..... 18, 29

**Other Authorities**

7C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure
§ 1909 (3d ed. 2024) .....24

Exec. Order No. 14,160, *Protecting the Meaning and Value of American Citizenship*, 90 Fed. Reg. 8449 (Jan. 20, 2025) ............................................ 13

Exec. Order No. 14,248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) ............................ 14

H.R. Rep. No. 107-329 (2001) ........................................................................ 5

H.R. Rep. No. 86-956 (1959) .......................................................................... 9

Memorandum from Brett A. Shumate, U.S. Dep't of Just., to All Civil Division Employees, Civil Division Enforcement Priorities (June 11, 2025), https://perma.cc/7M8R-UN5N .......................................................... 14

## INTRODUCTION

The U.S. Department of Justice ("DOJ") recently embarked on an unprecedented nationwide campaign to amass a wide array of highly sensitive personal information on voters in a centralized database. In connection with this effort, on February 26, 2026, DOJ sued New Jersey's Lieutenant Governor and Secretary of State Dale G. Caldwell, seeking to compel production of the state's complete and unredacted voter registration list, including sensitive and private information about every voter in New Jersey. But New Jersey law generally prohibits public disclosure of sensitive personal information, such as the "social security number . . . or driver license number of any person." N.J. Stat. § 47:1A-1.1; *see also id.* § 47:1A-5.3 (permitting election officials to redact the same).

This assault by DOJ intrudes not only on New Jersey's constitutional prerogative to maintain and protect its own voter registration list—and the explicit guarantees that New Jersey has made to voters that their private information will not be shared—but also on the rights of individual New Jersey voters who have good reason to fear their personal information being handed over to the federal government. This includes New Jersey voters Jamie Y. Ding and Danielle Litwak, as well as the members of Make the Road New Jersey ("MRNJ") (collectively, "Proposed Intervenors"), who seek to intervene to prevent disclosure of sensitive personal information to DOJ. MRNJ also seeks to protect its own mission-critical

efforts to serve communities worried about retaliation and scrutiny by the federal government. These latter concerns are of particular importance given that MRNJ's membership includes naturalized citizens. And MRNJ also fears the improper dissemination of its members' private voter information will result in the targeting of its members for denaturalization, a growing priority of the Trump administration.

Proposed Intervenors are entitled to intervene as a matter of right because they have significant interests that are at serious risk of impairment by the relief sought in this action, and the existing parties do not adequately represent those interests. *See* Fed. R. Civ. P. 24(a). Most significantly, Proposed Intervenors have an interest in ensuring that sensitive and personal information of MRNJ's members and of Mr. Ding and Ms. Litwak is not improperly disclosed to DOJ. Although New Jersey has thus far resisted disclosure, Defendant Caldwell does not adequately represent the Proposed Intervenors. As a governmental defendant, Defendant Caldwell must consider "broader public-policy implications" of the issues presented in this suit, while Proposed Intervenors are solely concerned with protecting their privacy and voting rights—"full stop." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 196 (2022) (citing *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538–39 (1972)). Unsurprisingly, in cases involving DOJ's nationwide crusade for voter data, other federal courts have already granted intervention as of right to similarly situated intervenors seeking to prevent DOJ from accessing their and their members' data.

*See, e.g.*, *United States v. Benson*, No. 1:25-cv-01148, 2025 WL 3520406 (W.D. Mich. Dec. 9, 2025) (granting intervention as of right to individual voters and the Michigan Alliance for Retired Americans); *United States v. Oregon*, No. 6:25-cv-01666, 2025 WL 3496571 (D. Or. Dec. 5, 2025) (granting intervention as of right to social welfare organization and individual voters); Declaration of Rajiv D. Parikh in Support of Mot. to Intervene ("Parikh Decl."), Ex. B (Order, *United States v. DeMarinis*, No. 25-cv-3934 (D. Md. Feb. 2, 2026), Dkt. No. 38) (granting intervention as of right to civic organizations and voters).

Alternatively, the Proposed Intervenors should be granted permissive intervention under Rule 24(b) to ensure that New Jersey voters themselves have a voice in this case, the core subject of which is the disclosure of *their* personal information. At a minimum, the Proposed Intervenors' presence will help to develop the issues and ensure vigorous presentation of arguments that the existing Defendant may be limited in presenting. Those considerations weigh strongly in favor of permissive intervention, as demonstrated by the recent permissive interventions granted to voters and nonprofit organizations in cases where DOJ is similarly seeking other states' voter data. *See, e.g.*, Parikh Decl., Ex. C (Order, *United States v. Nago*, No. 25-cv-522 (D. Haw. Jan. 5, 2026), Dkt. No. 20) (granting permissive intervention to NAACP affiliate); Parikh Decl., Ex. D at 7 (Order, *United States v. Scanlan*, No. 25-cv-371 (D.N.H. Jan. 5, 2026), Dkt. No. 23) (granting permissive

intervention to voters); Parikh Decl., Ex. E (Order, *United States v. Simon*, No. 0:25-cv-3761 (D. Minn. Jan. 6, 2026), Dkt. No. 90) (granting permissive intervention to civic organizations and voters).

## BACKGROUND

### I. Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional principles of federalism.

The U.S. Constitution "invests the States with responsibility for the mechanics" of federal elections, subject to any decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also* U.S. Const. art. I, § 4, cl. 1. Accordingly, as a default matter, the Constitution assigns to the states the responsibility of determining eligibility and maintaining lists of eligible voters. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013). While Congress has enacted certain laws governing voter registration, these laws augment existing "state voter-registration systems," *id.* at 5, and confirm that *states* are the custodians of voter registration data.

Thus, in 1993, Congress enacted the National Voter Registration Act ("NVRA"), which charges *states*—not the federal government—with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including maintaining voter lists, *id.* § 20507(c)–(g). It similarly makes *states* the custodians of those lists. *See Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018). Later, Congress enacted the Help America Vote Act ("HAVA")

"to improve voting systems and voter access." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). HAVA requires states to create a "computerized statewide voter registration list," 52 U.S.C. § 21083(a)(1), and to "perform list maintenance" consistent with the highly deferential provisions of the NVRA, *id.* § 21083(a)(2). HAVA is also abundantly clear that this list is to be "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A). Indeed, HAVA's legislative history stressed the importance of maintaining our decentralized electoral system to preserving liberty:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001). Accordingly, *by design*, neither the NVRA nor HAVA tasks the federal government with duties related to voter lists. Congress has intentionally "left it up to the States to maintain accurate lists of those eligible to vote in federal elections." *Husted*, 584 U.S. at 761.

