IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>DR. DALE G. CALDWELL, in his official capacity as Lieutenant Governor and Secretary of State for the State of New Jersey<br><br>Defendant(s). | Case Number: 3:26-CV-2025-ZNQ-JTQ<br><br>Motions Day May 4, 2026 |

**UNITED STATES' MEMORANDUM SUPPORTING ITS MOTION TO COMPEL FEDERAL ELECTION RECORDS UNDER THE CIVIL RIGHTS ACT OF 1960**

I.  BACKGROUND..............................................................................................................2

II.  LEGAL STANDARD .....................................................................................................3

III.  ARGUMENT.................................................................................................................3

A.  The Attorney General's Motion to Compel is a demand to be reviewed in a summary proceeding without discovery. ....................................................................................4
B.  The Motion to Compel should be granted because the United States provided notice of this action and a written demand stating its basis and purpose......................................................9
C.  New Jersey's SVRL is a record subject to production under Title III of the CRA...............14
D.  To the extent that state law conflicts with the requirements of the CRA, it is preempted.....19

IV.  CONCLUSION ...........................................................................................................20

**I HEREBY CERTIFY THAT ON APRIL 3, 2026, A TRUE AND CORRECT COPY OF THE FOREGOING DOCUMENT WAS SERVED VIA THE COURT'S ECF SYSTEM TO ALL COUNSEL OF RECORD. ..........................................................................................21**

## TABLE OF CONTENTS

I.  BACKGROUND ............................................................................................................2

II.  LEGAL STANDARD ....................................................................................................3

III.  ARGUMENT.................................................................................................................3

A.  The Attorney General's Motion to Compel is a demand to be reviewed in a summary proceeding without discovery. ....................................................................................4
B.  The Motion to Compel should be granted because the United States provided notice of this action and a written demand stating its basis and purpose......................................................9
C.  New Jersey's SVRL is a record subject to production under Title III of the CRA...............14
D.  To the extent that state law conflicts with the requirements of the CRA, it is preempted.....19

IV.  CONCLUSION ...........................................................................................................20

**TABLE OF AUTHORITIES**

Cases

*Ala. ex rel. Gallion v. Rogers*,
 187 F. Supp. 848 (M.D. Ala. 1960) ................................................................ passim
*Arizona v. Inter Tribal Council of Ariz., Inc.*,
 570 U.S. 1 (2013) ................................................................................ 19, 20
*Becker v. United States*,
 451 U.S. 1306 (1981) ............................................................................ 8, 9
*Becker v. United States*,
 452 U.S. 912 (1981) ............................................................................... 8
*Becker v. United States*,
 452 U.S. 935 (1981) ............................................................................... 8
*Bonner v. City of Prichard*,
 661 F.2d 1206 (11th Cir. 1981) ................................................................. 1
*Bostock v. Clayton Cnty., Ga.*,
 590 U.S. 644 (2020) .............................................................................. 12
*Buckman Co. v. Pls.' Legal Comm.*,
 531 U.S. 341 (2001) .............................................................................. 20
Coleman v. Kennedy,
 313 F.2d 867 (5th Cir. 1963) ................................................................. 4, 10
*Dinkens v. Att'y Gen.*,
 285 F.2d 430 (5th Cir. 1961) .................................................................... 4
*Donaldson v. United States*,
 400 U.S. 517 (1971) .......................................................................... 6, 7, 8
*Ebert v. Poston*,
 266 U.S. 548 (1925) .............................................................................. 11
*Foster v. Love*,
 522 U.S. 67 (1997) ............................................................................... 19
*In re Coleman*,
 208 F. Supp. 199 (S.D. Miss. 1962) ..................................................... 1, 10, 12
*In re Gordon*,
 218 F. Supp. 826 (S.D. Miss. 1963) ............................................................ 6
*Judicial Watch, Inc. v. Lamone*,
 399 F. Supp. 3d 425 (D. Md. 2019) ........................................................... 15
*Kennedy v. Lynd*,
 306 F.2d 222 (5th Cir. 1962) .............................................................. passim
*McIntyre v. Morgan*,
 624 F. Supp. 658 (S.D. Ind. 1985) ............................................................ 15
*United States v. North Carolina*
 5:25-cv-00283 (E.D. N.C. Sept. 8, 2025) ....................................................... 18
*Project Vote v. Kemp*,
 208 F.Supp.3d 1320 (N.D. Ga. 2016) ...................................................... …15
*Project Vote/Voting for Am., Inc. v. Long*,
 682 F.3d 331 (4th Cir. 2012) .................................................................. 15

