**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DR. DALE G. CALDWELL, in his official capacity as Lieutenant General and Secretary of State of New Jersey, *et al.*,<br><br>Defendants. | No. 26-cv-02025 (ZNQ) (JTQ)<br><br>*Electronically Filed*<br><br>Motion Return Date:<br>July 6, 2026 |

**BRIEF IN SUPPORT OF DEFENDANT DALE G. CALDWELL'S
MOTION TO DISMISS
AND OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL**

Jeremy M. Feigenbaum
*Solicitor General*

Stephen Ehrlich
*Deputy Solicitor General*

Liza B. Fleming
*Deputy Attorney General*

Robert A. Wiygul
Jason A. Levine
Hangley Aronchick Segal
Pudlin & Schiller

*Attorneys for Defendant Dale G. Caldwell*

JENNIFER DAVENPORT
ATTORNEY GENERAL OF
NEW JERSEY

Attorney for Defendant Dale G. Caldwell
R.J. Hughes Justice Complex,
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625
(862) 350-5800

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 1

BACKGROUND .......................................................................................... 3

    A.    Legal Background ........................................................................ 3

        1.    The National Voter Registration Act ................................. 4

        2.    The Help America Vote Act ............................................... 5

        3.    The Civil Rights Act of 1960 ............................................ 6

    B.    Factual Background ..................................................................... 7

        1.    DOJ's Demand For New Jersey's VRL ............................. 7

        2.    DOJ's Other Demands And Lawsuits ............................. 12

LEGAL STANDARD ................................................................................ 13

ARGUMENT ............................................................................................. 14

I.    DOJ Seeks Records Outside The Scope Of The CRA ......................... 15

    A.    The CRA Extends Only To Records That "Come Into" Officials' Possession, Not Records They Create. ........................ 15

    B.    The CRA Covers Only Records Related To Prior Federal Elections ..................................................................................... 18

    C.    The Records Subject To The CRA Are Ones That States Cannot Alter ............................................................................. 18

    D.    DOJ's Contrary Arguments Lack Merit .................................... 19

II.    DOJ's Demand Fails To Satisfy The CRA's "Basis" And "Purpose" Requirements. ................................................................... 24

    A.    DOJ Provided No Basis For Its Demand. ................................. 26

    B.    DOJ Provided No Proper Purpose For Its Demand. ................. 30

C.      DOJ Cannot Conclusively Establish, For Its Motion To Compel, That It Provided Its Accurate Purpose.................... 33

III.    The CRA Does Not Entitle DOJ To Driver License And Social Security Numbers Of Millions Of Voters. ................................ 38

IV.     DOJ's Demand Violates Multiple Federal Privacy Laws..................... 44

A.      DOJ's Demand Violates The Privacy Act................................ 44

B.      DOJ's Demand Violates The E-Government Act. .................... 47

C.      DOJ's Demand Violates The Driver's Privacy Protection Act. ................................................................................ 47

V.      The CRA Does Not Require Electronic Disclosure. ........................... 48

VI.     DOJ's Motion To Compel Should Be Denied. ................................... 49

CONCLUSION ................................................................................ 55

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Civil Rights Union* (*ACRU*) *v. Philadelphia City Commissioners*,
872 F.3d 175 (3d Cir. 2017)..........................................................4, 5, 6, 40

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013)..........................................................................3, 38

*In re Asbestos Products Liability Litigation (No. VI)*,
822 F.3d 125 (3d Cir. 2016)............................................................... 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................ 13

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019).....................................................6, 40, 44

*CFPB v. Accrediting Counsel for Independent Colleges and Secondary Schools*,
854 F.3d 683 (D.C. Cir. 2017).............................................................. 25

*Chao v. Community Trust Co.*,
474 F.3d 75 (3d Cir. 2007) .................................................................. 54

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962),
*aff'd sub nom. Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) ...........................................................25, 31

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024) .......................................................................... 25

*Department of Commerce v. New York*,
588 U.S. 752 (2019) .......................................................................... 34

*Duncan v. Walker*,
533 U.S. 167 (2001) .......................................................................... 27

*Epic Systems Corporation v. Lewis*,
584 U.S. 497 (2018) .......................................................................... 23

*EPIC v. Presidential Advisory Commission on Election Integrity*,
266 F. Supp. 3d 297 (D.D.C. 2017) ......................................................... 47

*Farina v. Nokia*,
625 F.3d 97 (3d Cir. 2010) ...................................................................... 38

*FDIC v. Wentz*,
55 F.3d 905 (3d Cir. 1995) .................................................................53, 54

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960),
*aff'd sub nom. Dinkens v. Attorney General*,
285 F.2d 430 (5th Cir. 1961) ......................................................... 21, 31, 52

*In re Gordon*,
218 F. Supp. 826 (S.D. Miss. 1963) ......................................................... 25

*Greater Birmingham Ministries, Inc. v. Secretary of State*,
105 F.4th 1324 (11th Cir. 2024).............................................................. 49

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
458 F.3d 244 (3d Cir. 2006).................................................................12, 36

*Jones v. Hendrix*,
599 U.S. 465 (2023) ............................................................................... 23

*Judicial Watch, Inc. v. Lamone*,
399 F. Supp. 3d 425 (D. Md. 2019) ......................................................... 22

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962) .................................................25, 28, 31, 32

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ..........................................................*passim*

*King v. Burwell*,
576 U.S. 473 (2015) ............................................................................... 23

*League of United Latin American Citizens v. Executive Office of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ....................................................... 3, 4

*League of United Latin American Citizens v. Executive Office of the President*,
808 F. Supp. 3d 29 (D.D.C. 2025)............................................................ 35

*Mayer v. Belichick*,
    605 F.3d 223 (3d Cir. 2010)........................................................................ 13

*McIntyre v. Morgan*,
    624 F. Supp. 658 (S.D. Ind. 1985) ............................................................ 21

*Nachman Corp. v. Pension Benefit Guaranty Corp.*,
    446 U.S. 359 (1980) ................................................................................... 34

*Niz-Chavez v. Garland*,
    593 U.S. 155 (2021) ................................................................................... 25

*Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.*,
    998 F.2d 1192 (3d Cir. 1993)..................................................................... 36

*Project Vote v. Kemp*,
    208 F. Supp. 3d 1320 (N.D. Ga. 2016) ..................................................... 22

*Project Vote/Voting for America, Inc. v. Long*,
    752 F. Supp. 2d 697 (E.D. Va. 2010) ........................................................ 42

*Public Interest Legal Foundation, Inc. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024)....................................................................41, 42

*Public Interest Legal Foundation v. Nago*,
    --- F.4th ----, 2026 WL 1144703 (9th Cir. Apr. 28, 2026)........................... 22

*Public Interest Legal Foundation v. Benson*,
    136 F.4th 613 (6th Cir. 2025),
    *cert. denied*, No. 25-437, 2026 WL 568298 (U.S. Mar. 2, 2026) ............*passim*

*Rhode Island State Council of Churches v. Rollins*,
    808 F. Supp. 3d 370 (D.R.I. 2025).............................................................. 34

*Sistrunk v. Rozum*,
    674 F.3d 181 (3d Cir. 2012)....................................................................... 24

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ................................................................................... 31

*Tavarez v. Klingensmith*,
    372 F.3d 188 (3d Cir. 2004)....................................................................... 17

v

*True the Vote v. Hosemann*,
   43 F. Supp. 3d 693 (S.D. Miss. 2014) ...................................................... 42

*United States v. Benson*,
   No. 25-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026),
   *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026) ...........................*passim*

*United States v. Galvin*,
   No. 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026)...................*passim*

*United States v. Gradwell*,
   243 U.S. 476 (1917) ................................................................................. 3

*United States v. Maine*,
   No. 06-0086, 2007 WL 1059565 (D. Me. Apr. 4, 2007).......................... 21

*United States v. Oregon*,
   No. 25-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026),
   *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026) ...........................*passim*

*United States v. Powell*,
   379 U.S. 48 (1964) ............................................................... 51, 52, 53

*United States v. Weber*,
   No. 25-9149, 816 F. Supp. 3d 1168 (C.D. Cal. Jan. 15, 2026),
   *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026) ...........................*passim*

*United States v. Westinghouse Electric Corp.*,
   638 F.2d 570 (3d Cir. 1980)................................................................. 54

*Voter Reference Foundation v. Torrez*,
   160 F.4th 1068 (10th Cir. 2025)............................................................ 41

*Washington v. Trump*,
   814 F. Supp. 3d 1173 (W.D. Wash. 2026) .............................................. 4

*Wilson v. USI Insurance Service LLC*,
   57 F.4th 131 (3d Cir. 2023) ................................................................. 13

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ............................................................................. 4

## Constitutional Provisions

U.S. Const. art. I, § 4, cl. 1.................................................................................. 3

## Statutes

5 U.S.C. § 552a ......................................................................................*passim*

18 U.S.C. § 2721 .................................................................................47, 48

18 U.S.C. § 2725 ...................................................................................... 47

26 U.S.C. § 7604 ...................................................................................... 51

42 U.S.C. § 1971 .................................................................................30, 31

52 U.S.C. § 10101 .................................................................................... 31

52 U.S.C. § 20501 ...................................................................................... 4

52 U.S.C. § 20507 .......................................................................*passim*

52 U.S.C. § 20510 .................................................................................5, 32, 39

52 U.S.C. § 20701 .......................................................................*passim*

52 U.S.C. § 20702 .......................................................................*passim*

52 U.S.C. § 20703 .......................................................................*passim*

52 U.S.C. § 20705 ...................................................................................... 51

52 U.S.C. § 21083 .......................................................................*passim*

52 U.S.C. § 21085 .................................................................................6, 40

52 U.S.C. § 21111 .................................................................................6, 12, 32, 39

E-Government Act, Pub. L. No. 107-347, § 208, 116 Stat. 2899
(2002).................................................................................................. 47

N.J. Stat. Ann. § 39:2-3.2 ....................................................................... 48

N.J. Stat. Ann. § 47:1A-1.1....................................................................... 38

N.J. Stat. Ann. § 47:1A-5.3 ............................................................................... 38

**Regulations**

68 Fed. Reg. 47610-01 ...................................................................................... 45

70 Fed. Reg. 43904-01 ...................................................................................... 46

82 Fed. Reg. 24147-01 ...................................................................................... 46

**Rules**

Fed. R. Civ. P. 1 ................................................................................................ 50

Fed. R. Civ. P. 3 ........................................................................................ 51, 53

Fed. R. Civ. P. 12 ............................................................................................. 13

Fed. R. Civ. P. 81 ............................................................................................. 50

**Other Authorities**

105 Cong. Rec. 1884 (1959) .............................................................................. 6

106 Cong. Rec. 5208 (1960) ............................................................................ 17

Black's Law Dictionary (4th ed. rev. 1968) .................................................... 26

DOJ, *Cases Raising Claims Under the National Voter Registration Act*
   (Mar. 6, 2025), https://perma.cc/4JXM-K64A ....................................... 43

DOJ Press Release (Feb. 26, 2026), https://perma.cc/P5KC-
   5TBB .......................................................................................................... 12

H.R. Rep. No. 86-956 (1959) ....................................................................... 6, 30

Letter from Pam Bondi, U.S. Attorney General, to Tim Walz,
   Governor of Minnesota (Jan. 24, 2026),
   https://perma.cc/V9KL-2Z73 ................................................................... 36

Oklahoma Attorney General, *Drummond enters settlement with DOJ to safeguard voter registration data* (Mar. 24, 2026), https://oklahoma.gov/oag/news/newsroom/2026/march/drummond-enters-settlement-with-doj-to-safeguard-voter-registration-data.html ....................................................................... 12

