**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

THE UNITED STATES OF AMERICA,

*Plaintiff*,

v.

DR. DALE G. CALDWELL, in his official capacity as LIEUTENANT GOVERNOR and SECRETARY of STATE of NEW JERSEY,

*Defendant*.

Case No. 3:26-CV-2025 (ZNQ-JTQ)

MOTION DAY:
July 6, 2026

# BRIEF IN SUPPORT OF MOTION TO DISMISS FILED BY INTERVENOR-DEFENDANTS THE NAACP; NAACP NEW JERSEY STATE CONFERENCE; SALVATION AND SOCIAL JUSTICE; AAPI NEW JERSEY; RETURNING CITIZENS SUPPORT GROUP; ASSOCIATION OF BLACK WOMEN LAWYERS OF NEW JERSEY; GARDEN STATE BAR ASSOCIATION; NEW JERSEY MUSLIM LAWYERS ASSOCIATION; PEOPLE'S ORGANIZATION FOR PROGRESS; AND EDWIN ORTIZ

**NEW JERSEY INSTITUTE FOR SOCIAL JUSTICE**
Micauri Vargas
Ryan P. Haygood
Henal Patel
Nuzhat Chowdhury
Heather Richner*
60 Park Place, Suite 511
Newark, New Jersey 07102
Telephone: (973) 624-9400

**PASHMAN STEIN WALDER HAYDEN, P.C.**
CJ Griffin
Gary S. Stein
Court Plaza South
21 Main Street, Suite 200
Hackensack, NJ 07601
Telephone: (201) 488-8200

*Counsel for Intervenor-Defendants*

**Admitted pro hac vice*

# TABLE OF CONTENTS

INTRODUCTION....1

LEGAL ARGUMENT....1

I. Title III of the CRA is Intended Only to Advance the CRA's Express Purpose of Protecting Voters from Racial Discrimination....1

II. Courts Have Found the DOJ is Seeking VRLs for Impermissible Uses....5

CONCLUSION....9

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States v. Oregon*,
No. 25-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026) ........ 7, 8

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ........ 6, 7

**Statutes**

52 U.S.C. §20701 ........ 4

**Other Authorities**

H.R. Rep. No. 86-956 (Aug. 20, 1959) ........ 3

*Iowa, Naturalized Citizens Settle Lawsuit Over Voter Eligibility Challenges Ahead of 2024 Election*, AP News (Feb. 11, 2026) ........ 9

*Proposals to Secure, Protect, and Strengthen Civil Rights of Persons Under the Constitution and Laws of the United States: Hearings before Subcommittee on Constitutional Rights of the S. Committee on the Judiciary*,
86th Cong. 1st Sess. 191 (1959) ........ 3

*Sumpter County, Alabama and the Origins of the Voting Rights Act*,
54 Ala. L. Rev. 877 (2003) ........ 2

*The Trump Administration's New Weapon Against Foes: Mortgage Filings*,
Wash. Post. (Aug. 26, 2025) ........ 5

*The Rise and Fall of the United States Commission on Civil Rights*,
22 Harv. C.R.-C.L. L Rev. 449 (1987) ........ 2, 3

## INTRODUCTION

Intervenor-Defendants adopt Defendant Dale G. Caldwell's arguments that the Department of Justice (DOJ) has failed to state a claim under the Civil Rights Act of 1960 (CRA). Intervenor-Defendants are racial justice organizations and an individual voter whose communities have long faced discrimination in voter registration and political participation. Yet the DOJ invokes Title III of the CRA to compel disclosure of sensitive voter information, implicating the very communities the statute was enacted to protect. This brief focuses on the CRA's anti-discrimination purpose and how the DOJ seeks records not to combat racial discrimination in voting, but to create a federal voter database that will be weaponized to disenfranchise voters of color, immigrants, and other marginalized communities. The DOJ's use of the CRA to obscure its true intent is a blatant perversion of Congress's purpose in enacting the statute. The complaint should therefore be dismissed, and the DOJ's accompanying motion to compel denied.

