## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DR. DALE G. CALDWELL, in his official capacity as LIEUTENANT GOVERNOR and SECRETARY OF STATE of NEW JERSEY,<br><br>Defendant. | Civil Action No. 3:26-cv-02025<br><br>Hon. Zahid N. Quraishi, U.S.D.J. |

## BRIEF OF AMICUS CURIAE THE UNITED BLACK AGENDA IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

*Of Counsel & On the Brief*:
Abbey True Harris
Mark J. Marsella
Alexander J. Gacos

CONNELL FOLEY LLP
56 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-0500
*Attorneys for Amicus Curiae*
*United Black Agenda*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

INTEREST OF AMICUS CURIAE ..................................................................... 4

STATEMENT OF FACTS .................................................................................. 6

LEGAL ARGUMENT........................................................................................ 8

POINT I                                                                            8

THE DEPARTMENT'S DEMAND FOLLOWS A LONG
HISTORY OF USING GOVERNMENT REGISTRATION LISTS
TO SUPPRESS AND INTIMIDATE BLACK VOTERS................................. 8

   A. American voting rights history reflects recurring cycles of
      progress followed by backlash that weaponizes voter-
      registration data. ...................................................................................9

   B. The Department seeks to use Title III of the Civil Rights Act
      in a way that would deepen the disenfranchisement the law
      was meant to prevent. ..........................................................................13

   C. Modern history shows that aggregated voter data is still
      turned against voters of color. .............................................................16

POINT II                                                                           18

GRANTING THE DEMAND WOULD PRODUCE THE EXACT
HARMS THE VOTING-RIGHTS ARCHITECTURE WAS
BUILT TO PREVENT: VOTER INTIMIDATION AND THE
CHILLING OF PARTICIPATION. ................................................................. 18

   A. Federal aggregation of voter data will fuel mass eligibility
      challenges that disproportionately remove voters of color
      from the rolls. .....................................................................................19

   B. The mere existence of a federal voter database will chill
      registration and participation, particularly among voters with
      reason to fear surveillance..................................................................20

## TABLE OF CONTENTS

C. The catastrophic risks of breach and misuse of centralized voter data requires sensitive information to be redacted..........................22

CONCLUSION ................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACLU v. Fordice*,
   969 F. Supp. 403 (S.D. Miss. 1994) ..................................................................12

*Crawford v. Marion County Election Bd.*,
   553 U.S. 181 (2008)...........................................................................................9

*Democratic National Committee v. Republican National Committee*,
   671 F. Supp. 2d 575 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir.
   2012) ...........................................................................................................16, 17

*Greidinger v. Davis*,
   988 F.2d 1344 (4th Cir. 1993) ...............................................................20, 21, 23

*Kennedy v. Lynd*,
   306 F.2d 222 (5th Cir. 1962) .......................................................................13, 14

*Louisiana v. Callais*,
   608 U.S. ___ (2026) (Kagan, J. dissenting)........................................................9

*Nat'l Coal. on Black Civic Participation v. Wohl*,
   512 F. Supp. 3d 500 (S.D.N.Y. 2021) .........................................................17, 21

*Pub. Int. Legal Found., Inc. v. Bellows*,
   92 F.4th 36 (1st Cir. 2024)................................................................................23

*Shelby County v. Holder*,
   570 U.S. 529 (2013)...........................................................................................9

*United States v. Amore*,
   No. 25-cv-00639-MSM-PAS (D.R.I.) .................................................................7

*United States v. Lynd*,
   301 F.2d 818 (5th Cir. 1962) .......................................................................13, 14

*United States v. Lynd*,
   349 F.2d 785 (5th Cir. 1965) ............................................................................14

iii

*United States v. Oregon*,
No. 6:25-cv-01666-MTK, 2026 U.S. Dist. LEXIS 25259 (D. Or. Feb. 5, 2026)
..................................................................................................7, 13, 14, 15

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ........................................................6, 15

**RULES**

Fed. R. Civ. P. 12(b)(6)...................................................................................14

**STATUTES**

52 U.S.C. § 10101 ...........................................................................................13

52 U.S.C. § 10307 ...........................................................................................21

52 U.S.C. § 21083 ...........................................................................................23

Civil Rights Act of 1960, Title III ..............................................................*passim*

**OTHER AUTHORITIES**

Carey Heckman, *America's Data Crisis*, 105 Iowa L. Rev. 1363, 1377 (2020)..............................................................................................................21

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025) ...................7, 19

Gilda R. Daniels, *Ending the Cycles of Voter Suppression*, Harv. C.R.-C.L. L. Rev. 373, 374 (2025)..........................................................9, 10, 15, 19

Kaylie Martinez-Ochoa et al., *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Justice (updated Apr. 29, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information ..........................6

Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR (June 29, 2025, 5:00 AM), https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database..................................14, 15

