IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DR. DALE G. CALDWELL, in his official capacity as Lieutenant Governor and Secretary of State for the State of New Jersey,<br><br>Defendant. | Case Number: 3:26-CV-2025-ZNQ-JTQ<br><br><br><br>Motion Return Date: July 6, 2026 |

**UNITED STATES' CONSOLIDATED REPLY IN SUPPORT OF ITS MOTION TO COMPEL (ECF 20) & RESPONSE TO MOTIONS TO DISMISS (ECF 50, 56, 57, 59, 77)**

**TABLE OF CONTENTS**

I.    INTRODUCTION ...............................................................................................- 1 -

II.   ARGUMENT......................................................................................................- 3 -

   A.    The Civil Rights Act calls for a summary proceeding to compel federal election records.............................................................................................................- 3 -

   B.    The Attorney General has a basis and purpose to investigate New Jersey's compliance with federal election laws. ...........................................................- 8 -

   C.    Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights..............................- 14 -

   D.    New Jersey's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in a federal election. ................................................- 19 -

   E.    The United States is entitled to unredacted "reproduction" and "copying" of New Jersey's SVRL. ...........................................................................................................- 23 -

   F.    The United States is complying with federal privacy laws, and New Jersey's privacy laws do not prevent disclosure of the requested data. ....................................................- 27 -

      1.    *The United States is complying with the Privacy Act.* .............................................- 28 -

      2.    *The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims.* ...........................................................- 30 -

      3.    *The Driver's Privacy Protection Act does not allow Defendant to deny the United States list maintenance data.*...........................................................................- 31 -

   G.    New Jersey's privacy laws do not prevent the United States from obtaining data maintained under HAVA or the NVRA...........................................................- 32 -

III.  CONCLUSION..................................................................................................- 35 -

# TABLE OF AUTHORITIES

**Cases**

*Ala. ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960) ................................................................. *passim*

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ...................................................................… 32, 34

*Bostock v. Clayton Cnty., Ga.*,
590 U.S. 644 (2020)…………………………………………..………18

*Buckman Co. v. Pls.' Legal Comm.*,
531 U.S. 341 (2001)………………………………………………..……...34

*California Supr. Ct. of Cal.*,
482 U.S. 400 …………………………………………………...………...…5

*Coal. for Open Democracy v. Scanlan*,
2025 WL 1503937 (D. NH May 27, 2025)…………………………………………..26

*Coleman v. Campbell*,
208 F. Supp 199 (S.D. Ms. 1962)……………………………………..……..16

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) ............................................................ 2, 16, 25

*Coventry Health Care of Mo., Inc. v. Nevils*,
581 U.S. 87 (2017) .............................................................................. 19

*Ebert v. Poston,* 266 U.S. 548 (1925)……………………………………………….………17

*Election. Privacy. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
266 F. Supp 3d. 297 (D.D.C. 2017)……………………………………….………31

*Election. Privacy. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017)……………………………………………….………31

*Foster v. Love*,
522 U.S. 67 (1997) ............................................................................ 32

*Fry v. Napoleon Cmty. Schs.*,
580 U.S. 154 (2017)…………………………………………………….………7

*Greater Birmingham Ministries, Inc. v. Sec'y of State*,
105 F. 4th 1324 (11th Cir. 2024)……………………………………..………….………26

*In re Gordon*,
   218 F. Supp. 826 (S.D. Miss. 1963)…………………………………………………………4

*In re Adams Golf, Inc. Sec. Litig.,*
381 F. 3d 261 (3d Cir. 2004)…………………………………………………………..27

*Judicial Watch v. Lamone*,
   399 F. Supp. 3d 425, 440 (D. Md. 2019)…………………………………………….23

*Kennedy v. Lynd*,
   306 F.2d 222 (5th Cir. 1962) ...................................................................... *passim*

*McIntyre v. Morgan*,
   624 F. Supp. 658 (S.D. Ind. 1985) ......................................................................21

*Milner v. Dep't of Navy*,
   562 U.S. 562 (2011) ........................................................................ 19

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ........................................................................ 19

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
   413 U.S. 405 (1973) ........................................................................ 21

*Project Vote/Voting for Am., Inc. v. Long*,
   682 F.3d 331, 337 (4th Cir. 2012)………………………………………..……………23

*Project Vote v. Kemp*,
208 F. Supp. 3d 1320 (N.D. Ga. 2016)………………………………………………….23

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
   566 U.S. 560 (2012) ........................................................................ 19

*United States v. Alabama,*
   No. 2:08-cv-00920 (M.D.  Ala. March 28, 2009)………………………………………13

*United States v. Amore*,
   2026 WL 1040637 (D.R.I. Apr. 17, 2026) ........................................................................8

*United States v. Ass'n of Citizens Councils of La.*,
   187 F. Supp. 846 (W.D. La. 1960) ........................................................................ 2, 3

*United States v. Bellows,*
   2026 WL 1430481 (D. Me. May 21, 2026)……………………………………………..20

*United States v. Benson,*
   819 F. Supp 3d. 753 (W.D. Mich. Feb. 10, 2026) ...................................................... *passim*

*United States v. Clarke*,
573 U.S. 248 (2014) ........................................................................................... 21

*United States v. Donaldson*,
400 U.S. 517 (1971)…………………………………………………………..7, 21

*U.S. Express Lines, Ltd. v. Higgins*,
281 F. 3d 383 (3d Cir. 2002)…………………………………………………..8

*United States v. Fontes*,
2026 WL 1177244 (D. Ariz. Apr. 28, 2026) ....................................................... 20

*United States v. Galvin*,
2026 WL 972129 (D. Mass. Apr. 9, 2026)…………………………………………8

*United States v. Great N. Ry. Co.*,
343 U.S. 562 (1952)……………………………………………………………18

*United States v. Georgia*,
No. 1:21-cv-02575 ( N.D. Ga. June 25, 2021)...…………………………………13

*United States v. Indiana*,
No. 1:06-cv-01000 (S.D. Ind. July 5, 2006)……………………………….…12

*United States v. Markwood*,
48 F. 3d 969 (6th Cir. 1995)…………………………………………………….4

*United States v. Mississippi*,
380 U.S. 128 (1965) .......................................................................................... 21

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ...................................................................................... 4, 25

*United States v. New Jersey*,
No. 2:06-cv-04889 (D. N.J. Oct. 12, 2006)……………………….…………12

*United States v. N. Carolina Bd. of Elections*,
No. 5:25-cv-00283 (E.D.N.C.)…………...………………………………10, 11, 17, 24

*United States v. Maine*,
2007 WL 1059565 (D. Me. April 4, 2007) ……………………….……………..11