## II. The Department of Justice has embarked on an unprecedented campaign to collect personal voter registration data held by the states.

In the spring of 2025, DOJ launched a campaign to demand broad and unprecedented access to state voter files, including personal information about each voter. It has reportedly sent demands to at least 48 states, with plans to make similar

demands on all 50.[1] The vast majority have declined to turn over sensitive personal information that is typically protected by state law.[2]

DOJ has now filed lawsuits against 29 states and the District of Columbia to compel production of that data. While DOJ has repeatedly claimed that it need not offer any justification for its demands, it reportedly seeks to use the data to create a national voter database to attempt to substantiate unfounded accusations that millions of non-citizens have voted illegally in recent elections. In recent public statements, moreover, Assistant Attorney General Harmeet Dhillon made clear that DOJ also intends to use the information to attempt to compel removal of *hundreds of thousands* of voters from the rolls.[3] And, as detailed in briefs filed by several states (including New Jersey) in DOJ's parallel suits seeking to compel sensitive voter data from other states, in many cases DOJ has not simply sought read-only access, but "materials that define or explain how" the voter information is coded into the

---

[1] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated Mar. 4, 2026), https://perma.cc/6SPZ-46VS; Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[2] *See* Martinez-Ochoa, O'Connor, & Berry, *supra* note 1.

[3] *See* AAG Harmeet Dhillon (@AAGHarmeetDhillon), X (Dec. 18, 2025, at 9:24 ET), https://x.com/AAGDhillon/status/2001659823335616795 (stating in video discussing these lawsuits: "You're going to see hundreds of thousands of people in some states being removed from the voter rolls.").

registration database, "potentially because additional information about . . . database coding would assist in transferring data . . . into other federal databases." Brief of Amici Curiae Maryland et al. in Support of Mot. to Dismiss at 6, *United States v. Bd. of Elections of N.Y.*, No. 1:25-cv-1338 (N.D.N.Y. Jan. 6, 2026), Dkt. No. 79-1 (quotation omitted).[4] Indeed, in recent months the federal government has repeatedly sought to transfer and utilize sensitive information given to or possessed by it for ulterior uses that threaten the citizenry in a number of ways. This includes, for example, collecting state data on Supplemental Nutrition Assistance Programs and using state-compiled Medicaid data for immigration enforcement purposes. *Id.* at 2–5. These concerns are similarly present here.

The pressure campaign against New Jersey began on July 15, 2025, when DOJ allegedly sent a letter requesting New Jersey's complete statewide voter registration list. Compl. ¶¶ 20–21, Dkt. No. 1.[5] According to DOJ, that letter pointed to differences in the confirmation notice rates, duplicate removal rates, and general

---

[4] *See also, e.g.*, Br. of Amici Curiae Maryland et al. in Support of Mot. to Dismiss at 7, *United States v. Oregon*, No. 25-cv-1666 (D. Or. Dec. 5, 2025), Dkt. No. 55-1; Br. of Amici Curiae Maryland et al. in Support of Mot. to Dismiss at 7, *United States v. Toulouse Oliver*, No. 25-cv-1193 (D.N.M. Feb. 18, 2026), Dkt. No. 89.

[5] Because DOJ does not attach the various letters it references, Proposed Intervenors rely on DOJ's allegations and characterizations of the correspondence between it and New Jersey. *See also* Parikh Decl., Ex. A ¶¶ 20–36 (Proposed Answer) (stating that Proposed Intervenors lack sufficient information to form a belief as to the truth or falsity of the allegations).

removal rates between New Jersey and the national averages. *Id.* ¶¶ 22–23. DOJ asserts that it then sent a second letter on August 14, 2025, again demanding New Jersey's voter registration list, this time under the Civil Rights Act of 1960. *Id.* ¶¶ 25–28. One week later, the New Jersey Office of the Attorney General ("NJOAG") reportedly responded with its own letter, seeking clarification as to DOJ's request. *Id.* ¶ 29. In early December 2025, NJOAG also reportedly requested a copy of a memorandum of understanding proposed by DOJ, which DOJ provided, *id.* ¶¶ 30–31, prompting NJOAG to request additional clarification to assuage privacy concerns, *id.* ¶ 32 (citing N.J. Stat. §§ 47:1A5.3, 47:1A-1.1). This request allegedly led to a telephone discussion between DOJ and NJOAG. *Id.* ¶ 33. According to DOJ, in January 2026, NJOAG declined to provide DOJ what it sought. *Id.* ¶ 34. DOJ then responded with this lawsuit.

### III. The Department of Justice sues New Jersey for its complete voter list.

DOJ filed this lawsuit on February 26, 2026, seeking to compel New Jersey to provide its full statewide voter registration list. *See generally id.* Although the case caption names Dale Caldwell in his official capacities as Lieutenant Governor and Secretary of State of New Jersey, *id.* at 1, the Complaint appears to seek relief from him as Secretary of State alone, *id.* ¶¶ 8–9. And although the Complaint alleges that DOJ seeks this data to ensure that New Jersey is complying with the NVRA and HAVA, it does not assert *any* claims under those laws. *See id.* at 8–9 (Count One

and request for relief). Instead, DOJ brings only one claim under the Civil Rights Act of 1960, 52 U.S.C. § 20703 ("Section 303"), a statute that permits DOJ to review certain voting records and papers for the purpose of enabling investigations "concerning infringement or denial of . . . constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).

Congress enacted Section 303 to preserve "the right of all qualified citizens to vote without discrimination on account of race," and specifically to facilitate "investigation[s]" authorized under the Civil Rights Act of 1957, which recalcitrant local officials had frustrated through the destruction of records. H.R. Rep. No. 86-956, at 1944 (1959). This history "leaves no doubt but that [Section 303] is designed to secure a more effective protection of the right to vote." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). DOJ *admits* it is not seeking to enforce any of the Civil Rights Acts, nor does it seek to investigate the unconstitutional denial of the right to vote—instead, DOJ claims only to be evaluating New Jersey's compliance with the NVRA and HAVA. *See* Compl. at 9 (requested relief subparagraph (C)).