*United States v. Ass'n of Citizens Councils of La.*,
  187 F. Supp. 846 (W.D. La. 1960) ................................................................... 4, 5
*United States v. Benson*,
  No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, (W.D. Mich. Feb. 10, 2026) ............... passim
*United States v. Great N. Ry. Co.*,
  343 U.S. 562 (1952) ...................................................................................... 12
*United States v. Maine*,
  Civ. A. No. 06-0086, 2007 WL 1059565 (D. Me. Apr. 4, 2007) ............................. 15
*United States v. Markwood,*
  48 F.3d 969 (6th Cir. 1995) ............................................................................ 6
*United States v. Mississippi*,
  380 U.S. 128 (1965) ..................................................................................... 15
*United States v. Mo. Pac. R.R. Co.*,
  278 U.S. 269 (1929) ..................................................................................... 11
*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950) .............................................................................. 5, 8, 10
*United States v. Oregon*,
  No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ........................ 7, 8
*United States v. Powell*,
  379 U.S. 48 (1964) ................................................................................. passim
*United States v. Weber*,
  Case No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ...... 6, 8

Statutes

10 U.S.C. § 130c(d)(2)(C) ............................................................................. 17
13 U.S.C. § 214 .......................................................................................... 17
26 U.S.C. § 7605(b) ...................................................................................... 7
30 U.S.C. § 1732(b) ..................................................................................... 17
44 U.S.C. § 3572(f) ...................................................................................... 17
52 U.S.C. § 20501 ....................................................................................... 10
52 U.S.C. § 20701 .................................................................................. passim
52 U.S.C. § 20703 .................................................................................. passim
52 U.S.C. § 20705 ......................................................................... 2, 9, 11, 20
52 U.S.C. § 21083(a)(4) ........................................................................... 19, 20
52 U.S.C. § 21111 ....................................................................................... 20
52 U.S.C. §§ 20701-20706 .............................................................................. 7
8 U.S.C. § 1445(f) ....................................................................................... 17
8 U.S.C. § 1449 .......................................................................................... 17

This is a straightforward case. It is an action under Title III of the Civil Rights Act of 1960 ("CRA") for federal election records. The CRA empowers the United States to immediately obtain those records, including New Jersey's statewide Voter Registration List ("SVRL"). It broadly authorizes the Attorney General to compel production of "all records and papers" that "come into … possession" of officers of election relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701. Title III of the CRA provides a unique investigative tool to the Attorney General to determine whether a federal lawsuit "should be instituted" and through a summary proceeding "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962); *see also In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") ("Congress has said that such records shall be made available to the Attorney General upon [her] demand therefor. [She] is the chief law enforcement officer of the nation. [She] desires to ascertain [herself] whether or not any violation of Federal law has occurred . . .").[1] In crafting the CRA's mandate in this way, Congress respected the federal structure. It recognized that state governments are responsible for conducting elections for federal office, balanced against the Attorney General's need to confirm that they are doing so in compliance with federal law. Its approach is one of "trust but verify," and ensures that federal elections are conducted transparently.

The United States made a written demand for federal election records to an officer of election for New Jersey, identifying the basis for the demand – Title III of the CRA – and the purpose for the demand – to assess New Jersey's compliance with the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA"). *See* Compl. ¶¶ 25-28. That

---

[1] The Fifth and Eleventh Circuits are the only federal circuits in which there is controlling authority addressing the CRA. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1210 (11th Cir. 1981) (en banc) (decisions by the Fifth Circuit issued before September 30, 1981, are binding in the Eleventh).

demand was denied. *See* Compl. ¶ 29. Therefore, pursuant to the CRA, the United States has filed this action requesting through a summary proceeding that the Court issue an order compelling production of the requested federal election records, including the SVRL. *See Lynd*, 306 F.2d at 225-26; 52 U.S.C. §§ 20703, 20705.