OMB, Circular No. A-108 (Dec. 2016), https://perma.cc/3NKT-64HA ........................................................................ 46

*Proposed Civil Rights Legislation: Hearing Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary*, 86th Cong., 1st Sess. (1959), https://perma.cc/H64U-GYMG ................... 16, 48

*Report of the United States Commission on Civil Rights* (1959), https://perma.cc/2PDF-GZHB .............................................. 17

Sarah N. Lynch, *Justice Dept. close to finalizing deal to hand over states' voter roll data to Homeland Security, sources say*, CBS News (Mar. 26, 2026), https://perma.cc/U5C7-735C ................................... 36

*Senate Committee on Government Operations & House of Representatives Committee on Government Operations*, 94th Cong., 2d Sess., *Source Book on Privacy* (1976), https://perma.cc/P4BS-6GYU ........................... 45

Webster's New International Dictionary of the English Language (2d ed. unabridged 1954) .................................................... 26

Webster's New World Dictionary of American Language (college ed. 1959) ............................................................................ 29

## INTRODUCTION

In this action, the U.S. Department of Justice seeks to enforce its unprecedented demand for an electronic copy of New Jersey's complete, unredacted voter registration list (VRL). Although New Jersey already provided DOJ with its public voter file, DOJ insists on obtaining an unredacted version of that entire list, containing the highly sensitive personally identifiable information of over 6 million registered New Jersey voters, including their driver license numbers and the last 4 digits of social security numbers. In response to DOJ's demand, New Jersey asked reasonable questions such as why this information was necessary to assess whether the State is complying with its VRL-maintenance requirements and whether DOJ intended to disclose this information to other agencies. DOJ merely responded that it needed this information for accuracy purposes and was unwilling to place any limitations on the agencies to whom the information could be disclosed. Because disclosure of voters' sensitive personally identifiable information implicates significant privacy concerns and is prohibited by New Jersey law, the State refused to provide an unredacted version of its VRL.

DOJ then filed this lawsuit under Title III of the Civil Rights Act of 1960 (CRA), arguing that it is entitled to the full unredacted VRL to assess whether New Jersey is complying with its VRL-maintenance obligations under the National Voter Registration Act of 1993 (NVRA) and Help America Vote Act of 2002 (HAVA). To be clear, DOJ does not allege that New Jersey's list-maintenance practices are deficient. And its demand is not particular to New Jersey—DOJ has filed lawsuits against 30 other jurisdictions around the country seeking

1

their unredacted VRLs containing the sensitive data of millions of Americans. But as every court to decide the issue has held, DOJ lacks authority for its sweeping demand.

The Constitution empowers States to administer elections, subject to congressional regulations. Through the NVRA and HAVA, Congress assigned States—not the Executive Branch of the Federal Government—responsibility for maintaining VRLs. Those statutes require that States make "reasonable effort[s]" to remove certain ineligible voters and in fact mandate procedures to protect against disenfranchisement by improper removal. DOJ has no authority to conduct voter list maintenance. It may only bring actions under the NVRA and HAVA to enforce States' obligations. Tellingly, DOJ did not sue under the NVRA or HAVA.

Instead, the Complaint's sole count invokes the CRA, a statute enacted decades before States were required to maintain statewide VRLs, let alone VRLs containing driver license and social security numbers, and that concerns investigations into racially discriminatory voting practices. But DOJ's Complaint fails to state a CRA claim several times over. *First*, the records DOJ seeks are not covered by the CRA—which applies to records election officers receive from prospective voters and not records, like the VRL, that a State creates. *Second*, DOJ has failed to state a sufficient "basis" and "purpose" for its demand, as the CRA requires. Although DOJ claims the basis of its demand is "the CRA" itself, the statute requires a statement of DOJ's *factual* (not *statutory*) basis for its demand. And assessing a State's compliance with VRL-maintenance requirements

2

is not a proper CRA purpose, which, consistent with the statute's role in detecting voting-related racial discrimination, must relate to a purpose of investigating violations of individuals' voting rights. *Third*, even if VRLs were generally within the scope of the CRA, nothing in the CRA (or the NVRA or HAVA) requires States to disclose voters' sensitive personally identifiable information. *Finally*, DOJ's demand for such private information is foreclosed by multiple federal privacy statutes.

Based on one or more of these fatal deficiencies, six other federal courts have rejected DOJ's motions to compel and dismissed parallel DOJ suits against other States. This Court should do the same.

## BACKGROUND

### A.   Legal Background

The U.S. Constitution vests the States with "authority to provide a complete code for [federal] elections, including … regulations relating to registration." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013) (citation omitted); *see* U.S. Const. art. I, § 4, cl. 1. It similarly entrusts the States with administering federal elections, as local governments are "best acquainted with the situation of the people" they govern. *United States v. Gradwell*, 243 U.S. 476, 484 (1917).

While States have primary responsibility for elections, the Constitution permits Congress to preempt state procedures through "positive and clear statutes." *Id.* at 485. But the Executive Branch has no constitutional authority to regulate elections. *League of United Latin Am. Citizens v. Exec. Off. of the President*,

780 F. Supp. 3d 135, 155, 194 (D.D.C. 2025). Any election-related powers the Executive Branch exercises must come from federal statutes. *Id.* at 170 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)); *accord Washington v. Trump*, 814 F. Supp. 3d 1173, 1213–16 (W.D. Wash. 2026). This case thus begins with a summary of the relevant statutory texts.

### 1.    The National Voter Registration Act

Congress enacted the NVRA in 1993 to "(1) increas[e] the number of registered voters, (2) increas[e] participation in federal elections, (3) maintain[] current and accurate voter rolls, and (4) ensur[e] the integrity of the voting process." *Am. Civil Rights Union* (*ACRU*) *v. Phila. City Comm'rs*, 872 F.3d 175, 178 (3d Cir. 2017) (citing 52 U.S.C. § 20501). "Congress was wary of the devastating impact purging efforts previously had on the electorate." *Id.* Thus, the NVRA "protects registered voters from improper removal" and "very narrowly limit[s] the circumstances that would justify removing voters in the interest of ensuring the accuracy of voting lists." *Id.* at 179, 182. The NVRA requires States only to "conduct a general program that makes a reasonable effort to remove" from their VRLs registrants who have become ineligible by death or change in residence. *Id.* at 182. This "reasonable effort" requirement is modest and affords States significant discretion; a program suffices as long as it reflects a "serious attempt that is rational and sensible." *Public Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied*, No. 25-437, 2026 WL 568298 (U.S. Mar. 2, 2026).

4

To facilitate oversight of States' list-maintenance programs, the NVRA also requires States to retain for at least two years, and make available for public inspection, "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i). Federal courts have consistently held that, when providing records to confirm their NVRA compliance under this provision, States may omit sensitive personally identifiable information, such as driver license and social security numbers. *United States v. Benson*, No. 25-1148, 2026 WL 362789, at *3 (W.D. Mich. Feb. 10, 2026) (collecting cases), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026). The NVRA authorizes the U.S. Attorney General to bring actions enjoining States to comply with their obligations under the statute. 52 U.S.C. § 20510(a).

### 2.    The Help America Vote Act

HAVA "was enacted in 2002 to help improve the equipment used to cast votes, the way registration lists are maintained, and how polling operations are conducted." *ACRU*, 872 F.3d at 180. "HAVA builds on the NVRA by requiring that each [S]tate maintains a computerized database for voter registrations" containing the name, registration information, and a unique identifier for each registered voter. *Id.* at 180–81; *see* 52 U.S.C. § 21083(a)(1)(A). States may not remove voters from the computerized VRL other than "in accordance with the provisions of the [NVRA]." *Id.* § 21083(a)(2)(A). And like the NVRA, HAVA requires only "a reasonable effort" to remove ineligible registrants. *Id.* § 21083(a)(4)(A). In short, "[n]othing in HAVA broadens the scope of the

5

NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019); *see ACRU*, 872 F.3d at 185. Congress expressly left "[t]he specific choices on the methods of complying with [HAVA's] requirements … to the discretion of the State." 52 U.S.C. § 21085. Unlike the NVRA, HAVA does not contain an inspection-of-records provision. *Benson*, 2026 WL 362789, at *3. As with the NVRA, the U.S. Attorney General may bring an action to enforce HAVA's requirements. 52 U.S.C. § 21111.

### 3. The Civil Rights Act of 1960

Decades before the NVRA and HAVA were enacted—that is, decades before federal law required the creation and maintenance of statewide VRLs— Congress enacted Title III of the Civil Rights Act of 1960. Passed in the Jim Crow era, the purpose of the CRA was to protect individuals' voting rights against racial discrimination. Although Congress had already passed the Civil Rights Act of 1957 to protect qualified citizens' right to vote without discrimination based on race, DOJ's lack of "authority to require the production of election records" posed a "serious obstacle" to combatting race discrimination in voting. 105 Cong. Rec. 1884 (1959) (letter from President Eisenhower). So the CRA was enacted so that DOJ could access registration records "essential to determin[ing] whether the denial of the franchise was in furtherance of a pattern of racial discrimination." *Id.*; *accord* H.R. Rep. No. 86-956, at 7 (1959).

To that end, the CRA requires election officials to "retain and preserve, for a period of twenty-two months from the date of any [federal] election …, all

records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Election officials cannot "alter[]" those records after receiving them. *Id.* § 20702. DOJ may "demand in writing" that "such record[s] … be made available for inspection, reproduction, and copying" by DOJ "at the principal office of [the records'] custodian." *Id.* § 20703. Any such demand must "contain a statement of the basis and the purpose therefor." *Id.*

### B.    Factual Background

#### 1.    DOJ's Demand For New Jersey's VRL

DOJ first contacted New Jersey on July 15, 2025, requesting "information regarding the [S]tate's procedures for complying with the statewide voter registration list maintenance provisions of the [NVRA]." Ex. 1 to Declaration of Liza B. Fleming at 1 ("Fleming Decl.").[1] DOJ also requested, among other things, information regarding voters New Jersey had removed from its voter registration list. *Id.* at 2–3. In addition, DOJ asked New Jersey to provide "[t]he current electronic copy of New Jersey's computerized statewide voter registration list," "includ[ing] all fields contained within the list." *Id.* at 1. In support of this request, DOJ's July 15, 2025 letter cited only "Section 20507(i) of the NVRA." *Id.*

---

[1] Exhibits 1–9 to the Fleming Declaration are copies of correspondence that are incorporated by reference in the Complaint. *See* Compl ¶¶ 20–23, 25–29, 31–34. In deciding motions to dismiss, courts may consider "documents integral to or explicitly relied upon in the complaint." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016) (citation and emphasis omitted).

7

On July 29, 2025, the Division of Elections in the New Jersey Department of State provided an electronic copy of New Jersey's then-current voter registration list. *See* Fleming Decl., Ex. 2. That list contained the names, addresses, and other information about individual registered voters that can be disclosed consistent with New Jersey privacy laws and without exposing certain especially sensitive, confidential personally identifiable information such as social security and driver license numbers. The list the Division of Elections provided to DOJ included the following data fields: Voter ID number; Legacy Voter ID number; Political Party Affiliation; Voter Status (active, inactive, or pending); Registration Date; First Name; Last Name; Middle Name; Suffix; Date of Birth; Street Number; Street Name; Apartment Unit; City; Zip Code; County; Municipality; Ward; District; Congressional District; Legislative District; Freeholder District; School District; and Fire District. Fleming Decl. ¶ 5.