## LEGAL ARGUMENT

### I. Title III of the CRA is Intended Only to Advance the CRA's Express Purpose of Protecting Voters from Racial Discrimination

"The right to vote is the cornerstone of the Republic, and the key to all other civil rights." U.S. Comm'n on Civil Rights, Report of the United States Commission on Civil Rights 19 (1959) (CCR Rep.). Consistent with that principle, Title III's legislative history makes clear that Congress's intent in passing the law was to

empower the Attorney General of the United States to request voter applications and related records specifically to investigate racial discrimination.

In 1957, Congress passed the Civil Rights Act of 1957, which, among other things, established the Commission on Civil Rights to investigate the continuing disenfranchisement of Black voters. *See* Brian K. Landsberg, *Sumpter County, Alabama and the Origins of the Voting Rights Act*, 54 Ala. L. Rev. 877, 881 (2003). In 1959, the Commission issued a report documenting widespread complaints from voters who were disenfranchised due to their race (and their affiliation with groups like the Intervenor-Defendant NAACP). *See* CCR Rep. at 55-58. The Commission also documented substantial obstruction of its investigations, with some counties flouting its subpoena powers, judges impounding registration records or enjoining the Commission from holding hearings, and at least one state passing a law authorizing the destruction of registration records. *See* Jocelyn C. Frye, Robert S. Gerber, Robert H. Pees, and Arthur W. Richardson, *The Rise and Fall of the United States Commission on Civil Rights*, 22 Harv. C.R.-C.L. L. Rev. 449, 456-58 (1987); CCR Rep. at 69-106. Although the destruction of these registration records hindered its investigation, the Commission's review of the records that remained still revealed racial discrimination, including practices that allowed white applicants—but not Black applicants—to correct errors on their registration forms. *See* CCR Rep. at 94.

Congress responded to the CCR Report by passing the Civil Rights Act of 1960 (CRA). In hearings leading up to the CRA's passage, the U.S. Attorney General explained that Title III was designed "to implement the authority vested in the Attorney General by the Civil Rights Act of 1957, to institute civil proceedings for preventative relief against discriminatory denials of the right to vote in Federal elections." *Proposals to Secure, Protect, and Strengthen Civil Rights of Persons Under the Constitution and Laws of the United States: Hearings before Subcommittee on Constitutional Rights of the S. Committee on the Judiciary*, 86th Cong. 1st Sess. 191 (1959) (statement of William P. Rogers, U.S. Att'y Gen.), https://perma.cc/H64U-GYMG. He testified that to establish proof of discrimination, "access to detailed information concerning applications, registrations, or other acts, tests, and procedures requisite to voting" was necessary to make comparisons and determine "who has been permitted to register to vote or vote and who has not, and to make the necessary racial breakdown." *Id*.

The House Report on H.R. 86-956 also makes it clear that Title III's purpose was to protect voters from racial discrimination and to empower the Attorney General to investigate such claims:

> *The purpose of Title III is to provide a more efficient protection of the right of all qualified citizens to vote without discrimination on account of race*. This is the same purpose contained in the Civil Rights Act of 1957, which authorizes the Attorney General to institute civil

> proceedings for preventive relief from the discriminatory denial of the right to vote. Experience has shown the need for this legislation. So long as there is lacking a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit, the authority of the Attorney General is rendered relatively ineffective. The situation requires evidence which is practically impossible to assemble *unless access is had to detailed information concerning application, registration, tests, and other acts and procedures requisite to voting.*
>
> Moreover, such information is mandatory for a proper evaluation of complaints.
>
> [H.R. Rep. No. 86-956 (Aug. 20, 1959) at 7 (emphasis added).]