Jude Joffe-Block, *The Justice Department plans to share sensitive voter data with Homeland Security*, https://www.npr.org/2026/03/27/nx-s1-5764266/voter-data-trump-doj-dhs .................................................................................................. 7, 19

Michael Waldman, "The Lasting Effects of Voter Suppression," *Brennan Center for Justice* (May 28, 2025), https://www.brennancenter.org/our-work/analysis-opinion/lasting-effects-voter-suppression ................................................................. 20

"Mississippi Commission's Files a Treasure Trove of Innuendo," Associated Press (Mar. 18, 1998), https://www.mdcbowen.org/p2/bh/badco/missSov.htm .................................... 12

Robert G. Clark, *Oral History Interview Conducted by John Dittmer in Pickens, Mississippi*, Library of Congress (Mar. 13, 2013), https://www.loc.gov/item/2015669174/ ............................................................. 11

Sarah Rowe-Sims, *The Mississippi State Sovereignty Commission: An Agency History*, Mississippi History Now (Sept. 2002), https://mshistorynow.mdah.ms.gov/issue/mississippi-sovereignty-commission-an-agency-history ............................................................... 11

Special Correspondent to the New York Times, *Eisenhower Signs Civil Rights Bill*, N.Y. Times (May 7, 1960) ........................................................ 1

Stephanie R. Rolph, *The Citizens' Council*, Mississippi History Now (Oct. 2019), https://www.mshistorynow.mdah.ms.gov/issue/the-citizens-council ................................................................................................ 11

President Ronald Reagan, *Remarks on Signing the Voting Rights Act Amendments of 1982*, Ronald Reagan Presidential Library and Museum, https://www.reaganlibrary.gov/archives/speech/remarks-signing-voting-rights-act-amendments-1982 ............................................. 3

Press Release, Mich. Att'y Gen., *Burkman and Wohl Sentenced for Intimidating Voters in Robocall Case* (Dec. 1, 2025), https://www.michigan.gov/ag/news/press-releases/2025/12/01/burkman-and-wohl-sentenced-for-intimidating-voters-in-robocall-case ................................................... 17

Press Release, N.Y. Att'y Gen., *Attorney General James Secures Up to $1.25 Million from Conspiracy Theorists Who Intimidated Black Voters with Threatening Robocalls* (Apr. 9, 2024), https://ag.ny.gov/press-release/2024/attorney-general-james-secures-125-million-conspiracy-theorists-who-intimidated;.............................17

Testimony of the Student Nonviolent Coordinating Committee Before the House Judiciary Committee, Appendix C, "Report on LeFlore County" (May 28, 1963), https://www.crmvet.org/docs/6305_sncc_cong_leflore.pdf.............................11

U.S. Dep't of Justice, Civil Rights Division, *Voting Rights Fact Sheet*, https://www.justice.gov/crt/voting-rights-fact-sheet..........................................22

William Sturkey, Ph.D., *A Brief History of the Mississippi State Sovereignty Commission*, Mississippi Department of Archives and History, https://www.dh-mdah.org/mssc-history ...............................................11

## PRELIMINARY STATEMENT

The Civil Rights Act of 1960 was born nearly a century after the Civil War, in reaction to a near century of Post-Reconstruction practices of blatant voter suppression, when poll taxes and literacy tests were the norm, when local officials could block Black voters without consequence, when people of color risked economic ruin or physical violence to even attempt to register to vote. This legislation established federal inspection of local voter registration records to ensure that registration was open to all, and imposed penalties for obstructing the right to register to vote. Congress's purpose in passing this law was plain: to increase voter participation and curb voter intimidation by giving the federal government a way to uncover bias in the voting records and dismantle systems built to keep people from the ballot.

President Eisenhower, in signing the 1960 legislation, noted that the law addressed "that key constitutional right of every American, the right to vote without discrimination on account of race or color. One provision, which requires the retention of voting records, will be of invaluable aid in the successful enforcement of existing voting rights statutes." President Eisenhower concluded that the "new

1

law will play an important role in the days ahead in attaining our goal of equality under law in all areas of our country for all Americans."[1]

Far from honoring that purpose, the Department of Justice proposes to use that very law, passed on lofty principles of voter protection, to demand that the Secretary of State of New Jersey, Lieutenant Governor Rev. Dr. Dale Caldwell, produce all voting records of New Jersey's citizens. This request effectively transforms Title III from a shield into a sword in an attempt to weaponize the law designed to protect against this very type of conduct.

In support of its request for private and sensitive voter information, the Department does not even attempt to fall within the intended scope of Title III of the Civil Rights Act of 1960. The Department points to no specific event of racial bias in any specific place. Nor does it ask for limited records tied to a clear enforcement need. Instead, it demands full access to the entire statewide voter rolls—the private data of millions of New Jersey residents—to be fed into a centralized federal database and used, presumably, as the basis for mass eligibility challenges.