*United Staes v. Mo. Pac. R.R. Co.*
*278 U.S. 269 (1929)*…………………………………………...…………17, 18

*United States v. Oregon*,
2026 WL 318402 (D. Or. Feb. 5, 2026)………………….…………………….8

*United States v. Powell,*
379 U.S. 48 (1964)…………………………………………………………………………4, 6, 7

*United States v. Vermont,*
No. 2:08-cv-00217 (D. Vt. Feb. 26, 2009)……………………...………….….……………..13

*United States v. Weber,*
816 F. Supp. 3d 1168 (C.D. Cal. Jan. 15, 2026)...…………………….……………………8

*United States of America v. Wis. Elections Comm'n et al.,*
2026 WL 1430354 (W.D. Wis. May 21, 2026)…………………….…………………….20

**Constitutional Provisions and Statutes**

U.S. Const. art. VI, cl. 2 ................................................................................................ 34

5 U.S.C. § 552 ................................................................................................................ 28

8 U.S.C. § 1445(f) ......................................................................................................... 22

8 U.S.C. § 1449……………………………………………………………..…………..22

8 U.S.C. § 1454……………………………………………………………..…………..22

18 U.S.C. § 2721…………………………………………………………..…………31, 32

18 U.S.C. § 2725……………………………………………………………..…………..31

18 U.S.C. § 3182………………………………………………………………..…………5

18 U.S.C. § 3184………………………………………………………………..…………6

18 U.S.C. §3186 …………………………………………………………………….5, 6

26 U.S.C. § 7605(b)………………………………………………………..…………....7

42 U.S.C. § 1973ff-1 .................................................................................................... 13

42 U.S.C. § 2000e-2 ..................................................................................................... 15

42 U.S.C. §§ 3604-3606, 3617  ................................................................................... 15

42 U.S.C. § 1973…………………………………………………………………………13

42 U.S.C. §1974…………………………………………………..…………………....11

44 U.S.C. § 3101 .......................................................................................................... 29

52 U.S.C. § 10101 ........................................................................................................ 15

52 U.S.C. §10301-10306, 10309…………………………………..………………15

52 U.S.C. § 20301……………………………………………………..…………………13

52 U.S.C. § 20507 .....................................................................................24, 25, 33

52 U.S.C. § 20510 ........................................................................................................ 33

52 U.S.C. § 20701 ...................................................................................... *passim*

52 U.S.C. § 20703 ...................................................................................... *passim*

52 U.S.C. § 20704 ................................................................................................ 24

52 U.S.C. § 20705 ............................................................................................ 1, 33

52 U.S.C. § 20706…………………………………………………………..…………15

52 U.S.C. § 21083 ........................................................................................ *passim*

52 U.S.C. § 21111 ...................................................................................... 24, 25, 33

Pub. L. No. 86-449, 74 Stat. 86 (1960)…………………………………………..………14

Pub. L. No. 93-579, § 2(b), 88 Stat. 1896 (1974) …………………………………..……..28

Pub. L. No. 107-347 § 208……………………………………………………………30

## Rules and Regulations

Fed R. Civ P. 81……………………………………………………………………..3, 4

28 C.F.R. §§ 0.50, 0.51 ...................................................................................... 29

68 C.F.R. 47611 .................................................................................................. 29

68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003) ...................................................... 28

70 Fed. Reg. 43904-01, (July 29, 2005) .............................................................. 28

82 Fed. Reg. 24147-01, (May 25, 2017) ...............................................................28

## Other

Authority to Obtain and Share Voter Roll Data
   50 Op. O.L.C. ___ (May 12, 2026)………………………………………………………3

*Black's Law Dictionary* 516 (4th ed. 1953)……………………………………………...…5

ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited May 11, 2026)……..…..26

H.R. Rep. 107-329 (2001)…………………………………………………………..…17

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 31–32 (Aug. 2001) ...................................................................... 16

Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited May 11, 2026)…….31

U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report 158 (June 2025)…………………………………………….……..9

*Webster's New World Dictionary of the American Language* 291 (8th coll. Ed. 1960)…………22

U.S. Dep't of Just., Fed. Prosecution of Election Offenses, (8th ed. 2017)………………………14

Plaintiff United States of America respectfully submits this consolidated Memorandum of Law as its reply in support of its Motion to Compel (ECF 20) and in opposition to the Motions to Dismiss by: (1) Defendant Dr. Dale G. Caldwell, Lieutenant Governor of New Jersey ("Lt. Gov. Caldwell") (ECF 50); (2) Intervenor-Defendants National Association for the Advancement of Colored People, et al. ("NAACP Intervenors")[1] (ECF 56); (3) Intervenor-Defendants League of Women Voters of New Jersey, Latino Action Network, and Maungsai Somboon ("LWV Intervenors") (ECF 57); and (4) Intervenor-Defendants Make the Road New Jersey, Jamie Y. Ding, and Danielle Litwak ("MRNJ Intervenors") (ECF 59). Collectively, Lt. Gov. Caldwell and Intervenor-Defendants are referred to as the "Defendants." The United States submits this consolidated Memorandum, instead of separate reply and opposition briefs, to facilitate the Court's review of the duplicative and overlapping arguments made by the Defendants.

## I.      INTRODUCTION

Title III of the Civil Rights Act of 1960 ("CRA") empowers the United States to obtain federal election records upon written demand. *See* 52 U.S.C. §§ 20701, 20703. When a State refuses to comply with the demand, Title III provides that the United States may seek "appropriate process to compel the production" of those federal election records. 52 U.S.C. § 20705. The United States made a written demand to Lt. Gov Caldwell for federal election records, specifically, New Jersey's statewide voter registration list ("SVRL"). Lt. Gov. Caldwell refused to comply with that demand, necessitating this action. Compl., ECF 1.

---

[1]  The other NAACP Intervenors include NAACP New Jersey State Conference, Salvation and Social Justice, AAPI New Jersey, Returning Citizens Support Group, Association of Black Women Lawyers of New Jersey, Garden State Bar Association, New Jersey Muslim Lawyers Association, People's Organization for Progress, and Edwin Ortiz.

Title III is a unique provision of federal law because it is purely an investigative tool. The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *affirmed sub nom. Dinkens v. Att'y Gen.*, 285 F.2d 430 (5th Cir. 1961), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). Title III authorizes the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).

The Court's inquiry here is a limited one: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the "officer[s] of election" fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that he satisfied the first three elements. *Lynd*, 306 F.2d at 225-26.