And it is notable that, while DOJ asserted NVRA and HAVA claims in otherwise nearly identical complaints it brought against a series of other states that similarly have refused to turn over sensitive voter data, DOJ has abandoned those

claims in the latest waves of these lawsuits, including this one against New Jersey.[6]

DOJ's change of tactic is an implicit admission that it does not believe it has a basis

---

[6] DOJ filed eight cases in September 2025, alleging claims under the NVRA, HAVA, and Section 303. *See* Compl., *United States v. Bellows*, No. 1:25-cv-468 (D. Me. Sep. 16, 2025); Compl., *United States v. Oregon*, No. 6:25-cv-1666 (D. Or. Sep. 16, 2025); Compl., *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Sep. 25, 2025); Compl., *United States v. Bd. of Elections of N.Y.*, No. 1:25-cv-1338 (N.D.N.Y. Sep. 25, 2025); Compl., *United States v. Benson*, No. 1:25-cv-1148 (W.D. Mich. Sep. 25, 2025); Compl., *United States v. Simon*, No. 0:25-cv-3761 (D. Minn. Sep. 25, 2025); Compl., *United States v. Scanlan*, No. 1:25-cv-371 (D.N.H. Sep. 25, 2025); Compl., *United States v. Pennsylvania*, No. 2:25-cv-1481 (W.D. Pa. Sep. 25, 2025).

The twenty-two subsequent cases filed since then, including this one, allege only a claim under Section 303. *See* Compl., *United States v. Albence*, No. 1:25-cv-01453 (D. Del. Dec. 2, 2025); Compl., *United States v. DeMarinis*, No. 1:25-cv-03934 (D. Md. Dec. 1, 2025); Compl., *United States v. Toulouse Oliver*, No. 1:25-cv-01193 (D.N.M. Dec. 2, 2025); Compl., *United States v. Amore*, No. 1:25-cv-00629 (D.R.I. Dec. 2, 2025); Compl., *United States v. Copeland Hanzas*, No. 2:25-cv-00903 (D. Vt. Dec. 1, 2025); Compl., *United States v. Hobbs*, No. 3:25-cv-06078 (W.D. Wash. Dec. 2, 2025); Compl., *United States v. Griswold*, No. 1:25-cv-03967 (D. Colo. Dec. 11, 2025); Compl., *United States v. Nago*, No. 1:25-cv-00522 (D. Haw. Dec. 11, 2025); Compl., *United States v. Galvin*, No. 1:25-cv-13816 (D. Mass. Dec. 11, 2025); Compl., *United States v. Aguilar*, No. 3:25-cv-00728 (D. Nev. Dec. 11, 2025); Compl., *United States v. D.C. Bd. of Elec.*, No. 1:25-cv-04403 (D.D.C. Dec. 18, 2025); Compl., *United States v. Raffensperger*, No. 5:25-cv-00548 (M.D. Ga. Dec. 18, 2025); Compl., *United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill. Dec. 18, 2025); Compl., *United States v. Wis. Elections Comm'n*, No. 3:25-cv-01036 (W.D. Wis. Dec. 18, 2025); Compl., *United States v. Fontes*, No. 2:26-cv-00066 (D. Ariz. Jan. 6, 2026); Compl., *United States v. Thomas*, No. 3:26-cv-00021 (D. Conn. Jan. 6, 2026); Compl., *United States v. Beals*, No. 3:26-cv-00042 (E.D. Va. Jan. 16, 2026); Compl., *United States v. Adams*, No. 3:26-cv-00019 (E.D. Ky. Feb. 26, 2026); Compl., *United States v. Ziriax*, No. 5:26-cv-00361 (W.D. Okla. Feb. 26, 2026); Compl., *United States v. Henderson*, No. 2:26-cv-00166 (D. Utah Feb. 26, 2026); Compl., *United States v. Warner*, No. 2:26-cv-00156 (S.D. W. Va. Feb. 26, 2026); *see also* Compl. at 8–9.

to pursue these actions under HAVA or the NVRA, and in that regard, DOJ is correct. HAVA does not require states to disclose voter registration information to anyone, and DOJ's letter correspondence to the Secretary does not purport to cite case law or other authority for the radical proposition that DOJ's authority to enforce HAVA's "uniform and nondiscriminatory" requirements entitles it to unfettered access to state voter registration lists upon demand. 52 U.S.C. § 21111. Nor does the NVRA provide a basis for DOJ's unprecedented and sweeping demand.

## IV. DOJ's demands jeopardize sensitive personal information of Proposed Intervenors and MRNJ's members.

New Jersey protects against the unauthorized disclosure of sensitive personal information. *See* N.J. Stat. §§ 47:1A-1.1, 47:1A-5.3. Proposed Intervenors and their members rely upon Defendant Caldwell's compliance with this law, and DOJ's attempted data grab threatens their cherished privacy. In addition to defending their privacy interests, Proposed Intervenors have well-founded concerns about DOJ's intended use of their sensitive personal information, particularly because the current presidential administration has repeatedly disregarded privacy protections over sensitive personal data. For example, public reports have indicated that the Department of Government Efficiency placed the security of millions of social

security numbers at risk through improper maintenance.[7] And last fall, at the height of the gubernatorial campaign, the National Archives allegedly released the military records of then-candidate, now-Governor Mikie Sherrill in violation of the Privacy Act.[8] Critically, DOJ is not hiding the ball here regarding its intended use of sensitive voter information—Assistant Attorney General Harmeet Dhillon recently admitted in an interview regarding these lawsuits: "You're going to see hundreds of thousands of people in some states being removed from the voter rolls."[9] And the current administration has made clear that it is willing to use all the tools at its disposal—including specifically through DOJ—to accomplish political goals, including by targeting individual citizens.[10]

---

[7] *See* Nicholas Nehamas, *DOGE Put Critical Social Security Data at Risk, Whistle-Blower Says*, N.Y. Times (Aug. 26, 2025), https://www.nytimes.com/2025/08/26/us/politics/doge-social-security-data.html. And DOJ recently admitted that some DOGE employees sought to share private social security data with private organizations seeking to undermine the results of prior elections. *See* Notice of Corrections to the Record, *Am. Fed. of State, Cnty., & Mun. Emps. v. Social Sec. Admin.*, No. 1:25-cv-00596-ELH (D. Md. Jan. 16, 2026), Dkt. No. 197, available at https://perma.cc/9RZD-6KGY.