## I.    BACKGROUND

The Attorney General of the United States brought this case as part of her investigation of New Jersey's compliance with provisions of federal election law. On July 15, 2025, the United States sent correspondence to then Lieutenant Governor and Secretary of State Tahesha Way ("Lt. Gov.") and Division of Elections Director Donna Barber, requesting cooperation by providing federal election records necessary to its assessment. ("July 15 Letter").[2] Neff Decl. ¶ 7 & Ex. 1. In particular, the letter noted that data from the most recent Election Assistance Commission's Election Administration and Voting Survey ("EAVS") showed New Jersey had a very high registration rate with 94.8 percent of citizen voting age persons being registered to vote.[3] This was coupled with no reported data on duplicates and with New Jersey having one of the lowest rates in the nation for sending confirmation notices to active voters.[4] *Id*. On July 29, 2025, the state provided a redacted version of its SVRL. On August 14, 2025, the Attorney General sent another letter to the Lt. Gov. renewing the July 15 request with a demand for the SVRL, pursuant to the CRA, within seven days of the date of the letter ("August 14 Letter"). Neff Decl. ¶ 8 & Ex. 2. In

---

[2] Lieutenant Governor and Secretary of State Way's term ended on January 20, 2026 when the Defendant assumed office.

[3] *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report (June 2025), *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited March 26, 2026) ("EAVS Report").

[4] The EAVS data reported by New Jersey is inconsistent with that of a jurisdiction that is engaging in reasonable list maintenance practices under HAVA and the NVRA.

that correspondence, the United States cited the CRA as the basis for the request and stated that the purpose was to assess New Jersey's compliance with HAVA and the NVRA. Those efforts were met by Defendant's refusal to produce the requested records as mandated by Title III of the CRA. *Id.* at ¶ 11, 13 & Ex. 3.  Upon assuming office, the Defendant informed the Attorney General his position was the same as his predecessor's. Neff Del. ¶ 13.   This action followed. *See* Compl., Dkt. 1.

## II.    LEGAL STANDARD

The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703. As discussed below in detail, the record before the Court demonstrates that the United States has satisfied each of these requirements.

## III.    ARGUMENT

The CRA requires that the Court review the Attorney General's Motion to Compel federal election records on an expedited basis using a summary proceeding without discovery. Through its Motion, the United States has established that it provided Defendants with notice of this action and a written statement of basis and purpose, which they rejected. As a result, Defendants cannot establish that there remains any "matter[] open for determination" under the Court's "severely limited" inquiry. *Lynd*, 306 F.2d at 226. To the extent that state laws purport to limit production

of the federal election records to the Attorney General, they are preempted by the CRA. Therefore, the United States respectfully submits that its Motion to Compel should be granted and an order compelling production of New Jersey's SVRL and other responsive federal election records entered.

A.    The Attorney General's Motion to Compel is a demand to be reviewed in a summary proceeding without discovery.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative." *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen.*, 285 F.2d 430 (5th Cir. 1961). It does not require known violations of federal law, but is a tool to evaluate "possible violations…" *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). In other words, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA. *Lynd*, 306 F.2d at 230. That approach makes sense. The United States cannot be expected to effectively enforce federal election laws such as HAVA or the NVRA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a

special statutory proceeding in which the courts play a limited, albeit vital, role." [5] *Id.* It functions much like an administrative summons. Therefore, "it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing CRA applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations").[6] "There is no place for any other procedural device or maneuver" in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also id.* at 225 (explaining that a contrary construction reflects "a basic misconception … concerning a Title III proceeding.").

Since a CRA summary action functions like an administrative summons, "the matters open for determination … are, of course, severely limited." *Lynd*, 306 F.2d at 226. The only issues to be assessed if there "is a genuine dispute" are "whether the written demand has been made … or whether the custodians against whom orders are sought have been given reasonable notice of the pendency of the proceeding." *Id.* That expedited and limited procedure was not altered by the passing reference in a footnote in *United States v. Powell* that the Federal Rules of Civil Procedure apply where a statute "contains no provision specifying the procedure…" 379 U.S. 48, 58 n.18 (1964). Rather, as the Supreme Court subsequently clarified, "the post-*Powell* cases, too, are

---

[5] The Supreme Court has recognized that statutes that vest investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). "It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt,* 338 U.S. at 643.