On August 14, 2025, DOJ acknowledged receipt of "New Jersey's statewide voter registration list"[2] but demanded an "electronic copy" of the list "contain[ing] *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." *Id.*, Ex. 3, at 1. For the first time, DOJ asserted that it sought these records under HAVA and the CRA. *Id.* at 1–2. Without any elaboration, DOJ stated that "[t]he purpose of [its] request is to ascertain

---

[2] DOJ's Complaint fails to acknowledge that New Jersey ever provided any copy of its VRL. *See* Compl. ¶¶ 25–27.

New Jersey's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 2.

New Jersey responded on August 21, 2025. *Id.*, Ex. 4. The Complaint asserts that this response "den[ied]" DOJ's request. Compl. ¶ 29. Instead, the State explicitly was merely seeking "additional information to enable [it] to sufficiently consider and respond to the request." Fleming Decl., Ex. 4, at 1.

With respect to DOJ's professed desire to assess New Jersey's compliance with its list-maintenance obligations under the NVRA, the State asked why it was necessary to "obtain[] confidential personally identifiable information of individual registered voters … to determine whether New Jersey is conducting a general program that makes a reasonable effort to remove the names of individuals who are deceased or have changed residence." *Id.* at 2. New Jersey also sought clarification regarding "how the DOJ intends to use the requested information to make its compliance determination." *Id.*

With respect to DOJ's invocation of the Civil Rights Act of 1960, the August 21 letter noted that the Act was designed to combat unlawful denial of voting rights on the basis of race. *Id.* New Jersey also observed that, although the CRA requires any demand for records to contain a statement of the basis and the purpose for the request, DOJ had "not provide[d] the *basis* for [its] request" for an unredacted copy of the VRL. *Id.* The State asked DOJ to furnish this information.

Finally, because DOJ was requesting that the State "transfer massive amounts of confidential personally identifying information to the [federal government]," New Jersey asked DOJ to explain how its request complied with the federal Privacy Act, as well as whether DOJ anticipated "disclosing any of the records sought to other federal agencies or other entities or individuals, and if so, under what circumstances and for what purpose or purposes." *Id.* at 2–3.

DOJ did not respond to the August 21 letter, but New Jersey continued to provide information requested by DOJ. By letter dated August 28, 2025, the State provided, among other things, detailed answers to DOJ's July 15 requests for information about New Jersey's list-maintenance procedures. *Id.*, Ex. 5. As the letter set forth at length, "a robust set of State laws and procedures more than satisfy the NVRA's list maintenance requirements." *Id.* at 1. DOJ did not respond to this letter.

On December 1, 2025, DOJ followed up on its demand for a complete, unredacted electronic copy of the VRL. *See id.*, Ex. 6. In response, New Jersey explained that DOJ had still not answered a number of the questions raised in the State's August 21 letter, including identifying (1) why DOJ needed to collect the state driver license and social security numbers of individual registrants; (2) the "basis" of DOJ's request under the CRA; and (3) "whether—or in what circumstances and for what purposes—the requested data may be disclosed to or otherwise accessed by other federal agencies or other third parties." *Id.*, Ex. 7, at 2. New Jersey reiterated its request for this information. *See id.* at 3.

10

Instead of sending a response letter, a DOJ representative called New Jersey on December 19, 2025, and memorialized the call in an email. *Id.*, Ex. 8. The email repeatedly referred to "our [i.e., DOJ's] voter list maintenance obligations under federal law"—without citing any authority for the proposition that DOJ can or must conduct voter list maintenance. *Id.* DOJ asserted that the requested driver license and social security numbers were "necessary for accuracy purposes." *Id.* And DOJ contended that "the basis and purpose as part of a CRA request is a nonreviewable matter that requires nothing more than a basic assertion, which can be applied to both the basis and the purpose. In this case, it is our voter list maintenance obligations under federal law." *Id.* Finally, beyond a generalized representation that DOJ would "comply with federal law," DOJ was unwilling to place any limitations on the agencies and persons to whom the personally identifiable information of millions of registered New Jersey voters could be disclosed, the circumstances under which it could be disclosed, or the purposes for which it could be used. *See id.*

By letter to DOJ dated January 9, 2026, the State explained that, "[a]fter careful consideration," it was "unable to disclose—in addition to the extensive voter-registration information provided earlier—the confidential, personally identifiable information of each registrant." *Id.*, Ex. 9, at 1. Among other bars, "the information sought implicates significant privacy concerns and is protected from disclosure by state law." *Id.* Contrary to DOJ's assertions, the State explained, these protections are not preempted by the NVRA, HAVA, or the CRA.

*Id.* at 1–2. Further, the letter added, the requested disclosure is foreclosed by federal privacy laws. *Id.* at 2 (identifying the Privacy Act and other statutes).

### 2.      DOJ's Other Demands And Lawsuits

DOJ commenced this lawsuit on February 26, 2026, asserting a single count: that it is entitled to New Jersey's unredacted VRL under the CRA. But this action is by no means unique. To date, DOJ has sued 30 States and the District of Columbia demanding complete, unredacted electronic copies of their respective VRLs.[3] All but one of those jurisdictions are contesting DOJ's unprecedented and sweeping demands.[4] Several of DOJ's initial lawsuits, filed in September 2025, asserted three counts, claiming entitlement to the unredacted lists under Section 8(i) of the NVRA, 52 U.S.C. § 20507(i)(1); Section 401 of HAVA, 52 U.S.C. § 21111; and the CRA, 52 U.S.C. § 20703. DOJ's suits filed after September 2025 all assert only a single count under the CRA.

Aside from references to the specific correspondence DOJ has exchanged with each State, the allegations in these CRA complaints are largely cookie-cutter. Here, DOJ relies on its August 14, 2025 demand for an electronic copy of

---

[3] These cases are listed in the Appendix. *See also* DOJ Press Release (Feb. 26, 2026), https://perma.cc/P5KC-5TBB. This Court may take judicial notice of them in deciding the motion to dismiss. *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 256 n.5 (3d Cir. 2006).

[4] DOJ's action seeking Oklahoma's VRL was resolved by agreement of the parties. *See* Notice of Voluntary Dismissal (ECF 24), *United States v. Ziriax*, No. 26-361 (W.D. Okla. Mar. 24, 2026); Oklahoma Attorney General, *Drummond enters settlement with DOJ to safeguard voter registration data* (Mar. 24, 2026), https://oklahoma.gov/oag/news/newsroom/2026/march/drummond-enters-settlement-with-doj-to-safeguard-voter-registration-data.html.

New Jersey's complete, unredacted VRL, which invoked the CRA. Compl. ¶ 39. The Complaint asserts—incorrectly—that this "written demand 'contain[ed] a statement of the basis and the purpose therefor.'" *Id.* ¶ 40 (quoting 52 U.S.C. § 20703). *Contra* Fleming Decl., Ex. 3 (stating only a "purpose" and not any purported "basis"). DOJ asks the Court to declare that New Jersey has violated the CRA; to order New Jersey to provide an unredacted copy of its VRL, including all registrant driver license numbers and social security numbers contained therein; and to order New Jersey to produce unspecified "other federal election records" that the Attorney General may demand in the future. Compl. at 9.

## LEGAL STANDARD

Under Rule 12(b)(6), a court must dismiss a complaint if it does not "'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (citation omitted). This requires a plaintiff to plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing whether a plaintiff has met Rule 12(b)(6)'s standard, the Court "is not bound to accept as true a legal conclusion couched as a factual allegation," and it should disregard "recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* In deciding a Rule 12(b)(6) motion, a court may consider "the complaint, … matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

13

## ARGUMENT

As six other courts' decisions already confirm,[5] DOJ's demand under the CRA for New Jersey's unredacted VRL fails to state a claim several times over. First, the State's VRL is outside the scope of the CRA's inspection provision. Second, although the CRA expressly requires that DOJ state both the basis and the purpose of its demand, DOJ has failed to state any basis, and its asserted purpose is legally insufficient. Third, even if DOJ's demand were otherwise cognizable, the CRA does not require disclosure of the specific sensitive, personally identifiable information DOJ demands here. Fourth, the disclosure DOJ insists on would violate privacy protections codified in both New Jersey and federal law. Finally, DOJ cannot avoid these fatal deficiencies by filing a "motion to compel" and claiming that it has virtually unreviewable discretion when seeking documents under the CRA. As multiple courts have held, nothing in the CRA displaces the Federal Rules of Civil Procedure or precludes the Court from determining whether DOJ's demand complies with all applicable statutory requirements. Under any level of scrutiny, DOJ's CRA claim fails as a matter of law. The Court should deny DOJ's motion to compel and dismiss the Complaint.

---

[5] *Benson*, 2026 WL 362789; *United States v. Fontes*, No. 26-66, 2026 WL 1177244 (D. Ariz Apr. 28, 2026); *United States v. Oregon*, No. 25-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Weber*, No. 25-9149, 816 F. Supp. 3d 1168 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Galvin*, No. 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, No-25-0639, 2026 WL 1040637 (D.R.I. Apr. 17, 2026).

14

## I.      DOJ Seeks Records Outside The Scope Of The CRA.

DOJ's claim fails at the threshold because the State's computerized VRLs do not fall within the plain text of the CRA, which requires election officials to "retain and preserve," without alteration, certain documents for potential inspection by DOJ. *See* 52 U.S.C. §§ 20701–20703. Three aspects of the statutory text make this clear.

### A.      The CRA Extends Only To Records That "Come Into" Officials' Possession, Not Records They Create.

To start, the plain text of the CRA applies only to records "which come into" election officers' "possession" and thus does not extend to New Jersey's computerized VRL—a document the State itself created. Section 301 of the CRA requires election officials to "retain and preserve, for a period of twenty-two months from the date of any [federal] election," only "records and papers *which come into [their] possession* relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701 (emphasis added). And Section 303 gives DOJ authority to demand, and requires election officials to make "available for inspection," only those records already required to be preserved under Section 301. *Id.* § 20703. As two federal courts recently explained in assessing DOJ's identical demands to Michigan and Arizona, "[t]he phrase 'come into [their] possession'" refers to "a process by which someone *acquires* an item from an external source"—here, "only those documents that state election officials receive from prospective voters," and "not

15

a document like the voter registration list that is created by state officials." *Benson*, 2026 WL 362789, at *9; *accord Fontes*, 2026 WL 1177244, at *3–4, 6–7. Indeed, "Congress frequently uses the phrase 'come into possession' to refer to items that a person *obtains* rather than *creates*." *Benson*, 2026 WL 362789, at *9 (collecting statutes and dictionary definitions).

This construction is confirmed by the words immediately following "come into [their] possession": "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. "Each of these terms refers to something that the voter submits or does as part of the registration process." *Benson*, 2026 WL 362789, at *9. Read together with "come into [their] possession," the statute is clear: the CRA requires election officials to preserve—and upon appropriate demand, make available to DOJ—only certain "records that election officials *receive*, rather than [records they] *create*." *Id.*

That legislative choice makes perfect sense given the context of the CRA. Congress recognized that "[t]o assemble the necessary proof" of denial "of the right to vote because of racial discrimination" was "impracticable, if not impossible, without access to detailed information concerning applications, registrations, or other acts, tests, and procedures requisite to voting." *Proposed Civil Rights Legislation: Hearing Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. 13–14 (1959) (statement by William P. Rogers, U.S. Att'y Gen.), https://perma.cc/H64U-GYMG. Before the CRA was enacted, DOJ had no "power in civil proceedings to require the production

16

of such records during any investigation it conduct[ed] as to complaints that qualified persons have been denied the right to vote in violation of Federal law." *Id.* at 14. Compounding this difficulty, "the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications." *Benson*, 2026 WL 362789, at *9 (citing *Report of the United States Commission on Civil Rights* 93 (1959), https://perma.cc/2PDF-GZHB); *accord* 106 Cong. Rec. 5208 (1960) (statement of Rep. Brown) (describing "measures" in some States "authorizing the destruction of voting records soon after elections in order to prevent their inspection and use by Federal investigators"). "The CRA responded to that problem by requiring states to preserve records that voters submit to them—not records that states create." *Benson*, 2026 WL 362789, at *9; *accord Fontes*, 2026 WL 1177244, at *3–4.