With this context, the CRA clearly does not authorize the DOJ's request for New Jersey's unredacted voter registration list (VRL). A review of the problem that Congress enacted Title III to address, the text of the statute, and the history of the CRA demonstrates that Congress authorized access to voting records for the limited purpose of investigating racial discrimination in voting. The CRA requires access to "records and papers which come into [the] possession" of election officials "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. §20701. These are the exact type of records the Commission subpoenaed to investigate complaints of disenfranchisement under the CRA of 1957 so that it could compare how applicants of different races were treated, such as whether white applicants were permitted to correct application errors while

Black applicants were not. Congress enacted Title III to give the Attorney General access to those specific types of records. Access to social security numbers, driver's license numbers, and other highly sensitive information is not relevant or necessary to carry out the CRA's stated purposes. Moreover, as discussed below, it appears that the DOJ is truly seeking these records for reasons that are antithetical to the purpose of the CRA. Because the DOJ seeks information beyond the authority Congress conferred, the complaint should be dismissed with prejudice.

## II. Courts Have Found the DOJ is Seeking VRLs for Impermissible Uses

The DOJ vaguely asserts that it seeks the unredacted VRLs to ensure New Jersey's compliance with federal "list maintenance" obligations. But as the Intervenor-Defendants detailed in their motion to intervene, the DOJ is actually on a nationwide hunt for highly sensitive data to create a centralized federal database that could be weaponized to target voters for disenfranchisement, facilitate immigration enforcement, or serve other current Executive Branch objectives, including the selective targeting of political enemies or marginalized people.[1] Def.

[1] These are not exaggerated concerns. As Caldwell notes in his brief, the DOJ has entered into agreements with the Department of Homeland Security (DHS) to allow DHS to use VRLs for immigration and criminal investigation. Caldwell's. Mot. Dismiss 36 (ECF 50-1). And in other contexts, the Director of the Federal Housing Finance Agency has been accused of accessing the sensitive financial information of President Trump's political targets, such as New York Attorney General Letitia James, to bring mortgage fraud claims against her. *See* Rachel Siegel, *The Trump Administration's New Weapon Against Foes: Mortgage Filings*, Wash. Post. (Aug.

Intervenor Mot. Intervene 3 (ECF 10-1). Multiple federal courts have agreed when deciding motions to dismiss, with one calling the DOJ's stated purpose of list maintenance "contrived." *United States v. Weber*, 816 F. Supp. 3d 1168, 1184 (C.D. Cal. 2026).

In dismissing the DOJ's lawsuit against California, District Judge David O. Carter detailed the many reasons why the DOJ really wanted the information:

> Representations by the DOJ itself show that their requests to states for voter roll data go beyond their purported compliance check with the NVRA and into the territory of comprehensive data collection. Former Deputy Assistant Attorney General of the DOJ's Civil Rights Division Michael Gates said . . . that the goal was for all fifty states to receive similar requests for voter rolls so that the government could get the last four digits of every voter's Social Security number. In a statement, the DOJ said that the state voter roll data provided to the Civil Rights Division is "being screened for ineligible voter entries" and [it was] further confirmed that the DOJ had "checked 47.5 million voter records."
>
> But behind this screening, there appears to be a different purpose. A lawyer working in the DOJ's Voting Section tasked with obtaining states' voter rolls was concerned that "the data would be used not for purging voter rolls of people who aren't eligible to vote, but for broader immigration enforcement." DOJ's relationship with DHS further confirms that voting rolls data is being used to compile a national database with millions of voters' private information.

---

26, 2025), https://www.washingtonpost.com/business/2025/08/25/trump-mortgage-filings-lisa-cook/.

> In other similar cases involving two other states, the DOJ asked election officials to run their entire voter list through the SAVE database – a database housed in DHS and used as the central federal database for citizenship records. These requests by the DOJ mirror requests by DHS itself to states like North Carolina, and complement an executive order by President Trump directing DHS to review publicly available voter registration lists against federal immigration databases. DHS officials have confirmed that the federal government is "finally doing what it should have all along – sharing information to solve problems."
>
> [*Weber*, 816 F. Supp. 3d at 1185-86 (internal citations omitted) (adding that technology company Palantir has been enlisted to amass a centralized database within the Executive Branch).]

In dismissing the complaint, Judge Carter did "not take lightly DOJ's obfuscation of its true motives" and held it could not "circumvent[] the authority granted to them by Congress . . . under the guise of a pretextual investigative purpose." *Id.* at 1186.