We need not theorize as to whether bulk data collection and mass challenges harm the communities that Title III aims to protect: we know that they do. Poll taxes and literacy tests may be gone. But while the means of intimidation may change, the

---

[1] Special Correspondent to the New York Times, *Eisenhower Signs Civil Rights Bill*, N.Y. Times (May 7, 1960).

2

ends stay the same. Voters of color—long the targets of government surveillance—will bear that burden again, made worse by the errors that multiply when records merge between incompatible systems. No doubt, the Department's demand, whatever the stated grounds, will disparately sting Black voter registration and participation.

Over six decades after the passage of Title III, it should be true—but it is not—that voter intimidation and harassment are remnants of the past. It should be true—but it is not—that the right to vote is not a data collection tool to mine and weaponize. Because these basic principles, which should not be in question, are today at risk, Amicus Curiae United Black Agenda (UBA) is compelled to come before this Court.

UBA respectfully asks this Court to reaffirm longstanding civil rights law and hold that a statute forged in one of the nation's deepest moral tests cannot be repurposed into a weapon that causes the harm that the law was meant to prevent. This Court should grant Dr. Caldwell's motion to dismiss and reaffirm the protection of the unfettered right to vote, "the crown jewel of American liberties," so that we do "not see its luster diminished."[2]

---

[2] President Ronald Reagan, *Remarks on Signing the Voting Rights Act Amendments of 1982*, Ronald Reagan Presidential Library and Museum, https://www.reaganlibrary.gov/archives/speech/remarks-signing-voting-rights-act-amendments-1982.

3

## INTEREST OF AMICUS CURIAE

The United Black Agenda (UBA) seeks to improve the economic, social, and political wellbeing of Black communities throughout the state. Founded in 2017, UBA is now a formal 501(c)(3), invitation-only, statewide coalition of Black-led and allied groups with unparalleled experience in law, policy, and grassroots advocacy on issues affecting Black New Jerseyans.

UBA, on behalf of Black constituents across New Jersey, works with policymakers, community groups, and residents to strengthen economic security and access to democracy. Its mission starts from the truth that New Jersey's long-standing racial gaps in wealth, health, housing, incarceration, and political representation flow from barriers to full civic participation. UBA focuses on removing barriers to voting and ensuring that Black communities have a real voice in the decisions that shape their lives.

UBA has become a central force in New Jersey civic life. It, along with its affiliates, helped establish early in-person voting, online voter registration, and the addition of more than 83,000 new voters, many from historically underrepresented communities. UBA and its affiliated organizations also lead town halls, voter outreach, and ongoing participation in the civic process.

Mindful that democratic access goes beyond voting, UBA has successfully advocated for policies that address structural economic inequality that fall hardest

4

on Black New Jerseyans. Those efforts have helped secure state funding for first-generation homebuyers, expand eviction relief, improve housing stability, and increase Black representation within the judiciary. Indeed, access to democracy is inseparable from economic security and freedom from fear or retaliation.

UBA submits this brief in support of Defendant's motion to dismiss the Department of Justice's complaint, which seeks disclosure of sensitive voter data. UBA appears as amicus curiae to offer additional legal authority, as well as historical context and real-world insight into how such disclosures affect Black voters. The 1.2 million Black New Jerseyans that UBA seeks to represent have long faced—and still face—the disproportionate harms of surveillance, data misuse, and voter intimidation.

Compelling disclosure and aggregation of voter-registration records risks discouraging participation in the communities UBA serves. And UBA's perspective—grounded in lived experience and ongoing voter, civic engagement and economic equity work—adds something the parties alone cannot. For these reasons, UBA respectfully submits that its perspective will aid the Court in a case of serious public importance, by highlighting legal and historical issues that deserve close attention.

## STATEMENT OF FACTS

On July 15, 2025, the United States Department of Justice sent a letter to Defendant, seeking information about New Jersey's voter-registration and list-maintenance procedures, along with an electronic copy of New Jersey's entire statewide voter-registration list. Compl. ¶¶ 20–21. The July 15 letter cited the Help America Vote Act (HAVA) as its authority. *Id.* ¶ 21. On July 29, New Jersey confirmed receipt of the July 15 letter. *Id.* ¶ 24.

When the Department heard nothing, it wrote again on August 14, this time citing Title III of the Civil Rights Act, 52 U.S.C. §§ 20701–20706, as its legal basis. *Id.* ¶¶ 25–27. The August 14 letter demanded "all fields" in the statewide voter file—full names, dates of birth, home addresses, and either driver's license numbers or the last four digits of Social Security numbers. *Id.* ¶ 27.

On August 21, the New Jersey Attorney General's Office refused the demand and asked the Department to explain what statute actually authorized it and what it intended to do with the data. *Id.* ¶ 29. The Department did not answer. About a month later, it filed this lawsuit.