Defendants seek to complicate that narrow inquiry by arguing that the United States' demand exceeds its statutory authority in several unfounded respects and violates federal and state privacy laws. First, Defendants argue that the SVRL is outside the scope of the records covered by the CRA. ECF 50 at 15-24. Second, Defendants argue United States has not supplied a proper "basis and purpose." ECF 50 at 24-38. Defendants further argue various privacy laws prevent disclosure. ECF 50 at 38-48. Defendants then contend that electronic disclosure is not required by

the CRA. ECF 50 at 48-49. Finally, Defendants maintain that the United States is not entitled to a summary proceeding and that all of the Federal Rules of Civil procedure apply.[2] ECF 50 at 49-55. For the reasons explained below, Defendants' arguments fail, their motions to dismiss should be denied and the United States' Motion to Compel should be granted.

## II.    ARGUMENT

### A.    The Civil Rights Act calls for a summary proceeding to compel federal election records.

The Attorney General's filing of an application for an order under Title III of the CRA "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Lynd*, 306 F.2d at 225. Rather, a CRA Title III proceeding is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including Defendants' motions to dismiss, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other

---

[2] The Department of Justice Office of Legal Counsel recently published a relevant opinion. That opinion concludes that the CRA authorizes the Attorney General to compel States to produce unredacted SVRLs. *See* Authority to Obtain and Share Voter Roll Data, 50 Op. O.L.C. ___ (May 12, 2026), *available at* https://www.justice.gov/olc/media/1440346/dl.

federal claims to which the Federal Rules of Civil Procedure do not apply).

In other words, Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *Morton Salt*, 338 U.S. at 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

New Jersey asserts that the Federal Rules of Civil Procedure must govern these proceedings because FRCP 81(a)(5) specifically makes the rules applicable to "*subpoenas*" even though this proceeding has nothing to do with subpoenas. ECF 50-1 at 50. In fact, a recent decision issued by a district court in the Sixth Circuit agreed with *Lynd* and rejected the Defendants' arguments that this proceeding is akin to the issuance of a subpoena. *See United States v. Benson*, 819 F. Supp.3d 753 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026). Consistent with the Supreme Court's treatment of similar statutes, *Benson* construed "a request for records under the CRA as a form of *administrative* subpoena" in which the Federal Rules of Civil Procedure do not apply. *Id.* at 765 (emphasis added) (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)). Therefore, "'[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…'" *Benson*, 819 F. Supp.3d at 753 (quoting *United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995)). Consequently, *Benson* acknowledged that "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Id.* at 766

(quoting *Markwood*, 48 F.3d at 976).

However, the United States has not issued a subpoena; it has made a "demand" under the CRA. 52 U.S.C. § 20703. While a demand is similar and akin to a subpoena, it is a term of art with a specific meaning differing from a subpoena. A "demand" is "an imperative request preferred by one person to another, under a claim of right, requiring the latter to do or yield something or abstain from some act." *Black's Law Dictionary* 516 (4th ed. 1951).[3] It "presupposes that there is no defense or doubt upon question of right." *Id.*

Black's uses as an example a "demand for extradition." *Id.* Federal interstate extradition is governed by 18 U.S.C. § 3182 and requires the executive authority of a state to produce a fugitive whenever the executive authority of another state demands the fugitive and produces a copy of an indictment or an affidavit made before a magistrate charging the person demanded with a crime. *Id.* In situations where extradition is challenged, court involvement is limited to determining if the statute has been facially followed as it is also a summary procedure. *California v. Super. Ct. of Cal.,* 482 U.S. 400, 407-08 (1987) (holding "the courts of asylum States may do no more than ascertain whether the requisites of the Extradition Act have been met."). The court can inquire "(a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive" - and no more. *Id.* at 408. Such a hearing is "emphatically not the appropriate time or place for entertaining defenses or determining the guilt or innocence of the charged party." *Id.* (internal quotation omitted).

Importantly, Congress has limited extradition demands to jurisdictions under the sovereignty of the United States. Requests for extradition made by foreign governments are

---

[3] This is the most recent edition of Black's at the time the CRA was enacted.

governed by 18 U.S.C. § 3184. That statute does not use the word "demand" and indeed provides for a court hearing where testimony is given, and evidence is taken in front of a judge or magistrate. *Id.* If the judge or magistrate deems the evidence sufficient to sustain a charge extraditable under the relevant treaty, the evidence is sent to the United States' Secretary of State, *id.,* who has discretion as to whether the fugitive is to be extradited to a foreign country, 18 U.S.C. § 3186. The use of the word "demand" in one statute and its omission in the other, highlights the summary nature of demand proceedings.

Similarly, in the context of a CRA demand, a court must determine if the law has been followed on its face. (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the "officer[s] of election" fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that he satisfied the first three elements. *See Lynd*, 306 F.2d at 225-26. If the Court finds that the United States has facially complied with the statute, then Lt. Gov. Caldwell must be compelled to produce the demanded records.

Defendants' heavy reliance on a misreading of *United States v. Powell* is misplaced. Lt. Gov. Caldwell implies that because *Lynd* preceded *Powell* and *Powell* applied the rules of civil procedure, *Lynd* was either wrongly decided, or overruled. ECF 50-1 at 51-52. Lt. Gov. Caldwell is wrong on both counts. In *Powell*, the Court explained that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply…" 379 U.S. at 58 n.18. The quoted language from *Powell* referred to a process expressly provided in the IRC that is missing

from the CRA. The Supreme Court explained that judicial inquiry was appropriate where a court is asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58. That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Powell,* 379 U.S. at 52 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA, and the CRA is not directed at a private citizen but rather state election officers acting in their official capacity. *See* 52 U.S.C. §§ 20701-20706. In fact, the CRA does not provide any process for *state government* election officers to object to CRA proceedings being initiated against them in their official capacity. *See id.*

As the Supreme Court acknowledged in *Donaldson v. United States,* "post-*Powell* cases, too, are clearly and consistently to the effect that the footnote in *Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." 400 U.S. 517, 529 (1971). That is exactly what has happened here. Lt. Gov. Caldwell was notified of and is responding to the Motion to Compel.

Lt. Gov. Caldwell's further assertion that because the United States filed a Complaint rather than an application, ECF 50-1 at 52-53, is similarly unavailing. Courts consider the substance of pleadings not their titles. *Fry v. Napoleon Cmty. Schs.,* 580 U.S. 154, 169 (2017) (holding "the use (or non-use) of particular labels and terms is not what matters"). However, even if this court decides to apply the Federal Rules of Civil Procedure, the rules must be applied on a limited basis

– that is, no discovery is permitted – consistent with the investigative, pre-suit, summary nature of a CRA demand proceeding. *See Lynd*, 306 F.2d at 226.