[8] *See* Caroline Vakil, *Sherrill campaign slams release of military records to opponent's ally*, The Hill (Sept. 25, 2025), https://perma.cc/8WZB-994P.

[9] *See supra* note 3.

[10] Election officials from multiple states have publicly questioned whether the Trump administration misled them regarding the purpose for its requests for voter information, citing reports that DOJ had shared voter information with the Department of Homeland Security. *See* Nick Corasaniti, *Election Officials Press Trump Administration Over Election Data*, N.Y. Times (Nov. 18, 2025), https://www.nytimes.com/2025/11/18/us/politics/election-officials-trump-voter-

The current administration's targeting of individual Americans extends to naturalized citizens as well, driven by a demonstrated disdain for immigrants and their civic participation even after they are naturalized. For example, President Trump himself has claimed that immigrants are an invading force that will "nullify the will of the actual American voters."[11] And the actions of his administration, in just its first year, further illustrate a concerted effort to target naturalized citizens: In January 2025, President Trump issued an executive order purporting to halt birthright citizenship guaranteed by the Fourteenth Amendment. *See* Exec. Order No. 14,160, *Protecting the Meaning and Value of American Citizenship*, 90 Fed. Reg. 8449 (Jan. 20, 2025). In March 2025, President Trump issued an executive order that, among other things, would require anyone registering to vote in federal

---

data.html; *see also United States v. Weber*, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807, at *10–12 (C.D. Cal. Jan. 15, 2026) (recognizing DOJ's "pretextual investigative purpose"). Lending further credibility to this suspicion is the fact that in January, Attorney General Pam Bondi sent a letter to Minnesota Governor Tim Walz demanding access to Minnesota's voter rolls as a condition to ending ICE's occupation of Minneapolis. *Read Bondi's Letter to Minnesota's Governor*, N.Y. Times (Jan. 24, 2026), https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html; *see also United States v. Oregon*, No. 6:25-CV-01666-MTK, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) (observing that "[t]he context of this demand within a letter about immigration enforcement casts serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases, and what it intends to do with that data").

[11] James Oliphant, *Trump says Biden's border policies are a 'conspiracy to overthrow' the US*, Reuters (Mar. 3, 2024), https://www.reuters.com/world/us/trump-says-bidens-border-policies-are-conspiracy-overthrow-us-2024-03-02.

elections to provide documentary proof of citizenship. *See* Exec. Order No. 14,248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025). At the same time, U.S. Citizenship and Immigration Services ("USCIS") has announced plans to make the citizenship test more difficult.[12] In June 2025, DOJ made denaturalization of U.S. citizens a top enforcement priority.[13] In early December 2025, dozens of people who had already satisfied the requirements for citizenship were plucked from the line at their naturalization ceremonies in several cities and informed by USCIS that they were no longer eligible.[14] And later in December, USCIS issued guidance to its field offices demanding that they generate 100 to 200 new denaturalization cases a month.[15] In just one year, the current administration has made citizenship more tenuous and its rights less secure for thousands of naturalized citizens.

---

[12] Ja'han Jones, *Trump admin's proposed changes to citizenship test could slow immigration*, MS NOW (Sep. 8, 2025), https://perma.cc/9AH5-DQ54.

[13] Memorandum from Brett A. Shumate, U.S. Dep't of Just., to All Civil Division Employees, Civil Division Enforcement Priorities (June 11, 2025), https://perma.cc/7M8R-UN5N.

[14] Billal Rahman, *Fear grips naturalization ceremonies—'Plucked out of line'*, Newsweek (Dec. 8, 2025), https://www.newsweek.com/fear-grips-us-naturalization-ceremonies-plucked-out-of-line-11173755.

[15] Hamed Aleaziz, *Trump Administration Aims to Strip More Foreign-Born Americans of Citizenship*, N.Y. Times (Dec. 17, 2025), https://www.nytimes.com/2025/12/17/us/politics/trump-immigration-citizenship-denaturalization.html.

As a result, the core interests of MRNJ are threatened by DOJ's brash demands here. MRNJ is a project of Make the Road States, a 501(c)(3) not-for-profit organization, with sister organizations in Connecticut, Nevada, New York, and Pennsylvania. *See* Declaration of Nedia Morsy ("Morsy Decl.") ¶ 5. Since its founding in 2014, MRNJ has led successful campaigns to empower immigrant and working-class communities through community organizing, high-quality legal services, policy innovation, and transformative education. *Id.* ¶¶ 5–6. MRNJ also focuses on promoting nonpartisan civic engagement in those communities. *Id.* ¶¶ 9–10. MRNJ thus views DOJ's efforts to obtain New Jersey's complete, statewide voter registration list—and all the sensitive, personal information contained within it—as not only an alarming overreach by the federal government, but one that threatens to deter and disenfranchise the members MRNJ serves, and particularly its members who are naturalized citizens. *Id.* ¶¶ 11–13. Thousands of naturalized citizens in New Jersey, including MRNJ's members, lawfully registered to vote after attaining citizenship. *Id.* ¶ 16. But MRNJ fears that the information DOJ seeks here will be used to target its members for denaturalization—a growing priority of the Trump administration, which has a demonstrated record of hostility towards naturalized citizens and immigrant communities generally. *Id.* ¶¶ 14, 17. Under these circumstances, MRNJ reasonably fears that DOJ's demand, if successful, will frustrate its nonpartisan civic engagement efforts and that its members may opt out

of registering and voting if they know that the federal government may scrutinize their rights to civic participation. *Id.* ¶¶ 19–21.