[6] The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *See Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added).

5

clearly and consistently to the effect that the footnote in *Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Donaldson v. United States*, 400 U.S. 517, 529 (1971), *superseded by statute* Pub. L No. 94–455 as stated in *Polselli v. Internal Revenue Service*, 598 U.S. 432 (2023).

In *United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 25, 2026), the court followed that approach and construed "a request for records under the CRA as a form of administrative subpoena." *Id.* at *7 (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)). Therefore, the court explained, "'[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…'" *Benson*, 2026 WL 362789, at *7 (quoting *United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995)). The court further noted "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Benson*, 2026 WL 362789, at *7 (quoting *Markwood*, 48 F.3d at 976). Consistent with the Supreme Court's clarification of footnote 18 in *Powell*, the *Benson* court recognized the propriety of "'a summary enforcement proceeding'" under Title III of the CRA. 2026 WL 362789, at *7 (quoting *Donaldson*, 400 U.S. at 529).

On the other hand, two District Courts in the Ninth Circuit recently misconstrued the nature of the CRA's summary proceeding. In *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026), *appeal docketed* No. 26-1232 (9th Cir. Feb. 25, 2026), the court misread the Supreme Court's decision in *Powell* to reject the Fifth Circuit authority that the Federal Rules of Civil Procedure do not apply to the CRA's special statutory proceeding. *See Weber*, 2026 WL 118807, at *8 & n.15. However, *Powell* merely observed that the Rules could be applied where no process was specified. *See* 379 U.S. at 58 n.18. As discussed

6

above, it did not "impair a summary enforcement proceeding," *Donaldson*, 400 U.S. at 529, such as the one used by the CRA.

A separate decision in *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Feb. 25, 2026), also applied a much broader construction of *Powell* than the Supreme Court intended. *Oregon* found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. 2026 WL 318402, at *8 (quoting *Powell*, 379 U.S. at 58 & n.18). Although the quoted language from *Powell* is correct, *see id.*, the *Oregon* court omitted any explanation that the quoted language referred to a process expressly provided in the IRC that does not exist in the CRA. The Supreme Court explained that judicial inquiry was appropriate when asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58 . That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for officers of election to object to Title III proceedings being initiated against them. *See id.*

Moreover, even with language in the IRC limiting records to "necessary" investigations, the Supreme Court noted in *Powell* that strong deference is given to the Government to investigate, and "'does not depend on a case or controversy for power to get evidence but can investigate

7

merely on suspicion that the law is being violated, *or even because it wants assurance that it is not.*'" 379 U.S. at 57 (quoting *Morton Salt*, 338 U.S. at 642-43) (emphasis added). *Powell* is completely consistent with *Lynd*. It does not support *Oregon*'s restrictions on records demands under the CRA to the statutory limitations that Congress included in the IRC.[7]

The *Weber* court also cited *Becker v. United States*, 451 U.S. 1306 (1981) to say that "the federal government's demands for documents are governed by the Federal Rules of Civil Procedure." *See Weber*, 2026 WL 118807, at *8.[8] *Becker* involved an administrative summons under the Internal Revenue Code ("IRC"). In that case, then-Justice Rehnquist recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "'not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and adversary hearing, if requested, is made available.'" *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (quoting *Donaldson*, 400 U.S. at 528-29). Justice Rehnquist distinguished between agency efforts "to take what is potentially income-producing property" from efforts to "merely require [the respondent] to produce evidence." *Id.* at 1308. Although "the need for summary enforcement of IRS summonses is clear and justifies dispensing with Federal Rules" in the latter context (gathering evidence), "the need to proceed summarily is

---

[7] The *Oregon* decision similarly misread *Lynd* by reasoning "the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation" instead of applying "directly to the court for the records." *Oregon*, 2026 WL 318402, at *8 n.1. *Lynd* does not say filing a pleading waives the expedited process under the CRA. Instead, as discussed above, the Fifth Circuit explained only that any pleadings that are filed do not need to "satisfy usual notions under the Federal Rules of Civil Procedure." 306 F.2d at 225-26.