In straining to extend the CRA to an internal VRL that the State itself creates, DOJ fails to give effect to every word in the statute and renders certain language surplusage. *See Tavarez v. Klingensmith*, 372 F.3d 188, 190 (3d Cir. 2004) (statutory terms should not be treated as surplusage). Had Congress intended to require States to preserve records they themselves create, it could easily "have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier, which is the language used in the NVRA." *Benson*, 2026 WL 362789, at *9 (citing 52 U.S.C. § 20507(i)(1)). But Congress intentionally required preservation only of certain records that "come into [election officials'] possession," "referring to only those documents that

17

state election officials receive from prospective voters." *Id.*; *accord Fontes*, 2026 WL 1177244, at *3–4. Because States' VRLs are not documents that "come into [election officials'] possession," the CRA does not authorize DOJ's demand.

### B.  The CRA Covers Only Records Related To Prior Federal Elections.

DOJ's demand also exceeds the scope of the CRA because the statute requires States to retain only records related to prior federal elections. As noted, States must preserve, "for a period of twenty-two months from the date of any [federal] election," specific "records … relating to any application … or other act requisite to voting in such election." 52 U.S.C. § 20701.[6] But DOJ is not demanding records relating to voting in a federal election within the past 22 months. Rather, DOJ seeks a copy of New Jersey's current VRL, which, of course, contains many additional, modified, and deleted registration records relative to the time of the last federal election and so exceeds the scope of the CRA.

### C.  The Records Subject To The CRA Are Ones That States Cannot Alter.

That New Jersey's VRL is a live, dynamic database—which is continuously updated by local election officials—further underscores that it is outside the CRA's scope. Section 302 of the CRA expressly prohibits the "alter[ation]" of "any record or paper required" to "be retained and preserved" under Section 301. 52 U.S.C. § 20702. The necessary logical inference is that the records to which DOJ has access are ones that States cannot otherwise be modifying (such

---

[6] DOJ's quotation of this provision excises this crucial durational language. *See* Compl. ¶ 1.

as the records of who applied to register to vote in a prior and consummated election). But as a matter of federal law, States are not merely permitted but *required* to alter their computerized VRL records on a continuous basis. *See, e.g.*, 52 U.S.C. § 21083(a)(4) (computerized statewide voter registration list required by HAVA must be "updated regularly"). For this reason, too, States' current VRLs fall clearly outside the scope of the CRA's inspection provision. *See Fontes*, 2026 WL 1177244, at *5 ("If [a VRL] were deemed … a document" that election officials "are required to preserve under [52 U.S.C.] § 20701," "then § 20702 would prohibit the []VRL from being altered"—a conclusion that "would directly conflict with both the NVRA and HAVA, which affirmatively require[] [S]tates to modify [their] VRLs under certain conditions."). Because the State's computerized VRL does not fall within the scope of the CRA for any or all of these three reasons, DOJ's Complaint fails.

### D.   DOJ's Contrary Arguments Lack Merit.

In its motion to compel, DOJ insists that *Benson* "made a significant legal error in its construction of the federal election records covered by the CRA." Motion to Compel Memo. at 14 (ECF 20-1) (MTC). In DOJ's view, Section 301 of the CRA captures *all* federal election records, of any sort. *Id.* at 14–15, 19. DOJ's arguments are unconvincing, and they were systematically dismantled in the *Fontes* court's recent opinion. *Fontes*, 2026 WL 1177244, at *5–7.

*First*, DOJ wrongly contends that *Benson* misinterpreted the phrase "comes into possession." According to DOJ, "[e]ven the *Benson* court expressed some discomfort at its conclusion, acknowledging" that its construction may have

19

been "overly pedantic" while "attribut[ing] any failing in that respect to … *Congress.*" MTC at 15 (citation omitted). As *Fontes* explained, however, "[t]his characterization of *Benson* is disingenuous." 2026 WL 1177244, at *6. "*Benson* never asserted that the phrase 'comes into possession' creates a pedantic distinction. Indeed, earlier in the opinion, the court expressly disavowed the notion that 'a distinction between voter registration applications and the voter registration list … may seem needlessly pedantic' by pointing out the salient differences between these documents." *Id.* (quoting *Benson*, 2026 WL 362789, at *10). And even if the two documents were identical, *Benson* explained, "the distinction between them would still be significant" in light of the CRA's role in detecting whether a State is improperly rejecting voter applications: "a voter application can be examined to determine whether it was unlawfully rejected, whereas a list of those who *successfully* registered to vote would be little help in such an investigation." 2026 WL 362789, at *10.

*Second*, DOJ incorrectly asserts that "no other federal court has adopted [*Benson*'s] limitation" on the scope of records within Section 301 of the CRA. MTC at 14. That is, as laid out above, no longer true. *See Fontes*, 2026 WL 1177244. And even when it was true, that observation was "of no value." *Id.* at *5. It reflected merely that *Benson* "is only a few months old" and "was among the first courts to consider whether VRLs are covered by § 20701"—because DOJ's current fusillade of CRA lawsuits is unprecedented. *Id. Benson*'s and now *Fontes*'s value are as persuasive precedents, and they indeed persuade.

20

*Third*, DOJ inaccurately suggests that *Benson*'s construction is at odds with *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen.*, 285 F.2d 430 (5th Cir. 1961), and *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). MTC at 14. But neither case contradicts *Benson*'s interpretation of the statute. "[B]oth cases essentially reiterate the plain text of [52 U.S.C.] § 20701 and do not make any affirmative findings which would suggest that [a State's ]VRL is covered by § 20701." *Fontes*, 2026 WL 1177244, at *5. DOJ similarly misses the mark in asserting that "courts specifically have recognized that Section 301 reaches 'records of voting registration.'" MTC at 15. *Benson* acknowledged that such records, where they were received by election officials rather than created by them (e.g., voter registration applications), fall within the CRA. *Benson*, 2026 WL 362789, at *10. But DOJ fails to identify any case holding that Section 301 of the CRA extends to State-created VRLs, let alone unredacted VRLs.[7] Indeed, no court has ever done so.

*Fourth*, while DOJ notes some opinions finding VRLs within the scope of the public-records provision in the NVRA, 52 U.S.C. § 20507(i), *see* MTC at 15–

---

[7] DOJ cites two cases for the proposition that "Section 301 [of the CRA] reaches … voter registration lists." MTC at 15. Both are plainly inapposite. *See United States v. Maine*, No. 06-0086, 2007 WL 1059565 (D. Me. Apr. 4, 2007) (entering consent decree resolving an action brought under HAVA and the NVRA only and making no reference to the CRA whatsoever); *McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) (vacating, for lack of subject matter jurisdiction, a preliminary injunction prohibiting county clerks from disposing of certain election materials pending resolution of a former congressional candidate's challenge to election results; stating in dicta that the CRA requires election officials "to preserve [certain categories of] election materials"—but not identifying State-created VRLs as one of them).

21

16 (citing *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 434 (D. Md. 2019); *Project Vote v. Kemp*, 208 F. Supp. 3d 1320, 1329 (N.D. Ga. 2016)),[8] "these cases are of no import here," *Fontes*, 2026 WL 1177244, at *6. Not only was the CRA "not at issue or even discussed in those cases," but they "were interpretating [sic] statutory language from the NVRA that is sufficiently dissimilar from [the CRA language] at issue here."[9] *Id.* The difference between 52 U.S.C. § 20701 and § 20507(i)—the latter of which refers to "just 'records' without any qualifier," rather than records that "come into [election officials'] possession"—serves only to underscore that the scope of records subject to the CRA is limited in the very way *Benson* and *Fontes* describe. *Benson*, 2026 WL 362789, at *9.

*Fifth*, DOJ misunderstands the issue when it argues that "comes into possession" relates not to whether an agency acquired documents from an outside source, but rather "focus[es] on *how* and *when* the [agency] gains possession of

---

[8] Notably, other courts disagree with *Lamone* and *Kemp* on this point. *See, e.g.*, *Pub. Interest Legal Found. v. Nago*, --- F.4th ----, 2026 WL 1144703, at *11 (9th Cir. Apr. 28, 2026) (holding that "a statewide voter list" is not a "'record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters' within the meaning of the NVRA" (quoting 52 U.S.C. § 20507(i))); *Benson*, 2026 WL 362789, at *6 ("[A] natural reading of § 20507(i) suggests that it requires states to disclose information regarding the process by which they maintain their voter registration list but not the list itself.").

[9] Similarly irrelevant are DOJ's citations to consent decrees in Georgia, Texas, and North Carolina, where those States agreed to provide certain voting information. *See* MTC at 18 n.11. That other States have chosen to provide such information—through settlement or voluntarily—does not mean that the CRA or any other law entitles DOJ to New Jersey's unredacted VRL.

22

the records or documents in the first instance." MTC at 16. The "temporal distinction[]" DOJ seeks to draw, *id.* at 17, does not in fact refute *Benson*'s analysis. Even assuming that some statutes use "come into possession" to address a time period, the triggering moment of "come into possession" is when an agency *acquires* or *receives* the relevant thing. Indeed, even DOJ says the focus is on how an individual "gains" possession of a record of paper or "acquire[s]" it. *Id.* As *Benson* recognized, "come into possession" refers to things obtained from elsewhere, not created internally. 2026 WL 362789, at *9.

Further, as *Fontes* explains, "[e]ven accepting [DOJ's] proffered interpretation as tenable in isolation, it does not work in [the CRA's] broader context." 2026 WL 1177244, at *7; *see King v. Burwell*, 576 U.S. 473, 486 (2015) (observing that courts have a duty "to construe statutes, not isolated provisions" (citation omitted)). In particular, as discussed *supra* Section I.C, DOJ's "interpretation places [52 U.S.C.] § 20702," which prohibits any alteration of the records within the scope of § 20701, "in conflict with multiple provisions of the NVRA and HAVA," which *require* that VRLs be altered on an ongoing, continuous basis. *Fontes*, 2026 WL 1177244, at *7; *see also Benson*, 2026 WL 362789, at *9 (discussing other aspects of the CRA's statutory and historical context that support the court's interpretation). That conflict alone forecloses DOJ's position. *See Jones v. Hendrix*, 599 U.S. 465, 478 (2023) ("Basic principles of statutory interpretation require that we construe [statutory provisions] in harmony, not set them at cross-purposes."); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 511 (2018) (explaining that

23

the Court's rules for statutory interpretation "aim[] for harmony over conflict"). Notably, DOJ's motion to compel nowhere even acknowledges § 20702.

*Sixth*, DOJ again errs in suggesting that the CRA's description of the official with the records-preservation obligation as a "person having custody, possession, or control of such record or paper" somehow expands the scope of records covered. MTC at 18 (quoting 52 U.S.C. § 20703). The provision does no such work. It simply cross-references the records covered by § 20701, requiring persons who have "*such* record or paper," 52 U.S.C. § 20703 (emphasis added), to maintain it. *See* 52 U.S.C. § 20701 (authorizing an officer who "come[s] into … possession" of covered records "to deliver[] them to another officer of election," after which "the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian").

This Court need go no further: Because VRLs are not records within the scope of the CRA, it must dismiss DOJ's single claim.