In Oregon, District Judge Mustafa T. Kasubhai found the DOJ could no longer "be taken at its word" and that since the *Weber* decision, the DOJ continued to "engage in conduct raising suspicion about the purposes for which it seeks unredacted voter registration lists." *United States v. Oregon*, No. 25-1666, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026).

> Attorney General Pamela Bondi sent a letter to Minnesota Governor Tim Walz regarding immigration enforcement in Minnesota. The letter details the Attorney General's views about the state of "lawlessness" regarding

> immigration enforcement in Minnesota and concludes with a list of demands to "restore the rule of law' through 'common sense solutions." Among those is a demand for Minnesota to "allow the Civil Rights Division of the [DOJ] to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the [CRA] of 1960." The context of this demand within a letter about immigration enforcement casts serious doubt as to the true purposes for which [DOJ] is seeking voter registration lists in this and other cases, and what it intends to do with that data.
>
> While the Court's decision[s] granting [the] motions to dismiss are firmly grounded on the application of law, [DOJ]'s conduct and written demands on states for disclosure of their highly sensitive voter information should not be ignored. Defendants' and Intervenors' expressed concerns about [DOJ]'s ulterior motives for seeking the sensitive data require attention. The presumption of regularity that has been previously extended to [DOJ] that it could be taken at its word – with little doubt about its intentions and stated purposes – no longer holds. When [DOJ], in this case, conveys assurances that any private and sensitive data will remain private and used only for a declared and limited purpose, it must be thoroughly scrutinized and squared with its open and public statements to the contrary.
>
> [*Id.*]

The fact that the DOJ has demanded unredacted VRLs from nearly every state and initiated litigation across the country demonstrates that this effort extends far beyond what Congress intended for Title III—investigating specific complaints of racial discrimination and disenfranchisement. These risks disproportionately affect communities historically subjected to heightened scrutiny in voting and registration,

including communities of color, naturalized citizens, and formerly incarcerated voters. For example, Intervenor-Defendant Mr. Ortiz, a formerly incarcerated U.S. citizen with a common name, believes that erroneous database matching could wrongly flag him or subject him to heightened scrutiny. *See* Ortiz Decl. ¶¶ 10-12, 15 (ECF 10-12); *see also* Hannah Fingerhut, *Iowa, Naturalized Citizens Settle Lawsuit Over Voter Eligibility Challenges Ahead of 2024 Election*, AP News (Feb. 11, 2026), https://apnews.com/article/iowa-voters-immigration-lawsuit-citizenship-2024-3f78043bc4682734a133b78030803323.

The CRA, however, was enacted to empower the DOJ to investigate and address complaints of racial discrimination in voting. Instead, the DOJ seeks broad access to confidential voter data to target marginalized communities for political purposes. This Court should not permit such unfettered access to highly sensitive voter data. The information the DOJ has already received—New Jersey's redacted VRL and its list maintenance procedures—is entirely sufficient for the DOJ to ascertain that New Jersey has complied with its list maintenance obligations under federal law. The DOJ's motion to compel should thus be denied and its complaint should be dismissed with prejudice.

## **CONCLUSION**

For the foregoing reasons, as well as those outlined in Defendant Caldwell's motion to dismiss, the Court should dismiss the DOJ's complaint with prejudice and

deny the motion to compel.

Dated: May 11, 2026

Respectfully Submitted,

/s/ CJ Griffin, Esq.________
CJ Griffin
Gary S. Stein
**Pashman Stein Walder Hayden P.C.**
Court Plaza South
21 Main Street, Suite 200
Hackensack, NJ 07601
(201) 488-8200

Micauri Vargas
Ryan P. Haygood
Henal Patel
Nuzhat Chowdhury
Heather Richner*
**New Jersey Institute For Social Justice**
60 Park Place, Suite 511
Newark, New Jersey 07102
(973) 624-9400
**Admitted pro hac vice*

*Counsel for Intervenor-Defendants*