The Department has filed at least 30 similar lawsuits, against states across the country, seeking their voter files.[3] Courts in California, Michigan, Oregon, Arizona,

---

[3] Kaylie Martinez-Ochoa et al., *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Justice (updated Apr. 29, 2026),

Massachusetts, and Rhode Island have dismissed parallel actions. The Department has appealed from the California, Michigan, and Oregon rulings.[4]

Two courts have questioned the Department's stated purpose. In *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026), the Central District of California refused to accept the Department's claim that it sought the data for "voter roll maintenance enforcement and compliance," finding instead that "the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." The District of Oregon called the Department's stated intentions, including plans to use voter data for immigration enforcement, "chilling." *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 U.S. Dist. LEXIS 25259, at *39 (D. Or. Feb. 5, 2026).

Public reporting and the Department's own representations bear out those concerns. Department personnel have said openly that they want "a central, federal database of voter information."[5] And in a March 2026 hearing in a parallel Rhode Island case, the acting chief of the voting section confirmed that the Department

---

https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information.

[4] *Id.*

[5] Devlin Barrett et al., *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

plans to run the voter data it collects against the Department of Homeland Security's

SAVE database, a system used to verify immigration status.[6] *United States v. Amore*,

No. 25-cv-00639-MSM-PAS (D.R.I.).

## LEGAL ARGUMENT

### POINT I

### THE DEPARTMENT'S DEMAND FOLLOWS A LONG HISTORY OF USING GOVERNMENT REGISTRATION LISTS TO SUPPRESS AND INTIMIDATE BLACK VOTERS.

UBA respectfully submits that when considering Dr. Caldwell's Motion to

Dismiss, the Court should evaluate the Department's demand not only through the

text and precedent but also against the historical abuses that led Congress to adopt

the Civil Rights Act's record-inspection provisions in the first place. That history

makes clear that when voter records are gathered and shared beyond their original

administrative purpose, the result has too often been intimidation, retaliation, and

the suppression of Black voters. The Department's demand fits that historical reality

and would enable the same harm. Viewed in that context, the legal and factual gaps

in the Department's complaint lead to only one conclusion: the complaint should be

dismissed with prejudice.

---

[6] Jude Joffe-Block, *The Justice Department plans to share sensitive voter data with Homeland Security*, NPR (Mar. 27, 2026, 5:53 PM), https://www.npr.org/2026/03/27/nx-s1-5764266/voter-data-trump-doj-dhs.

**A.** **American voting rights history reflects recurring cycles of progress followed by backlash that weaponizes voter-registration data.**

American voting rights have unfolded in cycles. As Professor Gilda Daniels explains, "our country has repeatedly endured cycles of voter suppression that involve periods of progress followed by the implementation of regressive laws."[7] Each cycle has lasted roughly a century—from the founding to the Fifteenth Amendment (94 years), and from the Fifteenth Amendment to the Voting Rights Act of 1965 (95 years)—and each ended only when Congress stepped in with landmark legislation to stop deeply rooted disfranchisement.[8] At the heart of these cycles is the contradiction that dates back to the founding: a nation that declared "all Men are created equal,"[9] while allowing a system that at its worst permitted enslavement.

We are 60 years into the third cycle, one that began with the Voting Rights Act of 1965 and has been marked by decades of increasingly aggressive efforts to dismantle it[10]—only now, the barriers are not poll taxes or literacy tests. They have

---

[7] Gilda R. Daniels, *Ending the Cycles of Voter Suppression*, Harv. C.R.-C.L. L. Rev. 373, 374 (2025). Professor Daniels is a professor of law at the University of Baltimore School of Law, author of *UNCOUNTED: The Crisis of Voter Suppression in America* (NYU Press, released January 2020, paperback released October 2021), and a former deputy chief in the Department of Justice, Civil Rights Division, Voting Section.

[8] *Id.*

[9] The Declaration of Independence para. 2 (U.S. 1776).

[10] *See, e.g.*, *Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008) (upholding an Indiana statute requiring valid government-issued photo identification to be presented before voting in person, and finding that the state's interest in

evolved into more technical, data-driven practices that sound neutral but still fall hardest on voters of color.[11] The Department's demand for sensitive voter data—untethered to any claim of discrimination and aggregated across all 50 states and the District of Columbia—fits that historical pattern.

History shows that when such data are gathered and shared, it does not merely collect dust. Again and again, when voter records have been compiled and exposed beyond their original purpose, the same consequence has followed: the empowerment of weaponization against voters, whose rights the recording system is meant to serve.

Consider the misuse of voter registration data in Mississippi. From the end of Reconstruction through the 1960s, the state enacted a series of measures purposed to keep Black citizens from registering to vote. One of the most insidious measures, among the familiar literacy tests and poll taxes, required the names of voter

---

preventing voter fraud outweighed the citizens' interest in voting without restrictions); *Shelby County v. Holder*, 570 U.S. 529 (2013) (invalidating the "preclearance" provision of the Voting Rights Act); *Louisiana v. Callais*, 608 U.S. ___ (2026) (Kagan, J. dissenting) (describing the ruling as rendering Section 2 of the Voting Rights Act "all but a dead letter").