Finally, with respect to Defendants' motions to dismiss, this Court must draw all reasonable inferences in favor of the United States, *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002), within the constraints imposed by the CRA. *Lynd*, 306 F.2d at 225-30. Taking as true the allegations in the United States' Complaint, the United States has satisfied each of the four elements of its CRA action. Therefore, Defendants' motions to dismiss must be denied.

**B. The Attorney General has a basis and purpose to investigate New Jersey's compliance with federal election laws.**

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records that articulates "the basis and purpose therefor." 52 U.S.C. § 20703.  The United States has done that.[4]

On July 15, 2025, the United States sent correspondence to then-Lieutenant Governor and Secretary of State Tahesha Way[5] ("Lt. Gov. Way") and Division of Elections Director Donna Barber, requesting their cooperation by providing federal election records necessary for an assessment of New Jersey's compliance with federal law ("July 15 Letter"). Neff Decl. ¶ 7, ECF 20-2; July 15 Letter, ECF 20-3. The July 15 Letter noted that data from the Election Assistance Commission's most recent biennial Election Administration and Voting Survey ("EAVS") showed

---

[4] In parallel litigation other Courts have found the United States has either not stated a basis and purpose, a proper basis and purpose or a true basis and purpose. *See generally United States v. Oregon*, No. 25-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed,* No. 26-1231 (9th Cir. Mar. 3, 2026)*; United States v. Weber,* No. 25-9149, 816 F. Supp. 3d 1168 (C.D. Cal. Jan. 15, 2026)*, appeal docketed,* No. 26-1232 (9th Cir. Mar. 3, 2026)*; United States v. Galvin,* No. 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026)*; United States v. Amore,* No-25-0639, 2026 WL 1040637 (D.R.I. Apr. 17, 2026).

[5] Lt. Gov. Way's term ended on January 20, 2026, when Lt. Gov. Caldwell assumed office.

New Jersey had a very high registration rate of 94.8 percent of the citizen voting age population.[6] However, New Jersey reported it removed just 2,866 duplicate voter registrations, a rate of one percent and well below the national average of 8.1 percent of all registrations removed. EAVS Report, *supra*, at 189-90. Furthermore, New Jersey reported that it sent confirmation notices to just 6.9 percent of all active registered voters, which is approximately one-third the national percentage of 19.5 percent among the states that reported the data. *Id.* at 180, 182. Compounding those problems, New Jersey did not report any data for the results it obtained from simply *sending* confirmation notices – i.e., how many people, if any, responded to the confirmation notices and whether such persons confirmed they were actually eligible to vote? *Id.* at 180-81. The EAVS data New Jersey reported is inconsistent with that of a jurisdiction that is engaging in reasonable list maintenance practices under the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA").

On August 14, 2025, the Attorney General sent another letter to Lt. Gov. Way repeating the request in the July 15 Letter by making a demand under the CRA for a copy of the SVRL within seven days ("August 14 Letter"). Neff Decl. ¶ 8, ECF 20-2; August 14 Letter, ECF 20-4. In the August 14 Letter, the United States cited the CRA as the basis for the request and stated that the purpose was to assess New Jersey's compliance with HAVA and the NVRA. Those efforts were met with a refusal by Lt. Gov. Way to produce the requested records as mandated by Title III of the CRA. Neff Decl. ¶ 11, ECF 20-2; Lt. Gov. Way's January 9, 2026 Letter, ECF 20-5.  Upon assuming office, Lt. Gov. Caldwell informed the Attorney General his position was the same as

---

[6] *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report 158 (June 2025), *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited March 26, 2026) ("EAVS Report").

Lt. Gov. Way's position. Neff Decl. ¶ 13, ECF 20-2. This action followed. *See* Compl., ECF 1.

Notwithstanding the history prior to the initiation of this action, Lt. Gov Caldwell, LWV Intervenors, and MRNJ Intervenors argue that the United States failed to provide a sufficient statement of basis and purpose for its demand for federal election records or, in the alternative, that the United States has not provided the true reason for the demand. ECF 50-1 at 30-38; 57-1 at 2-8; 59-1 at 2-5.

Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. Neff Decl. ¶¶ 14 ECF 20-2. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 Case No. 5:25-cv-00283 (E.D.N.C. Sept. 8, 2025) (E.D.N.C. Sept. 8, 2025), ECF 20-6. One of the problems alleged by the United States was that because the state registration form did not explicitly require a voter to provide a driver's license number or the last four digits of the voter's social security number their voter registration was incomplete. *Id.* at 2.  In some cases where this information was later obtained by the county boards of elections the information was not timely added to update the SVRL. *Id.* As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as Eric Neff's second declaration submitted with this response and reply ("Second Neff Decl.") at ¶9, Ex. 1).

Defendants Lt. Gov. Caldwell, NAACP Intervenors, LWV Intervenors, and the Amici further argue the Attorney General's concern with Defendant's list maintenance is not the true purpose of the Attorney General's request.  ECF 50-1 at 33-38; 56-1 at 5-8; 57-1 at 6-8; ECF 75 at

6-9.  Rather, these Defendants argue, based entirely on unreliable hearsay, that the Department of Justice is amassing a nationwide voter database.  Amicus the Brennan Center for Justice goes even further arguing the demand for records is an "attempt[] to seize authority over elections…" ECF 76 at 22-26.  These arguments are unfounded.  As the United States District Court for the Eastern District of North Carolina recently found in rejecting such arguments as "speculative and premature." *N. Carolina Bd. of Elections*, ECF 87 in North Carolina 87, Case No. 5:25-cv-00283, Order Denying Motion for Reconsideration of Motions to Intervene at 7 (attached to Second Neff Decl. at ¶10, Ex. 2).

The United States has long obtained SVRLs to assess and enforce HAVA and the NVRA. As mentioned in its Motion to Compel, the United States used the CRA to obtain statewide voter lists to assess compliance with list maintenance requirements in Georgia and Texas. ECF 20-7 to 20-9. Similarly, in 2007, the United States entered a Consent Decree with the State of Maine regarding HAVA compliance and list maintenance. *See United States v. Maine*, No. 1:06-cv-00086, 2007 WL 1059565 (D. Me. Apr. 4, 2007) (attached to Second Neff Decl. ¶11, Ex. 3). Paragraph 9(e) of the consent decree required Maine to "provide to the United States in July 2007 and again in January 2009 an electronic copy of voter information from the CVR (computerized statewide voter registration system) that includes the voter's full name, unique identifier, date of birth, address, voter jurisdiction, active or inactive status, and (in January 2009 only) whether the voter participated in the 2008 federal election." *Id.* at *5.[7] The United States entered into similar agreements with the States of New Jersey and Indiana to enforce voter registration list maintenance

---

[7] Paragraph 11 of the Maine consent decree explicitly invokes the CRA, referring to 42 U.S.C. § 1974, which was later transferred to 52 U.S.C. § 20701. 2007 WL 1059565, at *5.

compliance.[8] Likewise, Indiana was required by consent decree to "retain voter registration and list maintenance records related to the terms of this agreement for the time periods provided by… [Section 20701]." ECF 5 at 6 in *United States v. Indiana*, No. 1:06-cv-01000 (S.D. Ind. July 5, 2006) (attached to Second Neff Decl. ¶12, Ex. 5).