Moreover, the privacy interests of the individual voters here—Jamie Y. Ding and Danielle Litwak—are threatened by DOJ's demand as well. Both are civically engaged New Jersey voters who are very concerned that their sensitive and personal information will be disclosed to DOJ if its efforts here prevail. *See* Declaration of Jamie Y. Ding ("Ding Decl.") ¶¶ 3–4, 6–8; Declaration of Danielle Litwak ("Litwak Decl.") ¶¶ 3–5, 8–9. New Jersey law guarantees voters that their sensitive personal information will not be improperly disclosed by election officials. *See* N.J. Stat. § 47:1A-1.1 (prohibiting public disclosure of sensitive personal information, such as the "social security number . . . or driver license number of any person"); *id.* § 47:1A-5.3 (permitting election officials to redact such sensitive personal information). Ms. Litwak is also concerned about the privacy of her personal data because close family members have previously been the victim of identity theft and fraud in the past. Litwak Decl. ¶ 11. In addition to defending their privacy interests, Mr. Ding and Ms. Litwak have well-founded concerns about DOJ's intended use of their sensitive personal information. Ding Decl. ¶¶ 9–10; Litwak Decl. ¶ 10. These concerns are especially acute given that they hold political views and engage in civic activities disfavored by the current presidential administration, which has repeatedly indicated both a willingness to target and retaliate against its perceived political

enemies as well as a disregard for privacy laws and protections. Ding Decl. ¶¶ 6, 9–10, 12; Litwak Decl. ¶¶ 4–5, 10, 12. And Mr. Ding—a naturalized citizen—is particularly concerned that this administration's disdain for immigrant communities will risk further retaliation against him for exercising his civil rights as an American citizen. Ding Decl. ¶ 13. Ultimately, both Mr. Ding and Ms. Litwak feel DOJ's demands here could deter them and other New Jerseyans from civic engagement, including voting. Ding Decl. ¶ 12; Litwak Decl. ¶ 12.

## LEGAL STANDARD

To determine whether a movant has a right to intervene under Federal Rule of Civil Procedure 24(a)(2), courts review whether it has submitted "a timely application for leave to intervene," it has established "a sufficient interest in the litigation," there is "a threat that the interest will be impaired or affected, as a practical matter, by the disposition of the action," and the existing parties may inadequately represent the prospective intervenor's interest. *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998) (discussing Fed R. Civ. P. 24(a)(2)). "Courts, however, liberally construe Rule 24(a) in favor of intervention." *ACR Energy Partners, LLC v. Polo N. Country Club, Inc.*, 309 F.R.D. 191, 192 (D.N.J. 2015) (citation modified).

Alternatively, a nonparty may be permitted to intervene under Rule 24(b) if it has submitted a timely motion and "has a claim or defense that shares with the main

action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In exercising its discretion to grant permissive intervention, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).[16]

## ARGUMENT

### I. Proposed Intervenors are entitled to intervene as of right under Rule 24(a)(2).

The Court should grant Proposed Intervenors' motion to intervene as of right under Rule 24(a)(2) because they have timely moved to participate, the disposition of this case could impair their ability to protect significant interests, and no existing party adequately represents those interests.

#### A. This motion is timely.

Proposed Intervenors' motion is indisputably timely. "To determine whether [an] intervention motion is timely," courts in the Third Circuit consider: "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." *Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa.*, 701 F.3d 939, 949 (3d Cir. 2012) (quoting *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369 (3d Cir. 1995)). DOJ filed suit on February

---

[16] Proposed Intervenors submit a Proposed Answer as required by Rule 24(c), *see* Parikh Decl., Ex. A, but reserve the right to file a Rule 12 motion by the deadline set the Federal Rules of Civil Procedure or by this Court.

26, and this motion follows only a week later—before any case schedule has been set, before Defendant has appeared or answered, and while this case remains at the preliminary stage. *See Michaels Stores, Inc. v. Castle Ridge Plaza Assocs.*, 6 F. Supp. 2d 360, 364 (D.N.J. 1998) (finding timely an intervention motion filed "at such an early stage in the litigation[ that] the original parties to the action cannot have suffered any prejudice as a result"). Allowing intervention would not alter any existing deadlines, and Proposed Intervenors agree to abide by any future deadlines set by the Court or agreed to by the existing parties, so there is no conceivable prejudice to any existing party. *See Mountain Top Condo. Ass'n*, 72 F.3d at 370 (finding no prejudice where "there were no depositions taken, dispositive motions filed, or decrees entered during the four year period in question"); *Boutros v. Restrepo*, 321 F.R.D. 103, 106 (D.N.J. 2017) (finding timely an intervention motion filed before "dispositive motions have been filed in this case"). Proposed Intervenors therefore satisfy the timeliness factor for intervention as of right.

**B. Proposed Intervenors have an interest in protecting their sensitive and personal information from improper disclosure to DOJ.**

To satisfy the second prong, encompassing the second and third elements of Rule 24(a)'s test, "the Supreme Court has held that an applicant must assert an interest that is significantly protectable" by "demonstrat[ing] that its interest is specific to it, is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought." *Pennsylvania v. President U.S.*, 888 F.3d 52,

58 (3d Cir. 2018) (cleaned up) (citations omitted). Satisfying this requirement is less demanding than establishing an Article III injury-in-fact. *See Am. Farm Bureau Fed'n v. EPA*, 278 F.R.D. 98, 107 n.3 (M.D. Pa. 2011) (collecting authority); *cf. President U.S.*, 888 F.3d at 57 n.2 (movants seeking "to intervene as defendants . . . need not demonstrate Article III standing").

Proposed Intervenors satisfy that standard here. MRNJ serves communities that include thousands of registered New Jersey voters whose sensitive personal information—along with Mr. Ding's and Ms. Litwak's personal information—is threatened in this lawsuit. *See supra* Background, Part IV. The risk of disclosure alone, and of accompanying adverse consequences, is enough to satisfy Rule 24(a). *See, e.g.*, *Kalbers v. U.S. Dep't of Just.*, 22 F.4th 816, 827 (9th Cir. 2021) (recognizing "straightforward" significantly protectable interest in confidentiality of non-public documents); *Doe v. Oberweis Dairy*, 456 F.3d 704, 718 (7th Cir. 2006) (recognizing privacy interest as sufficient interest for entitlement to intervention); *In re Sealed Case*, 237 F.3d 657, 663–64 (D.C. Cir. 2001) (holding intervenors had "legally cognizable interest in maintaining the confidentiality" of records); *In re Chocolate Confectionary Antitrust Litig.*, No. CIV.A. 1:08-MDL-1935, 2008 WL 4960194, at *1 (M.D. Pa. Nov. 18, 2008) (finding "significantly protectable interest" supporting intervention in "safeguarding the confidentiality of information" (citation modified)); *see also DOJ v. Reps. Comm. For Freedom of the Press*, 489 U.S. 749,