[8] *Becker* was an order issued by the Circuit Justice on an application for a temporary stay. *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court). The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority.

less clear, as is the justification for dispensing with otherwise applicable provisions of the Federal Rules" in the former context (seizing income-producing property). *Id.*; *see id.* at 1310-11. When it comes to requests for evidence, "[o]bviously the taxpayer cannot simply write his own ticket as to the manner in which relevant nonprivileged evidence shall be made available to the IRS." *Id.* at 1311. In other words, far from supporting *Weber's* conclusion that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it. Therefore, summary proceedings apply to this Title III action.

**B.    The Motion to Compel should be granted because the United States provided notice of this action and a written demand stating its basis and purpose.**

The CRA establishes a well-defined means by which the Attorney General may expeditiously obtain federal election records. It imposes a "sweeping" obligation requiring officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 of the Act provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 of the Act authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703. After that written demand has been made, and the officer of election has rejected it, the Attorney General may seek an order from the federal court "to compel the production of such record or paper." 52 U.S.C. § 20705. Each of those requirements is met here.

On August 14, 2025, the Department of Justice sent the Lt. Gov. a written demand for a copy of New Jersey's SVRL. *See* Neff Decl. ¶ 8-10 & Ex. 2. As stated in that correspondence, the

9

basis for the demand was Title III of the CRA and the purpose was "to ascertain compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 2. Although it was unnecessary to state a factual basis for the demand, *see Lynd*, 306 F.2d at 226, the Department of Justice nevertheless provided one. As it explained in its written demand, New Jersey's SVRL was needed to provide the means "to assess [New Jersey's] compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq.*" Neff Decl. ¶10, Ex. 2. On January 9, 2026, the Lt. Gov. rejected the Attorney General's written demand. *Id.* at ¶ 13 & Ex. 2.

Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642-43 (same construction of administrative subpoena by the FTC). It does not require any factual basis *proving* a violation of federal law, which would undermine the "purely investigative" nature of Section 303. *Gallion*, 187 F. Supp. at 854; *see also Benson*, 2026 WL 362789 at *8 ("The CRA aids the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights. Thus, the DOJ may use the CRA to investigate possible violations of the NVRA.") (citations omitted). As a result, the United States satisfied the "basis and purpose" requirement by stating that the basis was the CRA and the purpose of the

10

request was "to ascertain New Jersey's compliance with the list maintenance requirements of the NVRA and HAVA." as required by federal law. Neff Decl. ¶10, Ex. 2.

The United States then proceeded to file this action in "the district in which [the] demand was made pursuant to [Section 303], or in which a record or paper so demanded is located…" 52 U.S.C. § 20705. In its Complaint (Dkt. 1), the United States provided "a simple statement by the Attorney General that after a … written demand for inspection of records … covered in [Section 301], the person against whom an order for production is sought … has failed or refused to make" the SVRL "'available for inspection, reproduction, and copying.'" *Lynd*, 306 F.2d at 226 (quoting 52 U.S.C. § 20703). The United States provided notice to the Lt. Gov. through service of the Complaint. (Dkt.1). As a result, the United States has established the CRA's requirements for compelling production of the SVRL and other responsive federal election records.

"[T]he prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 855 (emphasis added). And when the language is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting the CRA in a manner that better suits non-compliant officers of election. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554 (1925)(emphasis added). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278

U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). That does not change merely because the CRA has long been in effect. *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…").

Officers of election and other parties likewise are prohibited from using any "procedural device or maneuver" to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…" *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228. Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226; *cf. Powell*, 379 U.S. at 56 (explaining that there is no judicial oversight "to oversee the [IRS] Commissioner's determinations to investigate").

The *Benson* court acknowledged the "severely limited" inquiry that was to be applied to CRA motions to compel. *Lynd*, 306 F.2d at 226. It rebuffed the state's efforts to dispute the accuracy of the Attorney General's allegations of its list maintenance practices. *Benson*, 2026 WL

12

362789, at *8. The court reasoned, "the CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose." *Id.* (citing *Lynd*, 306 F.2d at 226).