## II. DOJ's Demand Fails To Satisfy The CRA's "Basis" And "Purpose" Requirements.

Even if New Jersey's VRL fell within the scope of the CRA, DOJ's Complaint would still fail because DOJ has not satisfied other essential statutory requirements. Any records request under the CRA must include "a statement of *the* basis and *the* purpose" for the demand. 52 U.S.C. § 20703 (emphases added). By using the conjunctive "and," the statute makes clear that "purpose" and "basis" are separate requirements. *Sistrunk v. Rozum*, 674 F.3d 181, 190 (3d Cir. 2012) ("conjunctive standard requires showing *both* elements"). And by twice

24

using the definite article, the CRA requires DOJ to state "a discrete thing": the complete basis and purpose of the request, not merely one basis and purpose among many. *Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021); *see also Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (distinguishing between definite and indefinite articles).

Thus, "DOJ is required to offer a written statement of *both* the purpose and basis for its demands." *Weber*, 816 F. Supp. 3d at 1182; *accord Oregon*, 2026 WL 318402, at *7–10; *Galvin*, 2026 WL 972129, at *4; *Amore*, 2026 WL 1040637, at *5. Without a complete statement of the basis and the purpose for DOJ's records demand, state officials and reviewing courts "cannot accurately determine whether the inquiry is within the authority of [DOJ] and whether the information sought is reasonably relevant." *CFPB v. Accrediting Counsel for Indep. Colls. & Secondary Schs.*, 854 F.3d 683, 691 (D.C. Cir. 2017); *see also id.* at 690 (emphasizing that the validity of a civil investigative demand "is measured by the stated purpose," making notification of purpose "an important statutory requirement"); *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) (CRA demands cannot be "used without restraint").

Cases contemporaneous with the CRA's passage, as well as dictionary definitions, demonstrate that "the basis" for a demand under the CRA is the factual reason for believing a statutory violation may have occurred, while "the purpose" is how the requested records will help determine whether the statute had been violated. *See Lynd*, 306 F.2d at 229 n.6; *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962),

*aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963); Black's Law Dictionary (4th ed. rev. 1968) ("basis" refers to the "groundwork; support; foundation"); *id.* ("purpose" refers to the "end; intention, or aim"); 1 Webster's New International Dictionary of the English Language (2d ed. unabridged 1954) ("basis" refers to "[t]hat which supports or sustains (something not material); a foundation"); 4 *id.* ("purpose" refers to "an object to be attained; the end or aim to be kept in view").

The Complaint fails to plausibly establish DOJ's compliance with either of these conjunctive requirements.

### A.    DOJ Provided No Basis For Its Demand.

The Complaint passingly asserts that DOJ's August 14 letter "contain[ed] a statement of the basis" for its records demand, Compl. ¶ 40, and that the "basis of the demand was the CRA," *id.* ¶ 26. But that assertion is contradicted by the August 14 letter itself, which makes no reference to any "basis" whatsoever. Fleming Decl., Ex. 3; *see Galvin*, 2026 WL 972129, at *3 (explaining that the CRA "directs the Court to [DOJ's] written demand—rather than [its] subsequent court filings—to determine whether that demand 'contain[ed] a statement of the basis' for the demand"). And even if DOJ had asserted such a basis in the August 14 letter, it would plainly be inadequate.

The CRA requires a statement of DOJ's *factual* basis for its demand, not its *statutory* basis. *Oregon*, 2026 WL 318402, at *8–9; *Weber*, 816 F. Supp. 3d at 1184 ("basis" requirement mandates statement of "the evidence behind [DOJ's] investigation of a particular state and specific, articulable facts pointing to the

violation of federal law"); *Amore*, 2026 WL 1040637, at *5 ("[T]he 'basis' contemplated by Title III is a factual, not legal basis."). Moreover, if DOJ could sufficiently state the basis of any CRA request simply by saying "the CRA," the requirement would be rendered meaningless, in violation of cardinal rules of statutory interpretation. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (courts must "give effect, if possible, to every clause and word of a statute").

In later email correspondence with New Jersey, DOJ asserted that its purported basis is the same as its purported purpose—namely, DOJ's supposed "list maintenance obligations under federal law." Fleming Decl., Ex. 8. DOJ was presumably referring to the "purpose" stated in its August 14 letter, i.e., "to ascertain New Jersey's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.*, Ex. 3, at 2. But again, ascertaining the State's "compliance with the list maintenance requirements of the NVRA and HAVA" is a statutory basis, not the factual one required by the CRA. *See Oregon*, 2026 WL 318402, at *9 ("ascertain[ing] Oregon's compliance with the list maintenance requirements of the NVRA and HAVA" was not "statement of a factual basis for believing Oregon violated the NVRA or HAVA" as required by the CRA).

And "[r]eading 'basis' in th[is] way" improperly "collapses its meaning with that of 'purpose.'" *Id.* As shown above, the CRA establishes "basis" and "purpose" as *separate* requirements. *Id.*; *Weber*, 816 F. Supp. 3d at 1182–84; *Galvin*, 2026 WL 972129, at *4; *Amore*, 2026 WL 1040637, at *5. "If the purpose is to investigate violations of a statute, the basis must be something else; the statute underlying the investigation is nothing more than a component of the purpose."

27

*Oregon*, 2026 WL 318402, at *9. DOJ cannot ignore the CRA's requirement to provide a separate factual "basis" for its demand. Even the demand in one of the early CRA cases, *Lynd*, on which DOJ heavily relies, *see* Compl. ¶¶ 1, 3–4, articulated a factual basis for the Attorney General's demand separate from its stated purpose: "This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." *Lynd*, 306 F.2d at 229 n.6; *see id.* at 229 n.5; *Bruce*, 298 F.2d at 861. Here, DOJ's CRA demand letter sets forth no basis—that is, factual foundation—for seeking the State's unredacted VRL.[10] For this reason alone, the Complaint fails to state a CRA claim. *See Oregon*, 2026 WL 318402, at *9; *Weber*, 816 F. Supp. 3d at 1184.

DOJ's response is unavailing. DOJ argues in its motion to compel that its July 15, 2025 letter, which asked several questions about New Jersey's voter list maintenance practices based on information reported by New Jersey to the federal Election Assistance Commission (EAC), "provided context" for its later demand under the CRA.[11] MTC at 13. But the State in fact answered all of DOJ's

---

[10] That DOJ has sued 29 other States and the District of Columbia, seeking the same information—and has apparently demanded unredacted VRLs from many other States—only underscores the lack of any particularized basis for its demand to New Jersey.

[11] DOJ incorrectly describes that information in its motion to compel. *Compare* MTC at 13 (asserting that "the data from the EAC showed" that New Jersey "had not tracked information about duplicate registrations"), *with* Fleming Decl., Ex. 1, at 2 (acknowledging that the State had provided the EAC with

questions concerning the EAC data in the State's August 28, 2025 letter, Fleming Decl., Ex. 5, and DOJ has never alleged that the State's responses were deficient, nor has DOJ otherwise renewed its EAC-related questions. If DOJ now means to suggest that the EAC-related questions in its July 15, 2025 letter can supply the missing factual "basis" for its August 14, 2025 CRA demand, DOJ is wrong. As noted, its July 15, 2025 letter contained no reference to the CRA whatsoever. *Id.*, Ex. 1. And the August 14, 2025 letter, which was the first time DOJ invoked the CRA, did not mention the information reported to the EAC. *Id.*, Ex. 3. Under the unambiguous text of the CRA, DOJ's "statement of the basis and the purpose" for a CRA demand must appear—expressly—in the CRA demand itself. *See* 52 U.S.C. § 20703 ("This demand shall contain a statement of the basis and the purpose therefor."); Webster's New World Dictionary of American Language 318 (college ed. 1959) (defining "contain" as "to have in it; hold; enclose or include"); *Galvin*, 2026 WL 972129, at *3 ("The statute therefore directs the Court to [DOJ's written demand] … to determine whether that demand 'contain[ed] a statement of the basis' for the demand"). In short, "the July [15] Letter contains no [CRA] demand, and the August 14 Letter's [CRA] demand does not identify the information in the July [15] Letter as its factual

---

information about the number of duplicate registration records it had removed); and *id.*, Ex. 5, at 5 (responding to DOJ and providing additional information about "New Jersey's process for determining and handling duplicative voter-registration records").

29

basis." *Oregon*, 2026 WL 318402, at *9. So DOJ's "patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis' fails." *Id.*[12]

### B.      DOJ Provided No Proper Purpose For Its Demand.

DOJ's CRA claim also fails for another reason: DOJ has not stated a legally sufficient purpose for its records request. According to DOJ's August 14 letter, the purpose of its demand was "to ascertain New Jersey's compliance with the list maintenance requirements of the NVRA and HAVA." Fleming Decl., Ex. 3, at 2. But that cannot support a CRA demand.

The CRA exists "to detect voting-related racial discrimination." *Weber*, 816 F. Supp. 3d at 1182. Its history is unambiguous: "The purpose of title III is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956, at 7 (1959); *see also supra* Background Section A.3 and Argument Section I.A (discussing the CRA and context of its enactment). In the words of DOJ's own preferred case, the "purpose" of Title III's record demand provision "is to enable the Attorney General to determine whether § 1971 [voting rights] suits or similar actions

---

[12] In any event, any alleged concerns about the information New Jersey submitted to the EAC do not plausibly establish a ground for demanding the State's unredacted VRL. DOJ's questions, which primarily compared certain data reported by New Jersey to purported national "averages" (with no discussion of the range of variation among other States' data, or the differences among States' specific list-maintenance procedures), do not plausibly suggest that New Jersey is in violation of its federal list-maintenance obligations under the NVRA or HAVA. *See* Fleming Decl., Ex. 1, at 2; *id.*, Ex. 5, at 3–5. Moreover, as discussed below, the sensitive data of individual New Jersey voters is not necessary or relevant to assessing compliance with these list-maintenance obligations. *See infra* pages 39–44.

should be instituted" and "to enable him to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228 (citing 42 U.S.C. § 1971, which is currently codified as amended at 52 U.S.C. § 10101 and authorizes DOJ to bring suits for injunctive relief for denial of voting rights based on race); *see id.* at 225 ("[The CRA] provides 'an effective means whereby preliminary investigations of registration practices can be made in order to determine whether or not such practices conform to constitutional principles.'" (quoting *Gallion*, 187 F. Supp. at 853)). DOJ's cited case *Lynd* satisfied this standard; there, DOJ stated "[t]he purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred." *Id.* at 229 n.6; *see also, e.g.*, *Coleman*, 208 F. Supp. at 200 (same); *Bruce*, 298 F.2d at 861 (same). "Reading Title III's text within its larger statutory and historical context, and consistent with the case law and legislative history explained above," it is clear "that the 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights." *Oregon*, 2026 WL 318402, at *10; *accord Amore*, 2026 WL 1040637, at *6; *Weber*, 816 F. Supp. 3d at 1182–83.[13]

---

[13] One district court, *Benson*, has disagreed in dicta. (As previously discussed, *Benson* dismissed DOJ's complaint against Michigan because VRLs are outside the scope of records subject to the CRA.) *Benson* relied on the premise that the CRA does not expressly mention race discrimination. 2026 WL 362789, at *8. But there is no question that the CRA was enacted to supplement federal capacity to enforce previous civil rights laws, chief among them the Civil Rights Act of 1957, which aimed at combatting racially discriminatory violations of the right to vote. *See* 71 Stat. 634, 637–38; *South Carolina v. Katzenbach*, 383 U.S. 301,

But DOJ's demand for New Jersey's VRL has nothing to do with racial discrimination or violations of individuals' voting rights, let alone enforcing the Civil Rights Act. Instead, DOJ's stated purpose is to investigate list-maintenance procedures under statutes enacted decades after the CRA. Specifically, DOJ claims it wants to assess New Jersey's compliance with the provisions of the NVRA that require "a general program that makes a reasonable effort to remove the names" of registrants who are ineligible to vote due to "death" or "a change in [] residence." 52 U.S.C. § 20507(a)(4); *see also* 52 U.S.C. § 21083(a)(1)(A) (HAVA provision requiring a "system of file maintenance" that makes a "reasonable effort" to remove ineligible registrants from the voting list).[14] This "purpose lack[s] any … relation to the purposes for which [the CRA] was enacted." *Oregon*, 2026 WL 318402, at *10; *see also Bruce*, 298 F.2d at 863 (noting that State's alleged failure to remove ineligible voters from rolls was "a matter which does not bear any particular importance" to a CRA proceeding).