[11] Daniels, *Ending the Cycles of Voter Suppression*, supra at 389-90 (describing how the modern tools of disenfranchisement have turned from poll taxes and literacy tests to mass voter challenges, among other restrictive voting measures, which depend on the aggregation of voter registration data).

applicants to be published in local newspapers.[12] That publication requirement, dressed as a neutral administrative act, was meant to intimidate. By making registrants' names and addresses public, registrars made it easier for employers to fire registrants, landlords to evict them, banks to deny them credit, and vigilantes to threaten or assault them.[13] Registration lists became target lists those set on enforcing racial hierarchy through economic and physical violence.[14]

The Mississippi State Sovereignty Commission, created in 1956 after *Brown v. Board of Education*, applied this practice on an institutional scale.[15] It gathered names of people associated with civil rights work, including voter registration, and

---

[12] *See* Testimony of the Student Nonviolent Coordinating Committee Before the House Judiciary Committee, Appendix C, "Report on LeFlore County" (May 28, 1963), https://www.crmvet.org/docs/6305_sncc_cong_leflore.pdf ("In 1962, the Mississippi Legislature enacted a new law requiring the publication of the names and addresses of all new voting registrants for 2 weeks in a newspaper of general circulation. This law is ostensibly designed to facilitate challenges of registrants on moral grounds. In fact, it can be used to facilitate reprisals" against Black Americans "who seek to register.")

[13] *Id.*

[14] Stephanie R. Rolph, *The Citizens' Council*, Mississippi History Now (Oct. 2019), https://www.mshistorynow.mdah.ms.gov/issue/the-citizens-council.

[15] William Sturkey, Ph.D., *A Brief History of the Mississippi State Sovereignty Commission*, Mississippi Department of Archives and History, https://www.dh-mdah.org/mssc-history; Sarah Rowe-Sims, *The Mississippi State Sovereignty Commission: An Agency History*, Mississippi History Now (Sept. 2002), https://mshistorynow.mdah.ms.gov/issue/mississippi-sovereignty-commission-an-agency-history.

11

shared that information with officials and private actors who used it to retaliate.[16] As former Mississippi legislator Robert G. Clark, Jr., later recalled, people who tried to register or help others do so faced professional ruin and personal danger.[17] When the Commission's files were finally made public in 1998, they showed surveillance records on more than 87,000 individuals.[18]

So, here is the lesson of history. When the government gathers and shares personal voter information, for whatever stated reason, an environment is created where misuse and harm are more likely. The government itself need not have to carry out the harm. Nor must we know exactly how the information will be misused. It is enough to know that in the wrong hands, personal voter information can be

---

[16] Row-Sims, *The Mississippi State Sovereignty Commission* (Sept. 2002), supra.

[17] Robert G. Clark, *Oral History Interview Conducted by John Dittmer in Pickens, Mississippi*, Library of Congress (Mar. 13, 2013), https://www.loc.gov/item/2015669174/ ("My father was a schoolteacher. He was fired . . . because he was teaching voter registration classes . . . he could not get another job in Mississippi. See, what they would do, they would take your name and give your name to the Sovereignty Commission. That Sovereignty Commission would send those names to all of the superintendents of education."); Sturkey, *A Brief History of the Mississippi State Sovereignty Commission* (describing the Commission's use of private information, including voter-registration data, as "some of the most egregious invasions of privacy in modern American history," enabling "retribution against citizens who advocated for racial equality").

[18] *ACLU v. Fordice*, 969 F. Supp. 403 (S.D. Miss. 1994); *see* "Mississippi Commission's Files a Treasure Trove of Innuendo," Associated Press (Mar. 18, 1998), https://www.mdcbowen.org/p2/bh/badco/missSov.htm.

weaponized. And that truth alone can make people—especially Black voters, who have felt this kind of threat before—think twice about voting.

**B.      The Department seeks to use Title III of the Civil Rights Act in a way that would deepen the disenfranchisement the law was meant to prevent.**

Title III permits record requests so that the Attorney General can decide whether to bring voting-rights cases and gather proof for them.[19] It is a tool for investigating specific claims of discrimination, not for broad data collection or fishing expeditions. The Department anchors its demand in those record-inspection provisions – but the most cursory review of the proper use of Title III makes clear that the Department's attempt to misuse this law must fail.

*United States v. Lynd*, 301 F.2d 818 (5th Cir. 1962) is one example of the intended and appropriate use of Title III. In that case, Theron Lynd, a registrar in Mississippi, refused to register qualified Black applicants while allowing white applicants to register with ease. *Lynd*, 301 F.2d at 787–88, 819–21. He imposed harsher tests on Black applicants, gave no reason for rejection, and then refused to turn over records when the federal government asked for them under Title III. *Id.* at 819–22, 822 n.1.