In *Indiana,* the United States later moved to amend the consent decree to obtain the full, unredacted SVRL, including driver's license numbers and social security numbers. *Indiana*, 1:06-cv-01000, ECF 16 (attached to Second Neff Decl. ¶13 Ex. 6). As discussed in the Motion, the United States was entitled to the unredacted SVRL pursuant to Title III, notwithstanding any conflicting state laws. *Id*. at ¶4. The consent decree acknowledged that the State is "required to provide the requested information under the relevant statutes and pursuant to the Supremacy Clause of the Constitution." *Id*. The parties further recognized that "compliance with this request [was] not a release of public information to a member of the public." *Id*. at ¶6. Importantly, the United States agreed to "use the voter registration list information to assess the State's compliance with federal voting laws, including, but not limited to, the NVRA." *Id*. at ¶7. The Order granting the Motion to Amend the Consent Decree required Indiana, within 21 days of the order, to immediately make available to the United States the full statewide voter registration list including, where available, the following information: each registered voter's full name, address, full date of birth, voter identification number as defined in IC 3-5-2-50.1, driver's license number, race, voter status and voting history. Moreover, the amended order required Indiana to produce such data in electronic format on a CD-ROM or DVD. ECF 18 in *Indiana*, 1:06-cv-01000 (attached to Second

---

[8] *See United States v. New Jersey*, No. 2:06-cv-04889 (D. NJ. Oct. 12, 2006). In New Jersey, paragraph 5 of the stipulated order required the HAVA identifiers to be provided and paragraph 14 required Defendant to retain voter registration and list maintenance records. ECF. 2 in 2:06-cv-04889 (attached to Second Neff Decl. ¶12, Ex. 4).

Neff Decl. at ¶13, Ex. 7).

The United States' use of Title III of the CRA is not limited to investigating compliance with HAVA and the NVRA. It supports the enforcement of the other federal election laws, such as the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA"), 52 U.S.C. §§ 20301, *et seq*. The United States sued Alabama for the State's noncompliance with 42 U.S.C. § 1973ff-1(c),[9] which required Alabama to report to the Election Assistance Commission, not later than ninety days after a regularly scheduled general election for federal office, certain data regarding ballots from absent uniformed services voters and overseas voters. *See* Complaint, *United States v. Alabama*, No. 2:08-cv-00920, ECF 1 (M.D. Ala. Mar. 28, 2009) (attached to Second Neff Decl. at ¶14, Ex. 8). The United States sought data in 21 Alabama counties under the CRA, and the Court issued an Order approving that request, indicating it would send demand letters to each of those counties for responsive federal election records. *Id*. at ECF 24. A copy of a letter sent to Shelby County, Alabama, in 2009 requesting federal election records pursuant to Title III is attached to the Second Neff Decl. at ¶14, Ex. 9. The United States filed a similar lawsuit in Vermont to obtain federal election records for enforcement of the UOCAVA reporting requirement, which the parties agreed were required under the CRA. *See* Complaint, *United States v. Vermont*, No. 2:08-cv-00217 (D. Vt. Feb. 26, 2009), ECF 1 (attached to the Second Neff Decl. at ¶15, Ex. 10).

The United States also has used the CRA to enforce the Voting Rights Act ("VRA"). For example, the United States sought federal election records from counties to support an enforcement action under Section 2 of the VRA in *United States v. Georgia*, No. 1:21-cv-02575 (N.D. Ga. June 25, 2021), ECF 1. The Attorney General sought election information from 159 counties in Georgia, and demand letters under Title III were sent to some of those counties. A copy of a letter sent to

---

[9] UOCAVA was transferred to 52 U.S.C. §§ 20301, *et seq*.

Newton County, Georgia is attached to the Second Neff Decl. at ¶16, Ex. 11. The Federal Prosecution of Election Offenses explains under the heading "Retention of Federal Records: 52 U.S.C. § 20701" that "[t]he detection, investigation, and proof of election crimes – in many instances Voting Rights Act violations – often depend[s] on documentation generated during the voter registration, voting, tabulation, and election certification processes." U.S. Dep't of Just., *Federal Prosecution of Election Offenses* 75 (8th ed. 2017). It further provides that "under Section 20701, all documents and records that may be relevant to the detection or prosecution of federal civil rights or election crimes must be maintained if the documents or records were generated in connection with an election that included one or more federal candidates."[10] *Id*. at 78.

Accordingly, the United States has provided a sufficient statement of basis and purpose for its demand for New Jersey's federal election records.

### C. Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. CRA section 303

---

[10] In April 2024, the Department of Justice also issued guidance that explains Title III of the CRA requires election officials to retain election records. "The Act protects the right to vote by ensuring that federal elections records remain available in a form that allows the Department to investigate and prosecute both civil and criminal election matters under federal law." U.S. Dep't of Justice, *Federal Law Constraints on Post-Election 'Audits'* 2 (Apr. 2024), *available at* https://www.justice.gov/crt/media/1348586/dl?inline (last visited Apr. 10, 2026).

authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [his] representative" such records.  52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Lt. Gov Caldwell and NAACP Intervenors suggest that the only permissible basis for a Title III request is to investigate racial discrimination in voting and not to assess a state's compliance with HAVA and the NVRA. ECF 50-1 at 30; 56-1 at 1-5. Defendants are mistaken. Congress made clear in the CRA where it intended a remedy to be limited to racial discrimination. *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). That is consistent with express limitations Congress made to remedies in other civil rights statutes. *See*, *e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

Moreover, in *Gallion,* the court concluded "that the prescribed standard of [CRA] Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 855 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a federal statute." *Coleman II,*

- 15 -

313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Defendants, Lt. Gov. Caldwell, NAACP Intervenors and LWV Intervenors also suggest that enforcing list maintenance by examining compliance with HAVA's identification requirements is incompatible with securing an individual's right to vote. *See* ECF 50-1 at 3; 56-1 at 8-9; 57-1 at 8-9. That is incorrect because examining compliance with HAVA is essential to securing an individual's right to vote. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why requiring voter registration applicants to provide their driver's license information and the last four digits of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier [SSN4s]. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2001) (excerpts attached to the Second Neff Decl. at ¶17, Ex. 12). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *Id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide

- 16 -

voter registration database "can mean access." *Id.* The Commission explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when Congress enacted HAVA in 2002. Congress explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found."[11] H.R. Rep. 107-329, pt. 1, at 36 (2001).