763 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person."). And other federal courts have held as much in DOJ's parallel cases seeking state voter data, granting intervention as of right to similarly positioned organizations. *See Benson*, 2025 WL 3520406, at *2–7 (granting intervention as of right to individual voters and Michigan Alliance for Retired Americans); *Oregon*, 2025 WL 3496571, at *1–3 (granting intervention as of right to Oregon social welfare organization and individual voters); *see* Parikh Decl., Ex. B (Order, *United States v. DeMarinis*, No. 25-cv-3934 (D. Md. Feb. 2, 2026), Dkt. No. 38) (granting intervention as of right to civic organizations and individual voters). MRNJ's concern about the confidentiality and privacy of its members' sensitive information, Morsy Decl. ¶¶ 12, 15, and the concerns of Mr. Ding and Ms. Litwak about their personal sensitive information, Ding Decl. ¶ 8; Litwak Decl. ¶ 11, thus constitute legally protectable interests that support intervention.

Importantly, such voter registration data is protected from disclosure under New Jersey law, including specifically the data that DOJ seeks. *See* N.J. Stat. §§ 47:1A-1.1, 47:1A-5.3. And the Proposed Intervenors are credibly concerned about the consequences of the disclosure of their sensitive information to DOJ, both because of the potential risk of data breaches that would expose them to identity theft scams, and because of the potential for retaliation by the federal government against

voters who engage in political advocacy work disfavored by the current administration, or who are simply disfavored given their status as naturalized citizens. Morsy Decl. ¶¶ 14, 18–20; Ding Decl. ¶¶ 8–13; Litwak Decl. ¶¶ 7–12.

Furthermore, these privacy interests implicate the right to vote. Proposed Intervenors have a substantial interest in preserving their own and MRNJ's members' "right to vote privately," *Powell v. Benson*, No. 20-CV-11023, 2020 WL 5229104, at *5 (E.D. Mich. Sept. 2, 2020), and in ensuring that right is not unlawfully burdened. *See League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 434–35 (5th Cir. 2011) (reversing denial of intervention and concluding voting-right interest was "a sufficient interest to satisfy Rule 24(a)(2)").

DOJ's efforts also threaten MRNJ's mission to increase the nonpartisan civic participation of the communities that it serves. Morsy Decl. ¶¶ 19–20. Because of the hostility the current administration has demonstrated towards naturalized citizens, MRNJ's members are likely to be hesitant to register to vote and engage with the democratic process if they fear that their sensitive personal information will be handed over directly to the federal government. *Id.*; *see also id.* ¶ 17. Such disengagement directly impedes MRNJ's organizational mission. *Id.* at ¶¶ 19–20. Courts have long recognized that organizations have a significant protectable interest in preserving and pursuing their own mission-critical organizational activities, particularly when it comes to ensuring their constituents' ability to vote. *See, e.g.*,

*See, e.g.*, *Jud. Watch, Inc. v. Ill. State Bd. of Elections*, No. 24 C 1867, 2024 WL 3454706, at *3 (N.D. Ill. July 18, 2024); *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365, at *2 (D. Nev. Apr. 28, 2020); *Issa v. Newsom*, No. 2:20-CV-01044-MCE-CKD, 2020 WL 3074351, at *3 (E.D. Cal. June 10, 2020); *cf. La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022) (recognizing that political party had "legally protectable interest" because they "expend significant resources in the recruiting and training of volunteers and poll watchers who participate in the election process").

Ultimately, as a federal court hearing one of these parallel cases recently found, Proposed Intervenors simply "have an interest in keeping their information private from the DOJ, whether or not disclosure to the DOJ produces any additional harm." *Benson*, 2025 WL 3520406, at *3. Once that information is disclosed, "the cat is out of the bag." *In re Sealed Case*, 237 F.3d at 664 (citation omitted) (finding impairment when intervenor's confidential information was at risk of disclosure). DOJ's demand for New Jersey voters' confidential information is thus "antithetical" to Proposed Intervenors' "efforts to maintain the confidentiality" of that information. *In re Chocolate Confectionary Antitrust Litig.*, 2008 WL 4960194, at *1; *see also Dev. Fin. Corp. v. Alpha Hous. & Health Care, Inc.*, 54 F.3d 156, 162 (3d Cir. 1995) (observing that impairment focuses upon the "practical consequences of the litigation").

The disclosure of the confidential information of MRNJ's members, and of Mr. Ding and Ms. Litwak, as a result of this litigation would plainly impair Proposed Intervenors' interests. There is therefore no doubt these interests satisfy the interest requirements of Rule 24(a)(2), which "[c]ourts . . . liberally construe . . . in favor of intervention." *ACR Energy Partners*, 309 F.R.D. at 192 (citation modified); *see also Benson*, 2025 WL 3520406, at *2; *Oregon*, 2025 WL 3496571, at *1; Parikh Decl., Ex. B (Order, *United States v. DeMarinis*, No. 25-cv-3934 (D. Md. Feb. 2, 2026), Dkt. No. 38) (finding "interests in privacy and the unfettered right to vote" sufficient for intervention as of right).

**C. Existing parties do not adequately represent Proposed Intervenors.**

Proposed Intervenors cannot be assured adequate representation in this matter if they are denied intervention. "[A]n applicant's interests are not adequately represented if they diverge sufficiently from the interests of the existing party, such that the existing party cannot devote proper attention to the applicant's interests." *President U.S.*, 888 F.3d at 60 (cleaned up). Because "[t]his burden is generally treated as minimal and requires the applicant to show that representation of his interest '*may be*' inadequate," *id*. (cleaned up) (citation omitted), courts are "liberal in finding" this requirement to be met, *see* 7C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1909 (3d ed. 2024) (noting that "there is good

reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests").