*Benson* found that the United States had adequately explained why its records request was "reasonably related to [the state's] compliance with the NVRA." 2026 WL 362789, at *9. That explanation was the same one provided by the United States in this case:

> The DOJ asserts that it intends to use [the state's] voter registration list to determine whether the State is properly removing ineligible voters and duplicate registrations from the rolls. It further contends that the entries [the state] seeks to omit from the [voter] list [that was requested under Section 303 of the CRA] – such as SSNs and driver's license numbers – are "necessary to identify duplicate registration records, registrants who have moved, and registrants who have died or otherwise are no longer eligible to vote in federal elections."

*Id.* (citation omitted). The *Benson* court therefore applied the deference the Supreme Court has instructed is afforded to the Government in its exercise of investigatory powers. *See*, *e.g.*, *Powell*, 379 U.S. at 57. It concluded, "[g]iven the Court's limited role in reviewing the purpose behind an administrative subpoena, the DOJ's representations sufficiently establish that [the state's] voter registration list is relevant to investigating the State's compliance with the NVRA." *Benson*, 2026 WL 362789, at *9.

Even if more of an explanation were required, the July 15 Letter provided context for the August 14 Letter, *Benson* at n. 3, explaining that data from the Election Assistance Commission showed the State of New Jersey as having a very high registration rate of 94.8 percent of the citizen voting age population, had not tracked information about duplicate registrations, and had one of the lowest rates in the nation for sending confirmation notices to active voters. *See* Neff Decl., Ex.1.

13

C.    New Jersey's SVRL is a record subject to production under Title III of the CRA.

While the *Benson* decision largely comports with the United States' position, it made a significant legal error in its construction of the federal election records covered by the CRA. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth. "Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved … if they relate to acts requisite to voting in such election." *Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). "[T]he papers and records" covered by Section 301 "have been specifically identified by Congress." *Lynd*, 306 F.2d at 226. As *Lynd* succinctly explained, "All means all." 306 F.2d at 230.

The *Benson* court read Section 301 much more narrowly and denied production of a SVRL to the Attorney General because the court determined that the CRA applies "only to documents that people *submit* to the State as part of the voter registration process, not a document like the voter registration list that is *created* by state officials." 2026 WL 362789, at *9 (emphasis added). The United States respectfully disagrees; no other federal court has adopted such a limitation. Moreover, today many – and likely even most – voter registration applications are only in a compiled electronic form in a SVRL.[9] Such a reading would effectively carve out vast numbers of

---

[9] According to data reported to the U.S. Election Assistance Commission for the State, it is doubtful that millions of federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions are accomplished online or

federal election records, including voter rolls, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226. Indeed, courts specifically have recognized that Section 301 reaches "records of voting registration," *United States v. Mississippi*, 380 U.S. 128, 134 (1965), including voter registration lists, *see, e.g.*, *United States v. Maine*, Civ. A. No. 06-0086, 2007 WL 1059565, at *5 (D. Me. Apr. 4, 2007); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985). Even the *Benson* court expressed some discomfort at its conclusion, acknowledging that it was possible that "the distinction between voter registration applications and voter registration lists is overly pedantic…" 2026 WL 362789, at *10. Nevertheless, *Benson* attributed any failing in that respect to "a pedantic distinction *made by Congress*…" *Id.* (emphasis in original).

Federal courts have rejected similar attempts to limit the scope of voting records under other statutes. In *Judicial Watch, Inc. v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425, 434 (D. Md. 2019). The court disagreed. It explained that Maryland misunderstood the NVRA's requirements and the plaintiff was entitled to the registered voter list because "a voter list is simply a partial compilation of voter registrations" encompassed by the Act. *Id*. at 442. The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id*. at 440 (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d

---

through other means not completed by a paper document. EAVS Report at 162-65, *supra* n. 2.

331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records).

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, 2026 WL 362789, at *10. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 20701, 20703. According to the *Benson* court, "'*come* into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. 2026 WL 362789, at *9 (first emphasis added). That, however, is not what the plain terms of the statute dictate: an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). The Lt. Gov. acquired the relevant records in the course of carrying out his duties as an officer of elections responsible for administering elections in New Jersey.

The *Benson* court's focus on the word "come" cannot create a carve-out for self-generated documents. Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. *See Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ("to enter upon or into possession of: acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or trigger duties to act based

16

on acquiring information or property *at a particular time*.[10] Following this focus on the *when* and *how* an individual gains possession of a record or paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision – and then only "for a period of twenty-two months from the date" of that same election.