---

308–13 (1966). The CRA identifies the documents States must retain so that the federal government can investigate such violations. There was no need for the CRA to re-explain that the purpose of these obligations is to protect individuals' voting rights.

[14] The NVRA and HAVA each have their own enforcement provisions, 52 U.S.C. §§ 20510(a), 21111, and the NVRA has its own inspection provision, *id.* § 20507(i). But as courts have recognized, neither statute requires States to make available or disclose to DOJ their complete, unredacted VRLs. *See, e.g.*, *Oregon*, 2026 WL 318402, at *5–7 (dismissing HAVA and NVRA claims); *Weber*, 816 F. Supp. 3d at 1186–92 (same). Perhaps for that reason, the sole count in DOJ's Complaint rests on the CRA.

DOJ has argued that the "purpose" of a records demand under the CRA need not relate to investigating civil rights violations. According to DOJ's reasoning, in enacting 52 U.S.C. § 20703, Congress granted DOJ broad authority to access state voter registration materials for *any* purpose it puts into writing. But Congress could not plausibly have intended to grant such unbridled investigatory power—including the "unfettered authority to invade citizens' right to keep their sensitive information private"—via a two-sentence provision aimed narrowly at preventing racial discrimination in voting. *Oregon*, 2026 WL 318402 at *9. Just as one would never assume a consumer fraud law affords a state agency subpoena authority to investigate pollution violations, so too it makes no sense to read the CRA's records-demand provision as allowing requests for records having nothing to do with assessing violations of CRA interests. Because DOJ failed to state a legally sufficient purpose for its CRA demand, its Complaint must be dismissed. *See, e.g.*, *Amore*, 2026 WL 1040637, at *6 (explaining that because "the purpose stated in [DOJ's] demand—purportedly, to ensure compliance with the NVRA and HAVA—does not plausibly relate to individual voting rights," DOJ's CRA demand would remain legally insufficient even if the court permitted DOJ to belatedly state "a factual basis" for the demand).

## C.   DOJ Cannot Conclusively Establish, For Its Motion To Compel, That It Provided Its Accurate Purpose.

The above accepts as true all the statements in DOJ's CRA demand—and explains why DOJ has nevertheless failed to state a factual basis and a legally

sufficient purpose, thus requiring dismissal. But even if this Court were to disagree (and to disagree with all the other bases for dismissal), it still could not grant DOJ's motion to compel for another reason: DOJ has not established, and cannot on this posture establish, that it even stated its true reason.

As explained above, a records request DOJ submits under the CRA must include "a statement of the basis and the purpose" for the demand. 52 U.S.C. § 20703; *Weber*, 816 F. Supp. 3d at 1182–84. DOJ cannot comply with the requirement of stating "the" purpose for which it seeks records by giving an inaccurate reason. *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) ("The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise."); *R.I. State Council of Churches v. Rollins*, 808 F. Supp. 3d 370, 384 (D.R.I. 2025) ("Providing a 'pretextual' reason for taking agency action 'that is incongruent with what the record reveals about the agency's priorities and decisionmaking process' can be a basis for setting aside agency action as arbitrary and capricious." (quoting *New York*, 588 U.S. at 782, 785)). After all, the parent who asks their child "the purpose" for which they want the family car would not be satisfied by an inaccurate or willfully incomplete reason. No less than when that is imposed by a statute: if DOJ can offer any purpose it thinks most palatable, though not "the" actual purpose for which it seeks this material, the requirement would lack force. *See Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 385 (1980) (rejecting

"construction of [a] statute [that] would … render [a provision] meaningless"). DOJ can therefore only succeed on a motion to compel if it can conclusively establish that it in fact stated its accurate purpose, such that no discovery is required or permitted.

But there are too many indications that DOJ's actual purpose may be different from its stated purpose of investigating New Jersey's compliance with its NVRA and HAVA obligations. Start with the context of these extraordinary requests, which the Federal Government is issuing at the same time as it launches an unprecedented mission to exert control over States' election administration—even where it has no authority to do so. *See, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 87–88 (D.D.C. 2025) (invalidating imposition of new requirements on voter registration forms); Executive Order, "Ensuring Citizenship Verification and Integrity in Federal Elections" (Mar. 31, 2026) (purporting to task the U.S. Postal Service with determining who may vote by mail and instructing it to refuse to deliver ballots based upon federal mail voter lists). Consider, too, the fact that DOJ requested VRLs from States across the country. "It appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." *Weber*, 816 F. Supp. 3d at 1184.

Other evidence, available at a motion-to-compel stage, heightens the concerns about the truth of the purpose asserted. The Social Security Administration recently admitted several of its DOGE employees signed a secret "Voter Agreement" to share SSA records with an unidentified "political advocacy group" that

35

sought "to find evidence of voter fraud and to overturn election results in certain States."[15] In January, the U.S. Attorney General told the Minnesota Governor that a "common sense solution" to "chaos in Minnesota," where DHS deployed thousands of immigration officers, would be to "allow [DOJ] to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the [CRA]."[16] *See also Weber*, 816 F. Supp. 3d at 1185 (DOJ's requests "mirror requests by DHS itself to [various] states"). Reporting in March suggested that DOJ was finalizing an agreement with DHS to allow the use of voter registration data for immigration and criminal investigations.[17] And a DOJ official recently confirmed it has finalized a data-sharing agreement with DHS, and intends to "run" all the VRL information it is seeking "against DHS's SAVE database," "a fetching system that seeks information from other databases to cross-check whether the data set on a [voter] roll is either a deceased

---

[15] Notice of Corrections to the Record (ECF 197), *Am. Fed. of State, Cnty. & Munic. Emps. v. SSA*, No. 25-596 (D. Md. Jan. 16, 2026). As this is a public record filed in a judicial proceeding, this Court may take judicial notice of it. *Jean Alexander Cosmetics, Inc.*, 458 F.3d at 256 n.5.

[16] Letter from Pam Bondi, U.S. Att'y Gen., to Tim Walz, Gov. of Minn. (Jan. 24, 2026), https://perma.cc/V9KL-2Z73. Because this document is an official letter from a government agency, the Court may take judicial notice of it. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993) (explaining in deciding motion to dismiss, court can take judicial notice of a "public record," including "letter decisions of government agencies").

[17] Sarah N. Lynch, *Justice Dept. close to finalizing deal to hand over states' voter roll data to Homeland Security, sources say*, CBS News (Mar. 26, 2026), https://perma.cc/U5C7-735C.

person or a noncitizen."[18] The official also admitted DOJ "cannot promise what any other agency will or will not do" with the VRL-data it is given.[19]

Moreover, there is evidence DOJ has been less than candid about its intended use of the VRL data it seeks. In November 2025, a DOJ official who has appeared in analogous cases against other States sent an email to several other DOJ officials, advising that DOJ was not "require[d] to give the states information about what we are going to do with the data," and so DOJ's "reply should always be: 'We will use the data in a manner consistent with Federal law' and say nothing more.'"[20] In the stated view of this DOJ official, "[n]o judge will have authority to limit us beyond a promise of Federal law compliance."[21]

As explained by courts that have already dismissed similar DOJ lawsuits, such statements and conduct "cast[] serious doubt as to the true purposes for which [DOJ] is seeking voter registration lists in this and other cases, and what it intends to do with that data." *Oregon*, 2026 WL 318402, at *11; *see Weber*, 816 F. Supp. 3d at 1186 (indicating DOJ's stated purpose for its VRL requests is "pretextual"). To be clear, Defendant's motion to dismiss does not seek adjudi-

---

[18] Hr'g Tr. 50:21–51:4, 65:1–10 (Mar. 26, 2026), *United States v. Amore*, No. 25-639 (D.R.I.) (attached as Exhibit A).

[19] *Id.* at 65:1–66:14.

[20] Email from E. Neff to J. Osete and M. Riordan (Nov. 18, 2025), https://perma.cc/A25E-GWKA, cited in Complaint for Declaratory and Injunctive Relief ¶ 78, *Common Cause v. U.S. Department of Justice*, No. 26-1352 (D.D.C. Apr. 21, 2026) (attached as Exhibit B).

[21] *Id.*

cation of DOJ's "true" purpose(s)—this Court can dismiss based on the insufficiency of the basis or the stated purpose, or any of the other grounds. But the evidence of ulterior motives underscores the importance of the CRA's basis-and-purpose requirements, and the inability to grant DOJ's motion to compel.

## III.   The CRA Does Not Entitle DOJ To Driver License And Social Security Numbers Of Millions Of Voters.

Even if the CRA extends to VRLs the State creates, and even if DOJ offered a proper basis and purpose, nothing in the CRA entitles DOJ to the sensitive personally identifiable data it seeks here.

Like most States, New Jersey prohibits disclosure of sensitive information contained in voter registration records, including driver license and social security numbers. *See* N.J. Stat. Ann. § 47:1A-1.1 (exempting this information from disclosure under public records law); *id.* § 47:1A-5.3 (election agencies should redact "voter signatures, Social Security numbers, driver license numbers, and non-driver identification numbers" before disclosing election records). And contrary to DOJ's unsupported suggestion, *see* Fleming Decl., Ex. 3, at 3; MTC at 19–20, no federal law preempts those voter privacy protections. Congress's authority to regulate the time, place, and manner of federal elections preempts "inconsistent" state regulations "so far as [that authority] is exercised, and no farther." *Arizona*, 570 U.S. at 9; *see also Farina v. Nokia*, 625 F.3d 97, 115–16 (3d

38

Cir. 2010) (explaining conflict preemption generally). But nothing in Title III of the CRA prohibits the redaction of sensitive voter information.

Although DOJ says the purpose of its demand is to assess the State's compliance with the NVRA and HAVA, as federal courts have recently explained in dismissing DOJ's nearly-identical lawsuits, "[e]ven if investigating NVRA or HAVA compliance were valid purposes for seeking voter registration lists under Title III," neither DOJ's demand nor its Complaint "provides any reasonable explanation why" an unredacted copy of the State's VRL "serves those purposes." *Oregon*, 2026 WL 318402, at *10 n.4; *accord Weber*, 816 F. Supp. 3d at 1183–84. The plain text of the NVRA and HAVA belies DOJ's assertion that "Congress plainly intended that DOJ be able to conduct an independent review of each state's [VRL]" when it authorized the Attorney General to enforce those statutes. Fleming Decl., Ex. 3, at 3. These provisions merely authorize DOJ to seek declaratory and injunctive relief as necessary to ensure States fulfill their statutory obligations. 52 U.S.C. §§ 20510(a), 21111.