The federal government's demand in *Lynd* was targeted and investigatory. It sought local records to show a pattern of racial discrimination in violation of 42

---

[19] For a discussion of Title III's records provision, see *Oregon*, 2026 U.S. Dist. LEXIS 25259, at *29-30 (citing *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962)).

U.S.C. § 1971 (now codified at 52 U.S.C. § 10101)—for example, differences in rejection rates, standards, and opportunities to cure defects. *Lynd*, 306 F.2d at 228. Title III was used as an investigative tool tied to a specific claim, in a specific jurisdiction, against a specific official. The court upheld that use because it was essential to enforcing voting rights. *Lynd*, 301 F.2d at 820 (citation omitted).[20] Lynd's refusal to comply led to a contempt finding, and the case became a model for later enforcement under the Voting Rights Act of 1965. *See United States v. Lynd*, 349 F.2d 785, 786 (5th Cir. 1965).

This case is nothing like *Lynd*.

The Department does not claim racial discrimination in voter registration. Nor does it allege that Mr. Caldwell has refused to register Black New Jersey voters, or that anyone was held to stricter standards based on race or national origin. It identifies no specific official, county, or pattern of exclusion. *See generally* Compl. ¶¶ 20–36. Instead, it seeks the entire statewide voter registration list—comprising the names, addresses, dates of birth, driver's license numbers, and partial Social

---

[20] Several courts have already rejected the Department's argument that *Lynd* precludes courts from evaluating the sufficiency of the Department's allegations regarding Title III violations, "including whether—applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place." *See, e.g.*, *Oregon*, 2026 U.S. Dist. LEXIS 25259, at *30.

Security numbers of over six million people—on the theory that the data might help assess general list-maintenance requirements.[21]

Title III does not authorize such overbreadth. Title III is not a dragnet to build a broad voter database but is rather a scalpel for investigating specific voting-rights violations. *See Oregon*, 2026 U.S. Dist. LEXIS 25259, at *30 (explaining that a Title III records demand must "relate to a purpose of investigating violations of individuals' voting rights"); *Weber*, 2026 U.S. Dist. LEXIS 8545, at *24–26 (finding that the Department's stated basis and purpose satisfy neither requirement). The law permits targeted requests tied to concrete claims of discrimination, not sweeping data grabs based on vague election-integrity concerns.

---

[21] Although the Department's stated purpose is to "ascertain compliance" with the National Voter Registration Act of 1993 (NVRA) and the Help America Vota Act of 2002 (HAVA), Compl. ¶ 27, the other rationale that has been publicly reported— "election integrity"—is no more substantial. *See* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR (June 29, 2025, 5:00 AM), https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database. That justification is particularly unpersuasive given that several states—including Texas, which has complied with the Department's disclosure demands—have withdrawn from the Electronic Registration Information Center, the only multistate system specifically designed to identify cross-state double registration. *See* Gilda R. Daniels, *Ending the Cycles of Voter Suppression*, supra, at 391-92.

15

C.    **Modern history shows that aggregated voter data is still turned against voters of color.**

The danger presented by this request for voter data is not a thing of the past. Even after the Voting Rights Act, voter data has been gathered and used in ways that suppress or intimidate Black voters, often with the same information, like name-and-address, that the Department now seeks.

Indeed, even now, cases from this District show a propensity to misuse voter rolls. In *Democratic National Committee v. Republican National Committee*, 671 F. Supp. 2d 575 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012), the Court described how voter lists were misused in the 1981 New Jersey governor's race. A group calling itself the "National Ballot Security Task Force" used registration data to target Black and Latino communities. *Id.* at 579–80. The group sent mail to voters, tracked which letters came back, and used those names of undelivered letters to build challenge lists of individuals to be removed from the voter rolls. *Id.* Those lists were then used at the polls, sometimes to question voters and, in some cases, to deter them from voting at all. *Id.* The case led to a consent decree that stayed in place for more than 30 days. *Id.* at 579–84.

The opinion in *DNC v. RNC* recounted the recent uses of a worn playbook. In 1986, party officials in Louisiana spoke openly about using these methods to cut down Black turnout. *Id.* at 580 (describing internal RNC communications confirming the program's goal was to "keep the black vote down considerably" by

16

purging "60,000-80,000 folks from the rolls"). In 1990, voters in Black communities in North Carolina received false mailings warning of legal trouble tied to registration rules that did not exist. *Id.* at 581. And in 2004, a similar list-building effort in Ohio targeted tens of thousands of voters, again with a heavy impact on Black communities. *Id.* at 582. Each of these efforts began with the aggregation of voter data and ended with pressure on Black voters.