Engrafting a racial discrimination requirement that does not exist in Title III of the CRA would violate the statute's express congressional mandate as well as undermine the Attorney General's enforcement of requirements in HAVA and the NVRA that help protect voting rights. Where, like here, the language of an enactment is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554 (1925). "[W]here the language of an enactment is clear, and

---

[11] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. First Neff Decl. ¶¶ 12-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *N. Carolina Bd. of Elections,* No. 5:25-cv-00283, ECF 20-6. As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *Id.*, Defs.' 2d Status R. at 2 (attached to the Second Neff Decl. at ¶ 9, Ex. 1 ECF 20-2).

construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of Defendants in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. *Benson* first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law. *Benson,* 819 F. Supp. 3d at 767. *Benson* explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes" such as the NVRA and HAVA. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fits neatly within the scope of Title III: "The CRA aides the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

As a result, the United States respectfully submits that the Court must decline Defendants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not

- 18 -

exist in Title III. *See id*.

>    **D.    New Jersey's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in a federal election.**

Congress broadly established the scope of federal election records covered by Title III. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added); *see also Lynd*, 306 F.2d at 226. Regardless of who created the SVRL, Lt. Gov. Caldwell has "custody, possession, or control of such record or paper" and must make it "available for inspection, reproduction, and copying." 52 U.S.C. § 20703.

New Jersey's SVRL is merely a composite of individual records relating to voter registration for federal elections. When a term goes undefined in a statute, the Court must "give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd*., 566 U.S. 560, 566 (2012). The ordinary meaning of the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 566 n.1 (2011) (the term "related" is "expansive"). As required by Section 303 of HAVA, 52 U.S.C. §21083, the SVRL is the method by which New Jersey accumulates the records of who has registered to vote, and one cannot seriously dispute that such a list "has 'a connection with, or reference to,' the topics the statute enumerates," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 384) – namely, voter "registrations." 52 U.S.C. § 20701.

Federal courts that have applied 52 U.S.C. § 20701 have concluded that Congress meant what it said in the statute. It does not exclude any voting record that Lt. Gov. Caldwell's office maintains, despite his argument that the SVRL is excluded because his office "created" it. *See* ECF 50-1 at 15. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election.'

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701).

The United States has substantially briefed this Court on *Benson* in its Motion to Compel. *See* ECF 20-1 at 16-19. Notwithstanding Defendants' arguments, *Benson* does not preclude the United States from obtaining New Jersey's SVRL. *See* ECF 20-1 at 13-19. *Benson* agreed with the United States regarding the summary nature of a Title III proceeding, but in doing so it reached a few atextual conclusions. In particular, *Benson* read Section 301 of the CRA more narrowly than Congress intended in the statute's reference to "all records." *See Benson*, 819 F. Supp. 3d. at 768-70.[12] The United States respectfully disagrees. Similarly, when a recalcitrant election official asked the *Lynd* court to differentiate between generated and non-generated records as a distinction under the CRA, the Court declined the invitation. *Lynd*, 306 F.2d at 230.

Nothing in Section 301 restricts "all records and papers" to only those records and papers

---

[12] Other Courts have largely adopted *Benson's* reasoning on this point. *See generally United States v. Bellows,* No. 1:25-cv-00468, 2026 WL 1430481 (D. Me. May 21, 2026); *United States of America v. Wis. Elections Comm'n et al.;* No. 3:25-cv-03398, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. Fontes*, No. 26-cv-00066, 2026 WL 1177244 (D. Ariz. April 28, 2026).

submitted by voters. Even assuming the examples of documents cited in the statute "refers to something that the voter submits or does," *Benson*, 819 F. Supp. 3d. at 768-69, that does not mean that every record or paper "relating to" those examples, 52 U.S.C. § 20701, likewise comes from a voter. *See United States v. Mississippi*, 380 U.S. 128, 134 (1965) (stating broadly that "records of voting registration [must] be kept" under Title III); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (Section 301 "encompasses, among other things, voting registration records, poll lists, applications for absentee ballots, ballot envelopes, tally sheets, computer programs used to tabulate votes, as well as the ballots themselves.").

Limiting Section 301 to materials that a state election official has acquired from a third party would undermine the statute's purpose. Interpreting Section 301 to exclude materials that state election officers have created themselves – including statewide voter registration lists – would subvert that purpose by frustrating the United States' ability to acquire evidence that could shed light on whether a violation of the law has occurred. Courts "have rejected rules that would 'thwart and defeat [an agency's] appropriate investigatory powers." *United States v. Clarke*, 573 U.S. 248, 254 (2014) (quoting *Donaldson*, 400 U.S. at 533); *accord N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, 819 Fed. Supp. 3d at 769. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and which "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 20701, 20703.  According to *Benson*, "'come into [their] possession' naturally refers to a process

- 21 -

by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. *Id.* at 768 (emphasis in original). That, however, is not what the plain terms of the statute dictate: an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). Lt. Gov. Caldwell acquired the relevant records while carrying out his statutory responsibilities for administering federal elections in New Jersey.

Contrary to *Benson*, "distinction[s] between possessing something and having something come into one's possession," *Id.* at 768, are temporal distinctions – not distinctions between obtaining records from an outside source and those through self-generation – as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

Federal courts addressing similar provisions of federal election law interpret election records expansively. The District of Maryland, for example, when asked by a private, nongovernment party, found that the "focus on the information sought" was significant "rather

- 22 -

than the particular language used to characterize that information" when interpreting the NVRA. *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425, 440 (D. Md. 2019) (citing *Project Vote v. Kemp*, 208 F. Supp. 3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list). Focusing on the information sought rather than how it was acquired or generated, the state's voter registration list qualified as election records. *Id*. at 441-42; *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (holding that "all records" under Section 8(i)(1) for request by private, third party included voter registration records). As a result, New Jersey's SVRL is encompassed by Section 301 of the CRA and must be produced to the United States.

**E.     The United States is entitled to unredacted "reproduction" and "copying" of New Jersey's SVRL.**

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or his representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226.