The existing parties—all government actors—do not adequately represent Proposed Intervenors' interests. DOJ, for one, seeks to forcibly compel production of New Jersey's unredacted state voter registration list, which directly impairs Proposed Intervenors' interests. And although New Jersey has, to date, resisted that demand, federal courts have "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003). This is because a government defendant's interests are "necessarily colored by [their] view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it." *Kleissler*, 157 F.3d at 972. Accordingly, Proposed Intervenors' burden here is "comparatively light." *Id.*

The Supreme Court recently emphasized this point, explaining that public officials must "bear in mind broader public-policy implications," whereas private litigants—like Proposed Intervenors—seek to vindicate their own rights "full stop." *Berger*, 597 U.S. at 196 (quoting *Trbovich*, 404 U.S. at 538–39). Thus, the Supreme Court cautioned that courts should not conduct the adequacy-of-representation analysis at too "high [a] level of abstraction," and reaffirmed that, even where the parties' interests "seem[] closely aligned," the burden to demonstrate inadequate

representation remains "minimal" unless those interests are "identical." *Id.* (citation omitted). In other words, even if Defendant Caldwell also opposes the relief that DOJ seeks at a high level of abstraction, it does not follow that he shares "identical" interests to private individual voters or civic organizations committed to empowering voters and their ability to civically engage. *See id.*

Here, the existing Defendant and Proposed Intervenors do not share "identical" interests. For one, Defendant Caldwell is obliged to enforce the requirements of the NVRA and HAVA, in addition to various state laws governing maintenance of the voter registration list. Thus, by definition, he has an obligation to weigh and carry out public duties that Proposed Intervenors do not share. *See, e.g.*, *Bellitto v. Snipes*, No. 16-CV-61474, 2016 WL 5118568, at *2 (S.D. Fla. Sept. 21, 2016) (concluding adequate representation was not guaranteed where existing defendant was "an elected official" whose interpretation of the NVRA might not be aligned with intervenors' interests). Indeed, the NVRA specifically requires them to "balance competing objectives"—maintaining accurate and current voter rolls while promoting access to the ballot box—that do not pertain to the Proposed Intervenors or their interests. *Bellitto v. Snipes*, 935 F.3d 1192, 1201 (11th Cir. 2019). Proposed Intervenors do not share these competing interests—they are focused entirely on maintaining the privacy of their sensitive personal information, whereas the existing Defendant Caldwell's competing obligations may incline him to acquiesce to DOJ's

demands. *See President U.S.*, 888 F.3d at 61 (finding inadequate representation when government had "numerous complex and conflicting interests" (quoting *Kleissler*, 157 F.3d at 973)). As the court granting a request for intervention as of right in the similar case against Michigan noted, "Michigan has other countervailing incentives—for example, to maintain an election system, comply with federal law, and preserve comity with the federal government—that may ultimately induce it to stop defending the lawsuit or give up the information at issue." *Benson*, 2025 WL 3520406, at *6; *see also Oregon*, 2025 WL 3496571, at *2 (noting the Oregon "Defendants have obligations under the NVRA and HAVA that Proposed Intervenors do not share and have broader public policy obligations and considerations that may incentivize them to make compromises that Proposed Intervenors would not make").[17]

Indeed, DOJ recently revealed in a parallel case that one of the state defendants in DOJ's most recent wave of lawsuits demanding voter data has already started negotiating a settlement. *See* Mot. Hearing, *United States v. Simon*, No. 0:25-cv-3761 (D. Minn. Mar. 3, 2026)). Representation is clearly inadequate where existing parties might "work out settlements" or "[c]ompromises" that would harm Proposed Intervenors, "which have interests inextricably intertwined with, but

[17] *See also, e.g.*, Text Order, *United States v. Amore*, No. 1:25-cv-00639 (D.R.I. Jan. 6, 2026) (granting intervention as of right to union, civic organizations, and voters).

distinct from, those of" governmental defendants. *Kleissler*, 157 F.3d at 974; *see also Kane Cnty., Utah v. United States*, 928 F.3d 877, 895–96 (10th Cir. 2019) (recognizing "administration of … litigation resources" and "inclin[ation] to settle" may further establish inadequate representation); *City of Chicago v. FEMA*, 660 F.3d 980, 986 (7th Cir. 2011) (explaining that a possible "conflict of interest … when it comes to settlement possibilities" favors intervention); *Fiandaca v. Cunningham*, 827 F.2d 825, 833 (1st Cir. 1987) (recognizing that "negotiated . . . settlement that would [be] contrary to the interest of the prospective intervenors").

Ultimately, the government entities on both sides of the case do not stand in the same shoes as Proposed Intervenors and thus cannot sufficiently represent their interests, which are directly impacted by the disposition of this matter. Proposed Intervenors therefore satisfy each of the requirements for intervention as of right.[18]

---

[18] The adequacy of representation prong only concerns "*existing* parties," Fed. R. Civ. P. 24(a) (emphasis added), which by definition does not include other proposed intervenors. *See Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 469 (4th Cir. 1992) (intervenors "assume the status of full participants in a lawsuit and are normally treated as if they were original parties *once intervention is granted*" (emphasis added)). And in nearly every parallel case brought by DOJ across the country, courts have permitted multiple sets of movants to intervene as defendants precisely because DOJ and state defendants did not adequately represent the myriad interests of the proposed intervenors. *See, e.g.*, Mins. of Mot. Hr'g, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Nov. 24, 2025), Dkt. No. 70 (granting intervention by oral order to state affiliates of NAACP and League of Women Voters); Order, *United States v. Bellows*, No. 1:25-cv-00468 (D. Me. Dec. 12, 2025), Dkt. Nos. 49, 51 (granting intervention to two sets of movants); Order, *United States v. Wis. Elections Comm'n*, No. 3:25-cv-01036 (W.D. Wis. Jan. 22, 2026), Dkt. No.

## II. Alternatively, Proposed Intervenors should be granted permissive intervention.

This Court should alternatively exercise its discretion to grant permissive intervention. Rule 24(b) is readily satisfied: Proposed Intervenors assert a "defense that shares with the main action a common question of law or fact," and granting intervention would not "unduly delay or prejudice the adjudication" of the matter. Fed. R. Civ. P. 24(b). Proposed Intervenors' defense requires resolution of the same factual and legal issues raised in the underlying lawsuit. *See* Parikh Decl., Ex. A (Proposed Answer). And Proposed Intervenors have moved promptly, *see supra* Argument, Section I.A, and agree to abide by any schedule set by the Court or agreed to by the original parties, meaning there will be no delay or prejudice.