Contrary to the *Benson* court's construction, then, "distinction[s] between possessing something and having something come into one's possession," 2026 WL 362789, at *9, are temporal distinctions – not distinctions between obtaining records from an outside source and through self-generation – as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

In any event, even if the *Benson* court's distinction between self-generated records and papers and those acquired from another source had merit, it would be irrelevant in all but the most

---

[10] *See, e.g.*, 44 U.S.C. § 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. § 214 (similar); 30 U.S.C. § 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. § 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received").

17

marginal cases. Sections 20701 and 20703 focus on individual "officer[s] of election" and "person[s] having custody, possession, or control of such record[s] or paper[s]." So even if someone in the Secretary of State's office generated the requested record and, under the *Benson* court's view, therefore did not "come into … possession" thereof himself or herself, any *other* "officer of election" within the same agency that acquires the record has indeed "come into … possession" of the record under that court's view and was obligated to "retain and preserve" it. 52 U.S.C. § 20701. Defendant, now "having custody, possession, or control of such record or paper" must "ma[k]e [it] available for inspection, reproduction, and copying." *Id.* § 20703.

Finally, this construction would create absurd results. Title III was enacted to, *inter alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This is not to say that this is Title III's sole function. It is not.) The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[11] To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic SVRL, so as to assure herself that the

---

[11] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Dkt. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at Dkt. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding (MOU). *See* U.S. Dep't of Just., MOU between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited March 26, 2026) *See also United States v. North Carolina* 5:25-cv-00283 (E.D. N.C. Sept. 8, 2025). The four documents are provided herein as Neff Decl., Exs. 4-7.

applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See* Neff Decl. ¶ 5. Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible for her to carry out the duties assigned to her by Congress.

> **D.    To the extent that state law conflicts with the requirements of the CRA, it is preempted.**

Defendants cannot deny the Attorney General access to their SVRL or other federal elections records because of conflicting state law. While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Id.*; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the two statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish

"[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA).

The United States believes that state law can be read in harmony with federal law. If it cannot be, and there is a direct conflict between state and federal laws, then state law must yield. *See* U.S. Const. art. VI, cl. 2; *see also Inter Tribal Council*, 570 U.S. at 15 ("States' role in regulating congressional elections – while weighty and worthy of respect – has always existed subject to the express qualification that it 'terminates according to federal law.'") (quoting *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001)). In any event, the United States has complied and will continue to comply fully with all federal privacy laws applicable to the SVRL and other federal election records that are produced.

## IV.    CONCLUSION

The Attorney General made a written demand for federal election records stating the basis and purpose for the demand to the Lt. Gov, who is an "officer[] of election" subject to the CRA, and that demand was rejected. The United States has provided "a simple statement" to the Court establishing these facts. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703. That is all that the CRA requires the Attorney General to establish to obtain the federal elections records she seeks

here. Accordingly, for the foregoing reasons, the United States respectfully submits that its Motion

to Compel production of federal election records under Section 305 of the CRA should be granted.

DATED: April 3, 2026                                Respectfully submitted,

                                                    HARMEET K. DHILLON
                                                    Assistant Attorney General
                                                    Civil Rights Division

                                                    ROBERT J. KEENAN
                                                    Acting Deputy Assistant Attorney General
                                                    Civil Rights Division

                                                    ERIC V. NEFF
                                                    Acting Chief, Voting Section
                                                    Civil Rights Division

                                                    */s/ Christopher J. Gardner*
                                                    Christopher J. Gardner
                                                    Jonathon Hauenschild
                                                    Trial Attorneys, Voting Section
                                                    Civil Rights Division
                                                    4 Constitution Square
                                                    150 M Street NE, Room 8.141
                                                    Washington, D.C. 20002
                                                    Christopher.Gardner@usdoj.gov
                                                    Jonathon.Hauenschild@usdoj.gov
                                                    202-812-2631

                                                    Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2026, a true and correct copy of the foregoing document

was served via the Court's ECF system to all counsel of record.

                                                    */s/ Christopher J. Gardner*
                                                    CHRISTOPHER J. GARDNER