The NVRA's list-maintenance obligations require only that States have a "general program" that makes a "reasonable effort" to remove deceased voters and those who have moved out of the jurisdiction. 52 U.S.C. § 20507(a)(4); *see Benson*, 136 F.4th at 624–29 (holding that Michigan's list-maintenance program "fell squarely within the NVRA's reasonable-effort language"). HAVA requires States to create a computerized VRL and maintain it "in accordance with the provisions of the [NVRA]." 52 U.S.C. § 21083(a)(2)(A); *see also id.*

39

§ 21083(a)(4)(A) (requiring "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters"). "Nothing in HAVA broadens the scope of the NVRA's list-maintenance obligations." *Bellitto*, 935 F.3d at 1202. And HAVA expressly leaves "[t]he specific choices on the methods of complying with [its] requirements … to the discretion of the State." 52 U.S.C. § 21085.

In short, the NVRA and HAVA place responsibility for VRL maintenance squarely on the States. DOJ has no authority to remove individual registrants or otherwise conduct its own list maintenance. And the focus of those federal statutes is on States' general processes. Contrary to DOJ's suggestion, the mere presence on the VRL at a given time of specific individuals who have become ineligible to vote does not indicate that States are in violation of list-maintenance obligations. Indeed, at any point in time, there will inevitably be ineligible voters on States' lists. *See, e.g.*, 52 U.S.C. § 20507(d) (requiring States to wait for a period of more than two years before removing certain registrants who have become ineligible to vote due to change in residence); *see also Benson*, 136 F.4th at 628 (explaining evidence that Michigan had 27,000 deceased voters on its rolls did not, as a matter of law, show that Michigan's list-maintenance program was "unreasonable"); *Bellitto*, 935 F.3d at 1205 ("The state is not required to exhaust all available methods for identifying deceased [and non-resident] voters; it need only use reasonably reliable information to identify and remove such voters."); *ACRU*, 872 F.3d at 182 ("[G]iven the importance of the right to vote, [the NVRA] is designed to protect voters from improper removal and only provides

40

very limited circumstances in which states may remove them."). "[T]he language of the NVRA does not require a perfect effort" to remove ineligible voters "nor does it even require a very good effort," but only "a *reasonable* effort." *Benson*, 136 F.4th at 628. So a snapshot of New Jersey's VRL at a single point in time is not probative of the State's compliance with its list-maintenance obligations; it reveals nothing about the regularity of the State's list maintenance, the procedures employed, the information used, or the number of ineligible registrants removed over any given period of time.

And what DOJ seeks here—the confidential driver license and social security numbers of millions of individual registrants on that snapshot—is, if anything, even more unmoored from DOJ's purported purpose. Indeed, cases evaluating records requests under the NVRA have repeatedly held that the sensitive, private data of individual registrants is not necessary to assess how a State implements programs and activities to maintain the accuracy of its VRL.[22] *See, e.g.*, *Voter Reference Found. v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *Pub. Interest Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases).

Rather, courts have consistently held that the NVRA allows "redaction of uniquely or highly sensitive personal information" from voter records subject to

---

[22] *Benson* therefore erred in accepting DOJ's representation that such sensitive information was relevant because it was purportedly "necessary to identify duplicate registration records, registrants who have moved, and registrants who have died or otherwise are no longer eligible to vote in federal elections" in Michigan's voter rolls. 2026 WL 362789, at *9.

inspection. *Bellows*, 92 F.4th at 56 (collecting cases); *see Benson*, 2026 WL 362789, at *3 (collecting cases). In fact, courts have repeatedly noted that requiring disclosure of sensitive personal information under the NVRA would have a chilling effect on prospective registrants, "potentially *undermin[ing]* the voter registration goals of the NVRA." *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 712 (E.D. Va. 2010) (emphasis added) (addressing disclosure of social security numbers); *accord True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014) (disclosure of personally identifiable information, with the attendant risks of identity theft and other harms, would "contravene[] the NVRA's purpose and historical bases for enactment, and would have the opposite effect than Congress intended").

For this reason, among others, courts have rejected DOJ's argument that it is entitled to obtain unredacted VRLs under the NVRA. *See Benson*, 2026 WL 362789, at *3 ("[I]nterpreting [the NVRA] to require such disclosure would contradict the NVRA's objective of increasing voter participation because the risk of having one's personal information misused will deter people from registering to vote." (citation omitted)); *Weber*, 816 F. Supp. 3d at 1176 ("DOJ's request for the sensitive information of Californians stands to have a chilling effect on American citizens … who may consider not registering to vote or skip casting a ballot because they are worried about how their information will be used."). In short, protecting such information from disclosure does not conflict with the NVRA's purposes, but rather serves them.

42

If anything, that conclusion applies even more strongly to the CRA, a statute expressly designed to protect individuals' voting rights against intimidation. Nothing in the CRA's requirement that election officials "retain and preserve" voter registration materials, 52 U.S. § 20701, prohibits States from protecting their citizens' privacy by redacting certain personally identifiable information. Indeed, when the CRA was enacted, election officials did not typically possess records of registrants' driver license or social security numbers. Nor did DOJ need such information to enforce the CRA's guarantees of individuals' voting rights. The requirement to record that information in voter rolls did not arise until HAVA's enactment in 2002. *See* 52 U.S.C. § 21083(a)(5)(A). Thus, as the Fifth Circuit made clear in *Lynd*, the types of records available under the CRA were "*not* … confidential, private papers," but rather "public records which ought ordinarily to be open to legitimate reasonable inspection." 306 F.2d at 231 (emphasis added). And since the time—starting decades later—that voter registration records *have* contained such confidential, sensitive information, federal law has deemed its redaction "appropriate and permissible." *Oregon*, 2026 WL 318402, at *12 (holding that the CRA did not preempt Oregon law prohibiting disclosure of driver license and social security numbers in the VRL).

Moreover, DOJ's own enforcement history demonstrates that it does not need driver license or social security numbers to successfully challenge States' list-maintenance programs.[23] *Contra* MTC at 18–19 (insisting that anything less

___

[23] *See* DOJ, *Cases Raising Claims Under the National Voter Registration Act* (Mar. 6, 2025), https://perma.cc/4JXM-K64A (identifying multiple suits from

43

than the sweeping authority DOJ demands would frustrate its ability to enforce the NVRA and HAVA—despite lacking proof for its assertion, notwithstanding that both statutes have been in effect for decades). What *is* relevant to assessing States' compliance with the NVRA and HAVA are their list-maintenance processes and procedures.[24] *See Benson*, 136 F.4th at 627–28; *Bellitto*, 935 F.3d at 1205. But that is not the information DOJ seeks here. Because the CRA does not require New Jersey to disclose its registrants' sensitive personally identifiable information, New Jersey could not have violated the CRA by declining to produce an unredacted copy of its VRL. Once again, this Court must dismiss.

## IV.    DOJ's Demand Violates Multiple Federal Privacy Laws.

Even if DOJ had otherwise stated a claim under the CRA, multiple federal privacy laws also bar DOJ's sweeping demand for the confidential information of millions of New Jersey voters. The Complaint therefore warrants dismissal for this additional reason.

### A.    DOJ's Demand Violates The Privacy Act.

The Privacy Act bars DOJ's demand for an unredacted copy of New Jersey's VRL. Congress passed the Privacy Act to "provide certain safeguards for an individual against an invasion of personal privacy." Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896 (1974). The Act accomplishes this by, among other things, regulating federal agencies' collection of records regarding Americans'

---

the mid-2000s, with no indication that DOJ ever had any pre-suit access to individual registrants' driver license or social security numbers).

[24] New Jersey provided that information to DOJ in its August 28, 2025 letter. Fleming Decl., Ex. 5. DOJ never responded to that letter.

First Amendment activities. *Id.* § 3. Enacted in the wake of the Watergate and Counterintelligence Program scandals, the Act was a response, in part, to concerns about the potential creation of "formal or de facto national data banks" or "centralized Federal information systems." *S. Comm. on Gov't Operations & H.R. Comm. on Gov't Operations*, 94th Cong., 2d Sess., *Source Book on Privacy* at 168 (1976), https://perma.cc/P4BS-6GYU. Under the Act, before a federal agency establishes or revises a "system of records" (i.e., a group of "records" about an individual collected or maintained by that agency), it must first publish a notice ("SORN") in the Federal Register. 5 U.S.C. § 552a(a)(3)–(5), (e)(4). Each SORN must identify various information, including the categories of records maintained, the categories of individuals on whom the records are maintained, the expected "routine use" of the records, the categories of users, and policies governing access, storage, and disposal. *Id.* § 552(e)(4).

Here, DOJ concedes it is bound by the Privacy Act. Compl. ¶ 28. But it has not identified any SORN adequate to cover the national database of confidential voter information it seeks to create. DOJ has relied principally on the SORN published at 68 Fed. Reg. 47610-01, 47611 (Aug. 11, 2003). *See* Fleming Decl., Ex. 7, at 2 & n.1. That SORN, however, lists only narrow categories of individuals, such as "[s]ubjects of investigations, victims, [and] potential witnesses." 68 Fed. Reg. at 47611. And the identified categories of records are those one would expect to find in DOJ's files: "case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." *Id.* No reasonable reader of

45

that SORN would come away with the impression that DOJ's files will contain complete and unredacted state voter registration lists, including sensitive personally identifiable information on millions of registered voters in New Jersey and other States.[25]

The two other SORNs DOJ cites are also unavailing. *See* Fleming Decl., Ex. 7, at 2 & n.1. The 2005 SORN at 70 Fed. Reg. 43904-01 allows DOJ to publicly disclose records maintained under the 2003 SORN after "the investigation is closed." And the 2017 SORN at 82 Fed. Reg. 24147-01 addresses disclosures after data breaches. Neither provides "sufficient notice to the American public" that the Federal Government will collect and maintain complete, unredacted VRLs containing the sensitive data of millions.

Importantly, an agency must provide "adequate advance notice" to Congress and the Office of Management and Budget before "mak[ing] a significant change in a system of records … to permit an evaluation of the probable or potential effect of such proposal on the privacy or other rights of individuals." 5 U.S.C. § 552a(r). "Significant change" includes substantial changes to the number, type, or categories of individuals about whom records are maintained. OMB, Circular No. A-108, at 5–6, 13–17 (Dec. 2016), https://perma.cc/3NKT-64HA. DOJ's attempt to collect sensitive personal information on *every* registered New Jersey voter (if not every registered American) easily satisfies that

---

[25] Troublingly, this SORN permits DOJ to disclose the subject records not only to other federal agencies, but also to private "individual[s] or organization[s]," if DOJ has "reason to believe" they can assist DOJ in its investigation or other functions. *Id.* at 47611–12.

46

standard. Because DOJ has not provided the required notice, its demand is invalid under the Privacy Act—even assuming that it were otherwise permitted under the CRA in the first place. *Weber*, 816 F. Supp. 3d at 1193–94.

### B.   DOJ's Demand Violates The E-Government Act.

DOJ has also not complied with the E-Government Act, Pub. L. No. 107-347, § 208, 116 Stat. 2899 (2002), which requires federal agencies to conduct a "privacy impact assessment" (PIA) *before* "initiating a new collection of information" that will be collected or maintained using information technology and that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual" if the information encompasses "10 or more persons." *Id.* § 208(b); *see EPIC v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 309 (D.D.C. 2017); OMB Guidance, M-03-22 (Sept. 26, 2003). The information in New Jersey's VRL includes personal information protected by the E-Government Act. Yet the Complaint fails to allege that DOJ completed the required PIA. That failure also warrants dismissal. *Weber*, 816 F. Supp. 3d at 1194.