The same tactics continue in more technologically sophisticated forms. In 2020, operatives used voter data to target about 85,000 phone numbers, including many in Black communities, with false robocalls warning that voting by mail would expose people to police, debt collectors, or public health authorities.[22] The scheme worked only because the callers had data that let them pick out who to target. The conduct was later found unlawful, and criminal charges followed. *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500 (S.D.N.Y. 2021).

Whether it was Reconstruction-era newspaper publication requirements, a state commissioner's information-sharing networks, or modern data-driven

---

[22] Press Release, N.Y. Att'y Gen., *Attorney General James Secures Up to $1.25 Million from Conspiracy Theorists Who Intimidated Black Voters with Threatening Robocalls* (Apr. 9, 2024), https://ag.ny.gov/press-release/2024/attorney-general-james-secures-125-million-conspiracy-theorists-who-intimidated; Press Release, Mich. Att'y Gen., *Burkman and Wohl Sentenced for Intimidating Voters in Robocall Case* (Dec. 1, 2025), https://www.michigan.gov/ag/news/press-releases/2025/12/01/burkman-and-wohl-sentenced-for-intimidating-voters-in-robocall-case.

intimidation, the throughline was the same: once voter data is gathered and shared, it can be weaponized against voters.

What begins as information requests that claim to support voting can quickly become a tool to discourage it.

The Court does not have to guess what may happen if the Department gets what it seeks. We have seen it for decades. Using Title III this way—turning a law meant to guard against abuse into a means of broad data collection—raises the same risks the statute was meant to prevent and undercuts the long effort to build trust in civil participation in Black communities.

## POINT II

### GRANTING THE DEMAND WOULD PRODUCE THE EXACT HARMS THE VOTING-RIGHTS ARCHITECTURE WAS BUILT TO PREVENT: VOTER INTIMIDATION AND THE CHILLING OF PARTICIPATION.

Apart from being legally dubious, the Department's demand for voter data, with no anti-discriminatory purpose or basis, is dangerous. Three main harms would likely follow from building a federal database of New Jersey's full voter file: (1) centralized data would fuel mass eligibility challenges that tend to fall hardest voters of color; (2) the mere existence of a federal voter database would make some people think twice about registering or showing up to vote, especially in communities of folks who have reason to fear government surveillance; and

18

(3) consolidation would raise serious risks of breach, misuse, and weaponization. Each harm is documented and reflects a recognized form of voter intimidation.

## A.    Federal aggregation of voter data will fuel mass eligibility challenges that disproportionately remove voters of color from the rolls.

Voter data is the fuel for mass eligibility challenges. Groups have used large datasets and automated software to file tens of thousands of challenges at once. Even when those challenges fail, they still strain election officials and force voters to defend their rights.[23] Putting every state's full voter file into one federal database would dramatically amplify these challenges.

The Department has made clear how it plans to use the data. In a March 2026 hearing in a parallel Rhode Island case, a senior Department official said the data would be checked against a federal immigration database.[24] And Department staff have openly discussed building a "central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025). The Department has also asked states to sign agreements that would give the federal government a role in flagging

---

[23] *See* Daniels, *Ending the Cycles of Voter Suppression*, supra, at 388-92, 387 n.105 (citing an analysis of federal voting data finding that "16 million voters were purged between the federal elections of 2014 and 2016," which was "almost 4 million more names purged from the rolls than between 2006 and 2008").

[24] Jude Joffe-Block, "The Justice Department plans to share sensitive voter data with Homeland Security," supra.

supposedly ineligible voters and pushing for their removal, often based only on a mismatch in records. *See, e.g.*, U.S. Dep't of Just., Texas Sec. of State, Confidential Mem. of Understanding (Docket No. 3-2).

We know the effects of these kinds of actions. In Texas, one study found that voters whose mail ballot requests were rejected in the 2022 primary were 16 percent less likely to vote in the general election that year.[25] The drop carried into the 2024 primary two years later.[26] These citizens were previously regular voters.[27]

The lesson here: Blocking a voter even once risks keeping that voter from coming back. The same is true for mass challenges and erroneous purges. When people are wrongly flagged or forced to fight for their votes, many do not return.

**B.      The mere existence of a federal voter database will chill registration and participation, particularly among voters with reason to fear surveillance.**

Even before any data is misused or exposed, the mere existence of a federal voter database can deter people from voting. Courts have recognized that forcing voters to expose sensitive personal information can place an "intolerable burden" on the right to vote. *See, e.g.*, *Greidinger v. Davis*, 988 F.2d 1344, 1355 (4th Cir. 1993).

---

[25] Michael Waldman, "The Lasting Effects of Voter Suppression," *Brennan Center for Justice* (May 28, 2025), https://www.brennancenter.org/our-work/analysis-opinion/lasting-effects-voter-suppression.