Nevertheless, Defendants, Lt. Gov Caldwell, LWV Intervenors, and MRNJ Voters ask this Court to legislate limitations conspicuously absent from Title III by limiting the United States to only the redacted, publicly available SVRL. ECF 50-1 at 1, 38-44; 57-1 at 8; 59-1 at 6.  The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Furthermore, Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

- 23 -

52 U.S.C. § 20704.

Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Despite this, Defendants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information. Congress rejected the position Defendants advance by the statute's broad reference to "all records and papers…" 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent confirmation notices and any responses). To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including New Jersey's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Defendants' argument that non-public records are excluded fails as a matter of law.  Importantly, one of the requirements of 52 U.S.C. 21083(a)(5) is that states collect either driver's licenses or the last four digits of a voter's social security number. As shown by *N. Carolina Bd. of Elections*, *supra,* not all jurisdictions properly do this. By providing only a redacted list without this information it is impossible for the United States to confirm New Jersey is actually collecting this information.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted SVRL and other responsive federal election records can

certainly be produced to the United States consistent with these federal protections through a protective order.[13] *Lynd*, 306 F.2d at 230.

This court's adoption of Defendants' position would eviscerate Title III. Because New Jersey's voting list will contain numerous individuals with the same name, the Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by federal law. For each voter in New Jersey, that requires his or her driver's license, social security number or other HAVA identifier. *See* 52 U.S.C. § 21083(a)(5)(D). As explained above, that information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died or who are otherwise no longer eligible to vote in federal elections.[14] The only way for the United States to determine whether New Jersey has an identifier for each person registered to vote for federal elections is by reviewing its complete SVRL. There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA and to ensure that New Jersey is in compliance with HAVA's identification requirements are for "the purpose of investigating possible violations of a Federal statute." *See Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338

---

[13] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states a memorandum of understanding, or MOU, memorializing these requirements. *See* Second Neff Decl. ¶ 18. As of May 11, 2026, fourteen states have provided their SVRLs without any MOU. *Id.* Three states have agreed to provide their SVRL under the terms of the MOU. *Id.* One other state agreed to provide its SVRL to settle a CRA lawsuit. *Id.*

[14] *See generally* 52 U.S.C. § 20507 (a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083 (a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose).

Finally, Lt. Gov. Caldwell's assertion that the United States is not entitled to an electronic copy of the records has no statutory basis. ECF 50-1 at 48-49. HAVA requires states, including New Jersey, to keep the list electronically in order that, among other reasons, (i) state election officials can quickly determine whether the election officials are complying with their statutory duty to maintain an accurate voter list and (ii) the Attorney General can quickly and accurately assess whether those election officials are complying with that statutory duty. There is no reason why New Jersey should not be compelled to produce the voter list in its electronic format. The only support Lt. Gov. Caldwell found for his argument not to produce the SVRL in electronic format is that a court in the 11th Circuit found that the NVRA does not require electronic production of records. *Greater Birmingham Ministries, Inc. v. Sec'y of State*, 105 F.4th 1324, 1332–33 (11th Cir. 2024). However, the Attorney General in the above captioned action is seeking the SVRL under the CRA, not the NVRA.

Finally, the data the United States has requested under the CRA is the same data twenty-six states—including New Jersey—and the District of Columbia routinely share *in electronic format* with a third party, the Electronic Registration Information Center ("ERIC"), to help facilitate their compliance with federal list-maintenance requirements.[15] Similarly, states have released to private parties even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides

---

[15] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited May 11, 2026).

concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

Accordingly, the United States is entitled to reproduction and copying of New Jersey's unredacted electronic SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying…"); *Lynd*, 306 F.2d at 226 (same).

**F.      The United States is complying with federal privacy laws, and New Jersey's privacy laws do not prevent disclosure of the requested data.**

Defendants make a variety of arguments that various privacy laws – the Privacy Act, E-Government Act, Driver's Privacy Protection Act, and state privacy law – require dismissal of the United States' efforts to compel production of New Jersey's federal election records.  *See* ECF 50-1 at 44-48; 57-1 at 8-10; 59-1 at 10.  Defendants' arguments are misguided at best. First, these arguments are affirmative defenses and therefore cannot form the basis for dismissing the Complaint. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004). Federal law does not require the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. The Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.[16] Defendants' remaining privacy arguments lack merit. The Complaint, incorporating the demand, is in full compliance with

---

[16] As *Lynd* recognized under similar circumstances, any legitimate privacy concerns can be addressed through an appropriate protective order governing the production of the demanded federal election records, including compliance with Section 304 of the CRA and the Privacy Act. *See* 306 F.2d at 230.

federal privacy laws.

### 1.    *The United States is complying with the Privacy Act.*

The Privacy Act does not bar the disclosure of New Jersey's SVRL to the United States, as Lt. Gov. Caldwell asserts. ECF 50-1 at 44-47. The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. §§ 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." State and local entities fall outside that definition. *See id.* The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93-579, § 2(b), 88 Stat. 1896 (1974), only within the scope of the federal agency record systems. There is no basis for Lt. Gov. Caldwell to fail or refuse to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

To that extent, the voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151. The list of routine uses for this collection of information includes JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). As referenced in SORN CRT-001

in the categories of records in the system: "The delegated legal duties and responsibilities of each section are described in detail at the Civil Rights Division Web page: *http://www.usdoj.gov/crt/crt-home.html*." 68 C.F.R. 47611. Similarly, it is noted that the purposes of the SORN are broad:

> The purposes of this system are to assist all the sections within the Division in maintaining names of Division employees and their case investigation assignments, names of defendants or investigation targets, victims, witnesses or potential witnesses, or other persons or organizations as they relate to potential or actual cases, investigations, and matters of concern to CRT.

*Id.* The statutes cited for routine use in the Department of Justice SORNs include enforcement of HAVA, the NVRA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy.[17] The United States made its requests and filed this action pursuant to those statutes. *See* Compl., ECF 1 ¶¶ 10-19. The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

To the extent that Lt. Gov. Caldwell is concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs. Regardless, there is simply no requirement in federal law which requires the United States to plead its compliance with the Privacy Act in a complaint it brings that involves obtaining records that contain personally identifiable information. Rather, the Privacy Act in conjunction with Section 204 of the CRA simply requires that when

---

[17] States have frequently been the subject of voting investigations and enforcement as JUSTICE/CRT – 001 SORN advises. The United States has been involved in statewide redistricting cases where it has used statewide voter registration lists (https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0#tx2021) (last visited May 11, 2026).

protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use. As outlined above, the United States will do that.