---

53 (granting intervention to "two groups of voter advocacy organizations and individual Wisconsin voters"); *supra* Text Order, *Amore*, note 17 (similar); Order, *United States v. Albence*, No. 1:25-cv-01453 (D. Del. Feb. 4, 2026), Dkt. No. 27 (granting intervention motion filed nearly 7 weeks after first set of intervenors' motion and 3 weeks after that first motion was granted).

In any event, the only other movants here (*see* Dkt. No. 3) could not adequately represent the interests of Proposed Intervenors. Proposed Intervenors include MRNJ—which has a distinct mission that encompasses the interests of naturalized citizens that are uniquely threatened and at risk of impairment by the relief DOJ seeks here, Morsy Decl. ¶¶ 6–10, 13–15, 18–21—and individual voters, each of whose personal information is at risk and whose unique experiences are not reflected by any of the other movants who seek intervention in this case, Ding Decl. ¶¶ 3–6, 8–10, 12–13; Litwak Decl. ¶¶ 3–5, 8–12. *See also supra* Background, Part IV.

Courts regularly grant permissive intervention to ensure actual voters (or organizations representing them) have a say in litigation concerning their rights.[19] That rationale applies with particular force here. Proposed Intervenors and their members indisputably have "confidentiality and/or privacy interest[s]" at stake in this case, which alone "warrant[] an opportunity to permissively intervene to protect that interest." *In re Exch. Union Co.*, No. 24-MC-91645-ADB, 2025 WL 894652, at *3 (D. Mass. Mar. 24, 2025). Furthermore, Proposed Intervenors represent a collection of New Jersey voters. Because Proposed Intervenors would represent the very voters "whose personal information would be distributed to the Department of Justice were the United States to prevail in this action," their "presence would assist the court in deciding the issues before it." Parikh Decl., Ex. D at 5 (Order, *United States v. Scanlan*, No. 25-cv-371 (D.N.H. Jan. 5, 2026), Dkt. No. 23). These considerations, in addition to the clear satisfaction of Rule 24(b), strongly weigh in favor of permissive intervention, as courts have found in permitting groups to intervene in parallel cases seeking state voter data. *See id.* at 7 (granting permissive intervention to individual voters); Parikh Decl., Ex. C (Order, *United States v. Nago*,

[19] *See, e.g.*, *1789 Found. Inc. v. Fontes*, No. CV-24-02987-PHX-SPL, 2025 WL 834919, at *4 (D. Ariz. Mar. 17, 2025) (permitting advocacy organizations to intervene as defendants); *Pub. Int. Legal Found., Inc., v. Winfrey*, 463 F. Supp. 3d 795, 802 (E.D. Mich. 2020) (permitting voting rights organizations to intervene as defendants); *League of Women Voters of N.C. v. North Carolina*, No. 1:13CV660, 2014 WL 12770081, at *3 (M.D.N.C. Jan 27, 2014) (permitting voters to intervene).

No. 25-cv-522 (D. Haw. Jan. 5, 2026), Dkt. No. 20) (granting permissive intervention to NAACP affiliate); Parikh Decl., Ex. E (Order, *United States v. Simon*, No. 0:25-cv-3761 (D. Minn. Jan. 6, 2026), Dkt. No. 90) (granting permissive intervention to Minnesota Alliance for Retired Americans, League of Women Voters Minnesota, Common Cause, and voters).[20]

Thus, even if this Court does not find the requirements of intervention as of right met here, it should exercise its discretion to grant permissive intervention. *See In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 273, 285 (D.N.J. 2000) (granting permissive intervention despite denying intervention as of right), *aff'd sub nom. In re Cendant Corp. Litig.*, 264 F.3d 286, 297 (3d Cir. 2001) (affirming both denial of intervention as of right and grant of permissive intervention).

---

[20] *See also* Mins. of Mot. Hr'g, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Nov. 24, 2025), Dkt. No. 70; Order, *United States v. Bellows*, No. 1:25-cv-00468 (D. Me. Dec. 12, 2025), Dkt. No. 49; Order, *United States v. Toulouse Oliver*, No. 1:25-cv-01193 (D.N.M. Dec. 15, 2025), Dkt. No. 9; Electronic Order, *United States v. Galvin*, No. 1:25-cv-13816 (D. Mass. Jan. 6, 2026), Dkt. No. 30; Order, *United States v. Thomas*, No. 3:26-cv-00021 (D. Conn. Jan. 13, 2026), Dkt. No. 23; Order, *United States v. Albence*, No. 1:25-cv-01453 (D. Del. Jan. 15, 2026), Dkt. No. 22; Order, *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. Jan. 16, 2026), Dkt. 105; Text Order, *United States v. Copeland Hanzas*, No. 2:25-cv-00903 (D. Vt. Jan. 16, 2026), Dkt. No. 41 (granting permissive intervention to Vermont Alliance for Retired Americans and two voters); Order, *United States v. Wis. Elections Comm'n*, No. 3:25-cv-1036 (W.D. Wis. Jan. 22, 2026), Dkt. No. 53; Order, *United States v. Raffensperger*, No. 1:26-cv-00485 (N.D. Ga. Jan. 30, 2026), Dkt. No. 13; Text Order, *United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill. Mar. 2, 2026) (granting permissive intervention to civic organizations, unions, and voters).

## CONCLUSION

For the foregoing reasons, Proposed Intervenors respectfully request that the Court grant them intervention as of right or, in the alternative, permissively.

Respectfully submitted,
*s/ Rajiv D. Parikh*

Dated: March 6, 2026

**PEM LAW LLP**
Rajiv D. Parikh (NJ Bar # 032462005)
1 Boland Drive, Suite 101
West Orange, NJ 07052
T: (973) 577-5500
rparikh@pemlawfirm.com

**ELIAS LAW GROUP LLP**
Abha Khanna*
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

Omeed Alerasool (NJ Bar # 403712022)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
oalerasool@elias.law

* *Pro hac vice* motion forthcoming

*Counsel for Proposed Intervenors*