### C.   DOJ's Demand Violates The Driver's Privacy Protection Act.

DOJ's demand also violates the Driver's Privacy Protection Act (DPPA), 18 U.S.C. §§ 2721–2725, which generally prohibits disclosure of driver license and social security numbers obtained by the New Jersey Motor Vehicle Commission (NJMVC) in connection with a motor vehicle record, *id.* §§ 2721(a), 2725(1), (3), (4). These protections extend to the personal information the Divi-

sion of Elections receives from NJMVC to carry out its voter registration functions. *Id.* § 2721(b)(1), (c); N.J. Stat. Ann. § 39:2-3.2. But contrary to DOJ's claim, Compl. ¶ 28 (making legal argument that disclosure of a motor vehicle record is still allowed if disclosure is for use by a government agency "carrying out the government agency's function to accomplish its enforcement authority"), its demand does not fall within a permissible use because it has not said why it needs voters' driver license or social security numbers to "carry[] out its functions." 18 U.S.C. § 2721(b)(1); *see supra* Section II.B–C (explaining why the requested material is not being requested for an actual CRA enforcement purpose, but instead purportedly for NVRA/HAVA purposes, and possibly for other unstated purposes). So this Court should dismiss the Complaint for this reason too. *Weber*, 816 F. Supp. 3d at 1195.

## V.     The CRA Does Not Require Electronic Disclosure.

Even putting all other deficiencies aside, the CRA does not require electronic production of any records. *Contra* Compl. at 9. Instead, records within the CRA's scope, when properly demanded, need only "be made available for inspection, reproduction, and copying at the principal office of [the] custodian." 52 U.S.C. § 20703. That limitation was a deliberate choice by Congress, which wanted to "avoid[]" the "charge" that "the federal government [was] interfer[ing] unduly with state control over voting records." *See Proposed Civil Rights Legislation: Hearing Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. 13–14 (1959) (statement by William P. Rogers, U.S. Att'y Gen.), https://perma.cc/H64U-GYMG. DOJ's demand for an

48

electronic copy of the State's VRL, rather than mere in-person access to and copying of that VRLs, thus transgresses the limitations Congress established. *See Greater Birmingham Ministries, Inc. v. Sec'y of State*, 105 F.4th 1324, 1332–33 (11th Cir. 2024) (NVRA does not require electronic production of records as "electronic production is neither public inspection nor photocopying; it is an entirely different method of disclosure").

## VI.    DOJ's Motion To Compel Should Be Denied.

For all the reasons that Defendant's motion to dismiss should be granted, DOJ's motion to compel should be denied. The motion to compel is an improper attempt to circumvent the Court's normal review. Remarkably, DOJ asserts that the Court must order New Jersey to provide its unredacted VRL without examining the merits of DOJ's claim or resolving any material factual disputes. But nothing excuses DOJ from the obligation to demonstrate that it complied with the CRA, or other applicable laws, before obtaining sensitive voter records—as every court to consider DOJ's recent salvo of VRL demands has concluded.

This Court should reject DOJ's argument that the CRA displaces "usual notions under the Federal Rules of Civil Procedure" and creates a "special statutory proceeding," under which the Court is restricted to a "severely limited" inquiry. MTC at 4–5 (quoting *Lynd*, 306 F.2d at 225–26); *see also id.* at 6 (asserting that, under "Fifth Circuit authority …, the Federal Rules of Civil Procedure do not apply to the CRA's special statutory proceeding"). To support its argument, DOJ leans heavily on language from *Lynd*, a set of consolidated cases that arose out of investigations into discriminatory election practices in Jim Crow-

era Mississippi and Louisiana. There, faced with local election officials flouting the document retention requirements of the CRA to stymie investigation efforts, the Fifth Circuit opined that judicial enforcement of a demand under Title III "is a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. According to DOJ's reading of *Lynd*, it is entitled to an order compelling production of any federal election records it demands, upon a mere showing that "the written demand [for records under the CRA] was made" and "the custodians against whom orders are sought have been given reasonable notice of the pendency of proceeding." MTC at 5 (quoting *Lynd*, 306 F.2d at 226); *see also id.* at 2 (setting forth the legal standard purportedly governing the motion to compel); *id.* at 20–21. In other words, DOJ contends that the Court has no discretion and no choice but to allow DOJ access to whatever documents it requests, at any time, and over any objections, no matter how well founded.

DOJ's theory is untenable for multiple reasons. *First*, its reliance on *Lynd* is misplaced given both the plain text of the Federal Rules and Supreme Court precedent. The Federal Rules of Civil Procedure govern "in all civil actions and proceedings …, excepted as stated in Rule 81." Fed. R. Civ. P. 1. Rule 81 includes exceptions in proceedings not relevant here and reinforces that the Federal Rules apply. Fed. R. Civ. P. 81(a). The Federal Rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed.

50

R. Civ. P. 1. And "a civil action is commenced by filing a complaint with the court"—just as DOJ did in commencing this action. Fed. R. Civ. P. 3.

The Federal Rules apply here. The CRA simply states that where an election officer does not comply with a CRA demand, DOJ can seek judicial relief: "The United States district court for the district in which a demand is made" under 52 U.S.C. § 20703 "shall have jurisdiction by appropriate process to compel the production of such record or paper." *Id.* § 20705. The CRA thus calls for "appropriate process," not a "special" statutory proceeding, as DOJ contends.

Indeed, after the Fifth Circuit's non-binding decision in *Lynd*, the Supreme Court considered analogous statutory language and held that the Federal Rules apply in circumstances like these. *See United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). *Powell* involved a provision of the Internal Revenue Code that, like Title III, allows a federal agency to compel the production of records "by appropriate process." 26 U.S.C. § 7604(a). The Court held that because the statute referenced "appropriate process" but "contain[ed] no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 58 n.18.

Although DOJ attempts to distinguish *Powell* on the basis that it addressed a different statute, *see* MTC at 7, DOJ offers no compelling argument that the same language—that courts "shall have jurisdiction by appropriate process"—has a different meaning in the Internal Revenue Code than in the Civil Rights Act. Both allow a federal agency to compel the disclosure of records "by appropriate process." If the Federal Rules apply to one, they should also apply to the

51

other. *See Amore*, 2026 WL 1040637, at *4 (agreeing "that the Federal Rules of Civil Procedure govern this case, and that DOJ is not entitled to any sort of summary or abbreviated procedures for obtaining the information it seeks"); *Fontes*, 2026 WL 1177244, at *1 ("[I]n accord with [*Powell*], the Court finds that the Federal Rules of Civil Procedure applies [sic] to this action."); *Weber*, 16 F. Supp. 3d at 1182 (same); *Oregon*, 2026 WL 318402, at *8 (same).

*Second*, even putting aside that the 1960s Fifth Circuit cases relied on by DOJ precede *Powell* and are not binding on this Court, their holdings are not to the contrary. Although *Lynd* used broad language that conflicts with the application of the Federal Rules, the circumstances in *Lynd* show that the CRA's statutory requirements were met, the nexus to race discrimination in voting was clear, and there was no other indication that the demand was unlawful. 306 F.2d at 228–29 & n.6. Further, *Lynd* expressly noted that disputes about whether demanded records fell within the scope of the CRA "would, of course, be open for [judicial] determination." *Id.* at 226. *Alabama ex rel. Gallion v. Rogers*, another case cited by DOJ, considered a constitutional challenge to the CRA on the merits. 187 F. Supp. 848, 853 (M.D. Ala. 1960). Neither case stands for the proposition that courts must—or may—refuse to review whether DOJ's demands satisfy the requirements of the CRA and are otherwise lawful.

*Third*, even if DOJ were generally empowered to elect to pursue a "summary proceeding" in lieu of a civil action under the Federal Rules, it did not do so here. Instead, it "made an affirmative choice to file a complaint and proceed through ordinary litigation." *Oregon*, 2026 WL 318402, at *8 n.1. Indeed, DOJ

has elected to proceed via a complaint in all its 31 actions seeking States' VRLs. And its conduct in this matter belies any asserted need to proceed on an "expedited basis." *See* MTC at 3. When DOJ sent its CRA demand letter to New Jersey on August 14, 2025, the State responded within one week, requesting clarification—as DOJ's letter had invited. Fleming Decl., Exs. 3, 4. But DOJ ignored these requests, failing to provide any further communication for over three months. *See id.*, Ex. 6. When DOJ ultimately commenced suit in late February 2026, it chose to file a standard complaint under Federal Rule 3, not a *Lynd*-style application—and did not file its motion to compel in this action until more than a month later. Having set the civil-action machinery of the Federal Rules in motion, DOJ should not now be permitted to repudiate the procedures it invoked. *See Amore*, 2026 WL 1040637, at *4 n.1; *Oregon*, 2026 WL 318402, at *8 n.1.

*Fourth*, DOJ's appeal to applications to enforce "administrative subpoenas"—which, DOJ suggests, are an appropriate model for the "summary" proceeding it now seeks, MTC at 5–6—is unavailing. In such proceedings, the Third Circuit has repeatedly applied *Powell*, emphasizing that "the district court's role is not that of a mere rubber stamp, but of an independent reviewing authority called upon to insure the integrity of the proceeding." *FDIC v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (citation modified). Among other requirements, "the agency must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry is relevant, … and that the administrative steps required by the statute have been followed." *Id.* (citing *Powell*, 379 U.S. at 57-

58). The Third Circuit has further instructed that "privacy concerns must be considered" when "personal documents of individuals … are the subject of an administrative subpoena." *Id.*; *see also Chao v. Cmty. Tr. Co.*, 474 F.3d 75, 79 (3d Cir. 2007) (reciting standard for enforcement of administrative subpoena); *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 574, 576–77, 579–80 (3d Cir. 1980). So even were the disanalogous scenario of administrative subpoenas somehow relevant, it does not help DOJ in this case.

Even *Benson*, which DOJ cites extensively, opined only that the court's role when faced with a demand under the CRA was limited, not that such a demand was functionally unreviewable. 2026 WL 362789, at *7 (construing demand as administrative subpoena but noting court must still determine whether agency has complied with statutory requirements and is not acting in bad faith). And, of course, like every other federal court that has adjudicated DOJ's demands for States' unredacted VRLs, the *Benson* court actually granted that State's motion to dismiss with prejudice—just as this Court should do here.

At bottom, as six unanimous decisions underscore, nothing in the CRA authorizes or requires this Court to summarily dispose of this case by rubber-stamping DOJ's demand. To the contrary, even under the "summary proceeding" model DOJ invokes, DOJ's demand for New Jersey's VRL must be rejected as a matter of law: the records sought are not within the scope of the CRA, *see supra* Section I; DOJ has failed to satisfy the statutory requirement to state "the basis and the purpose" of its request, let alone a legally sufficient basis and pur-

54

pose, and has not justified evading discovery into the accuracy of its given purpose, *see supra* Section II; the records DOJ seeks are not relevant to the purpose it asserts, *see supra* Section III; and DOJ's demand violates privacy laws, *see supra* Sections III–IV. Each defect is fatal to this suit; together they are overwhelming.

## CONCLUSION

The Court should deny DOJ's motion to compel and grant the State's motion to dismiss.

Respectfully submitted,

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

Dated: May 4, 2026

/s/ *Robert A. Wiygul*
Robert A. Wiygul
Jason A. Levine
Hangley Aronchick Segal Pudlin & Schiller
1415 Route 70 East, Suite 405
Cherry Hill, NJ 08034
(856) 616-2100
rwiygul@hangley.com

Jeremy M. Feigenbaum
Solicitor General

Stephen Ehrlich
Deputy Solicitor General

Liza B. Fleming
Deputy Attorney General
R.J. Hughes Justice Complex,
25 Market Street, P.O. Box 080
Trenton, New Jersey 08625

*Attorneys for Defendant Dale G. Caldwell*

55