[26] *Id.*

[27] *Id.*

The concern finds support in the evidence. In 2016, 11 percent of unregistered Americans told Pew Research that they chose not to register because of "privacy or security reasons."[28] And in the past decade, voter records for millions of Americans have been exposed online after being sold to partisan analytics firms, robocall vendors, or unverified third parties.[29] So the fear that keeps people from registering is real and legitimate.

Those fears consume voters of color, who have clear reasons to worry that voting data could be used for immigration enforcement, criminal matters, or other forms of retaliation. It is the same fear cultivated by the Mississippi Sovereignty Commission, the National Ballot Security Task Force, and the 2020 robocalls warning Black voters that voting by mail would expose their information. A federal push to gather and cross-check voter data raises those same concerns.

Courts have made clear that voter intimidation does not require threats of violence. In *National Coalition on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500 (S.D.N.Y. 2021)—the case arising from the 2020 robocalls mentioned above—the court held that intimidation under § 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b), reaches "actions or communications that inspire fear of . . . privacy violations, and even surveillance." *Id.* at 509. No showing of intent is

---

[28] Carey Heckman, *America's Data Crisis*, 105 Iowa L. Rev. 1363, 1377 (2020).
[29] *Id.* at 1381-82.

21

required if the recipient reasonably interprets the act or communication as a threat. *Id.* at 513. Courts have repeatedly recognized that actions reasonably creating fear that "personal information would be collected" if citizens registered or voted was sufficient to constitute intimidation. *See, e.g.*, *United States v. Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012) (letter distributed among immigrants warning that if they voted in the upcoming election their personal information would be collected was evidence of unlawful intimidation under California law).

Even the Justice Department's own civil-rights guidance recognizes that intimidation can occur "at the registration stage" and lists "doxing" and "invasions of privacy" among actionable intimidation tactics.[30] A federal database of every American voter's identifying information, subject to cross-database matching and mass challenges, is itself intimidating. Fear of misuse keeps people away from the polls just as surely as past forms of intimidation did.

**C.     The catastrophic risks of breach and misuse of centralized voter data requires sensitive information to be redacted.**

Beyond chilling communities from accessing the polls, and beyond mass challenges, federal aggregation creates a single point of catastrophic failure. Centralized repositories of personally identifiable information expose voters to identity theft, stalking, and retaliatory harassment if the data is improperly disclosed.

---

[30] U.S. Dep't of Justice, Civil Rights Division, *Voting Rights Fact Sheet*, https://www.justice.gov/crt/voting-rights-fact-sheet.

22

A single breach of a fifty-state database could compromise tens of millions of voters at once.

Even if the Department had a valid reason for its request—which it does not—highly sensitive data must be redacted, including the birth month and day, voter signature, full Social Security number, and driver's license number. Nothing in the text of the NVRA, HAVA, or Title III prohibits the State's redaction of this information. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ([N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File."). In fact, courts have repeatedly held that disclosure laws should be read to avoid burdening the right to vote. *See id.*; *Greidinger v. Davis*, 988 F.2d 1344, 1355 (4th Cir. 1993) (disclosure of unredacted voter records and sensitive personal data as a condition to vote imposes an "intolerable burden" on the right to vote). HAVA also places responsibility for voter-database security with the States, requiring safeguards against unauthorized access. *See* 52 U.S.C. § 21083(a)(1)(A). The Department's request fails to account for the protections that Congress put in place to prevent the catastrophic risks described above.

23

## CONCLUSION

It cannot be overstated that this federal government action of collecting mass data about all of New Jersey's voters goes to the heart of our citizens' right to vote, which is "precious, almost sacred,"[31] the most "basic right, without which all others are meaningless,"[32] the "foundation stone for political action."[33]

For the reasons discussed above, the Court should deny the Department's request and dismiss the Complaint.

CONNELL FOLEY LLP

BY: /s/ Abbey True Harris

Abbey True Harris
Mark J. Marsella
Alexander J. Gacos
56 Livingston Avenue
Roseland, NJ 07068
(973) 535-0500
aharris@connellfoley.com
mmarsella@connellfoley.com
agacos@connellfoley.com
*Attorneys for Amicus Curiae*
*United Black Agenda*

DATE: May 11, 2026

---

[31] Representative John Lewis, *Address to the Democratic National Convention*, PBS Newshour (Sept. 6, 2012, 6:02 PM), https://www.pbs.org/newshour/show/rep-john-lewis-your-vote-is-precious-almost- sacred.

[32] President Lyndon B. Johnson, *Remarks in the Capitol Rotunda at the Signing of the Voting Rights Act*, The American Presidency Project (Aug. 6, 1965), https://www.presidency.ucsb.edu/documents/remarks-the-capitol-rotunda-the-signing-the-voting-rights-act.

[33] Martin Luther King Jr., *Civil Right No. 1 – The Right to Vote*, N.Y. Times (Mar. 14, 1965).

24