### 2.    The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims.

Defendants next argue that the demand for production of New Jersey's SVRL and other federal election records violates the E-Government Act. According to Defendants, the United States is required to conduct a "privacy impact assessment," or "PIA," before initiating investigations of each state's compliance with HAVA and the NVRA. *See* ECF 50-1 at 47; 59-1 at 10 n. 5. Again, neither the E-Government Act nor case law supports this assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107-347, § 208(b)(l)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The Attorney General requested Lt. Gov. Caldwell provide a voter registration list already maintained pursuant to federal law to analyze New Jersey's federally required list maintenance. The SVRL would be kept on a system for which a Privacy Impact Assessment has been done. Only when a new system is established – not when each new data request is made – is a Privacy Impact Assessment required.[18]

---

[18] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act

Even if the Court found the E-Government Act applied here – and it should not – Defendants have misplaced their reliance on *Election Privacy Info Ctr. v. Presidential Advisory Comm'n on Election. Integrity,* 266 F. Supp. 3d 297 (D.D.C. 2017) ("*EPIC I*"). *See* ECF 50-1 at 47. *EPIC I* does not support dismissal of a complaint based on an alleged failure to conduct a PIA. In *EPIC I,* the plaintiff sought to enjoin a federal commission's collection of state voter information, claiming the commission had failed to prepare a PIA under § 208 of the E-Government Act. The D.C. Circuit affirmed dismissal of the claim on standing grounds. *See Election. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,* 878 F.3d 371 (D.C. Cir. 2017) ("*EPIC II*"). In doing so, *EPIC II* explained that the Act "is intended to protect *individuals* – in the present context, voter – by requiring an agency to fully consider their privacy before collecting their personal information. EPIC is not a voter and is therefore not the type of plaintiff the Congress had in mind." *Id.* at 378 (emphasis in original).

### 3.    The Driver's Privacy Protection Act does not allow Defendant to deny the United States list maintenance data.

Finally, Defendants incorrectly maintain that dismissal is warranted because they claim that the United States' demand violates the Driver's Privacy Protection Act ("DPPA"). ECF 50-1 at 47-48. DPPA generally prohibits the disclosure of "personal information" obtained by a state Department of Motor Vehicles in connection with a motor vehicle record. *See* 18 U.S.C. §§ 2721(a), 2725(1), (3), (4). Nonetheless, the statute explicitly contains exceptions that permit certain governmental uses. Under 18 U.S.C. § 2721(b)(l), disclosure is allowed "for use by any government agency ... in carrying out its functions," including law enforcement or other regulatory

---

Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited May 11, 2026).

enforcement purposes. This statutory language demonstrates that DPPA was not intended to block all government access to DMV records – particularly when requested for purposes of law enforcement or regulatory enforcement.

DPPA's prohibition is clearly not implicated in the present case. The Department of Justice is a government agency performing a statutorily mandated function-verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in § 2721(b)(1), the United States' use of DMV-provided information is permissible, even though the information originates from a motor vehicle record. Transfers of DMV data to government agencies for official functions, including voter registration administration, are therefore consistent with DPPA and fall squarely within the statute's exceptions.

**G.     New Jersey's privacy laws do not prevent the United States from obtaining data maintained under HAVA or the NVRA.**

The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Id.*; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the CRA, HAVA, and the NVRA, adopting a "trust, but verify" approach. State election officials, including

- 32 -

Lt. Gov. Caldwell, are given the primary responsibility for administering federal elections. Specifically, Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.*

Each of these provisions regulate the conduct of federal elections and make state officials responsible for implementing them. But contrary to what Defendants argue, that does not mean that the Attorney General, as the Nation's chief law enforcement officer, plays no role at all. Far from it. At the same time state election officials were trusted to conduct federal elections, Congress empowered the Attorney General to verify that Lt. Gov. Caldwell is doing so in compliance with federal law. Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510(b), 20507(a)(4). Adopting this approach of trust but verify thereby respects the federal structure and the primacy of state officials in conducting federal elections.

Title III of the CRA further promotes the transparency of the state's conduct of federal elections by giving the Attorney General pre-suit investigative tools to evaluate a state's records pertaining to those elections, including its SVRL. As *Lynd* explained, "the right of the Attorney General to inspect and copy such records is not dependent upon an existing demonstrable right" to maintain a lawsuit. 306 F.2d at 227. "His right to records does not require that he show he could win without them." *Id.* In other words, the CRA's purpose "is to enable the Attorney General to determine" if an enforcement action "should be instituted. And it is to enable him to obtain evidence for use in such cases if and when filed." *Id.* at 228. To afford the Attorney General the ability to verify compliance with federal law, the CRA "has equipped him with the machinery thought suitable for the effective fulfillment of that obligation." *Id.* at 230. "Wide scope must be accorded the Attorney General" in his ability to review federal election records like the SVRL and "extends as far as the sovereign State itself." *Id.* at 228. If the Attorney General's review reveals that state election officials are not in compliance with federal law, then the United States can bring an appropriate enforcement action. In other words, trust, but verify.

The United States believes that state law can be read in harmony with federal law. However, if there is a direct conflict between state and federal laws, then state law must yield under the Supremacy Clause. *See* U.S. Const. art. VI, cl. 2; *see also Inter Tribal Council*, 570 U.S. at 15 ("States' role in regulating congressional elections – while weighty and worthy of respect – has always existed subject to the express qualification that it 'terminates according to federal law.'") (quoting *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001)). In any event, the United States has complied and will continue to comply fully with all federal privacy laws applicable to the SVRL and other federal election records that are produced. Through its Motion to Compel, the United States asks the Court to respect the federal structure, acknowledging that while Lt. Gov.

- 34 -

Caldwell is trusted to conduct federal elections, the Attorney General has been empowered by the CRA to verify that he is doing so in compliance with HAVA and the NVRA.

### III.    CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Motions to Dismiss (ECF 50, 56, 57, 59) be denied and that the United States' Motion to Compel Production of federal election records under Section 305 of the CRA (ECF 20) be granted.


DATED: May 26, 2026                              Respectfully submitted,

                                                 HARMEET K. DHILLON
                                                 Assistant Attorney General
                                                 Civil Rights Division

                                                 JESUS A. OSETE
                                                 Principal Deputy Assistant Attorney General
                                                 Civil Rights Division

                                                 ERIC V. NEFF
                                                 Acting Chief, Voting Section
                                                 Civil Rights Division

                                                 /s/ *Christopher J. Gardner*
                                                 CHRISTOPHER J. GARDNER
                                                 JONATHAN P. HAUENSCHILD
                                                 Civil Rights Division, Voting Section
                                                 4 Constitution Square
                                                 150 M Street NE, Room 8th Floor
                                                 Washington, D.C. 20002
                                                 Christopher.Gardner@usdoj.gov
                                                 Jonathon.Hauenschild@usdoj.gov
                                                 202-812-2631

                                                 *Attorneys for the United States*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of May 2026, true and accurate copies of the

foregoing were sent to all parties receiving notices through the Court's CM/ECF system.


*Christopher J. Gardner*
Christopher J. Gardner