NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DR. DALE G. CALDWELL, *in his official capacity as Lieutenant Governor and Secretary of State of New Jersey,*<br><br>Defendant. | Civil Action No. 26-2025 (ZNQ) (JTQ)<br><br>OPINION |

QURAISHI, District Judge

THIS MATTER comes before the Court upon: (1) a Motion to Compel Federal Election Records under the Civil Rights Act of 1960 filed by Plaintiff United States of America (the "Government" or "Plaintiff") ("Motion to Compel," ECF No. 20); and (2) a Motion to Dismiss filed by Defendant Dr. Dale G. Caldwell, in his official capacity as Lieutenant Governor and Secretary of State of New Jersey ("Caldwell" or "Defendant") ("Motion to Dismiss," ECF No. 50).[1]

The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.

---

[1] The Court acknowledges with appreciation the supplemental briefing provided by Intervenor-Defendants and Amici: League of Women Voters of New Jersey, Latino Action Network, and Maungsai Somboon (ECF No. 3); Make The Road New Jersey, Jamie Y. Ding, and Danielle Litwak (ECF No. 6); The National Association for the Advancement of Colored People ("NAACP"), NAACP New Jersey State Conference, Salvation and Social Justice, AAPI New Jersey, Returning Citizens Support Group, Association of Black Women Lawyers of New Jersey, Garden State Bar Association, New Jersey Muslim Lawyers Association, People's Organization for Progress, and Edwin Ortiz (ECF No. 10); Democratic National Committee (ECF No. 53); United Black Agenda (ECF No. 61); and Brennan Center for Justice and Campaign Legal Center (ECF No. 71).

For the reasons set forth below, the Court will **GRANT** the Motion to Dismiss and **DENY AS MOOT** the Motion to Compel.

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    FACTUAL BACKGROUND

This is one of over two dozen lawsuits that the United States has recently brought seeking voter registration data from states and localities.  On July 15, 2025, the United States Department of Justice (the "DOJ") first contacted the State of New Jersey (the "State" or "New Jersey") and requested an electronic copy of the State's computerized statewide voter registration list ("VRL") to ensure compliance with the National Voter Registration Act (the "NVRA"), 52 U.S.C. § 20507. (ECF No. 50-4, Declaration of Liza B. Fleming ("Fleming Decl."), Ex. 1 (the "July 15 Letter").) The July 15 Letter cited concerns arising from the Election Assistance Commission's Election Administration and Voting Survey, which indicates that New Jersey has: a particularly high registration rate amongst its citizen voting-age population; no reported data on duplicates; and one of the lowest rates in the nation for sending confirmation notices to active voters.  (*Id.*)

On July 29, 2025, the Division of Elections within the New Jersey Department of State provided an electronic copy of New Jersey's then-current public VRL.  (Fleming Decl., Ex. 2 (the "July 29 Letter").)  This list excluded personally identifiable information requested by the DOJ, specifically registered voters' driver's license numbers, and the last four digits of registered voters' social security numbers. (*Id.*)

On August 14, 2025, the DOJ acknowledged receipt of this list but demanded that New Jersey submit an electronic copy of its VRL "contain[ing] *all* fields, including the registrant's . . . state driver's license number or the last four digits of the registrant's social security number." (Fleming Decl., Ex. 3 (the "August 14 Letter").)  In addition to asserting its authority under the

NVRA, the DOJ here maintained that it was empowered to seek these records under the Help America Vote Act (the "HAVA"), 52 U.S.C. § 21083, and the Civil Rights Act of 1960 (the "CRA"), 52 U.S.C. § 20703. (*Id.*) Citing to Title III of the CRA, the DOJ maintained that the Attorney General has the authority to request and make available for "inspection, reproduction, and copying" any record related to "application, registration, payment of poll tax, or other act requisite to voting in [any general, special, or primary] election." (*Id.* (citing 52 U.S.C. §§ 20701–20703).)

New Jersey responded on August 21, 2025 and expressed three concerns. (Fleming Decl., Ex. 4 (the "August 21 Letter").) First, it asked how the DOJ's proffered purpose of assessing NVRA and HAVA compliance would be furthered by the requested confidential personally identifiable information. (*Id.* at 2) ("It is not clear that obtaining confidential personally identifiable information of individual registered voters is necessary to determine whether New Jersey is conducting a general program that makes a reasonable effort to remove the names of individuals who are deceased or have changed residence.").) Second, New Jersey noted that the August 14 Letter failed to articulate a basis for its request pursuant to 52 U.S.C. § 20703. (*Id.*) Third, the State expressed concerns regarding compliance with the federal Privacy Act, 5 U.S.C. § 552 *et seq.*, and that, before sharing confidential personally identifiable information, it would like to "better understand how the information may be used and with whom it may be shared." (*Id.* at 3.)

On August 28, 2025, New Jersey presented the DOJ with a description of its list-maintenance procedures, its ineligible voter removal procedures, the identity of the election officials responsible for carrying out those procedures, and responses to other questions posed in the July 15 Letter related to registration statistics flagged by the DOJ. (Fleming Decl., Ex. 5.)

On December 1, 2025, the DOJ followed up on its demand for a complete, unredacted copy of New Jersey's VRL. (Fleming Decl., Ex. 6.) New Jersey responded on December 8, 2025, maintaining that the DOJ had neither assuaged its concerns as to the use of the confidential personally identifiable information, nor answered most questions raised in the August 21 Letter. (Fleming Decl., Ex. 7.) The State reiterated its request for this information. (*Id.*)

In an email memorializing a call between the DOJ and the State on December 19, 2025, the DOJ reaffirmed that the withheld personally identifiable information was necessary for "accuracy purposes," represented that "[the DOJ] will always comply with federal law, including the Privacy Act," and articulated its position that "the basis and purpose [requirement] as part of a CRA request is a nonreviewable matter that requires nothing more than a basic assertion, which can be applied to both the basis and the purpose." (Fleming Decl., Ex. 8.)

On January 6, 2026, New Jersey ultimately refused to disclose "the confidential, personally identifiable information of each registrant." (Fleming Decl., Ex. 9 (the "January 6 Letter").) The January 6 Letter declared that Plaintiff does not have the authority to compel New Jersey to disclose an unredacted VRL under the NVRA, HAVA, nor the CRA, and articulated the State's continued concerns about the potential for misuse of confidential information as well as the incompatibility of the DOJ's request with state and federal privacy law. (*Id.*)

## B.    PROCEDURAL HISTORY

Plaintiff commenced this action on February 26, 2026, asserting in its complaint that Title III of the CRA gives the Attorney General the "sweeping power" to obtain all those records and papers related to "application, registration, payment of poll tax, or other act requisite to voting" retained by state election officials, 52 U.S.C. § 20701. (ECF No. 1.) On April 3, 2026, Plaintiff

4

filed the Motion to Compel the production of New Jersey's statewide, unredacted VRL. (ECF No. 20.) On May 4, 2026, Defendant filed the Motion to Dismiss. (ECF No. 50.)

### C.   SUBJECT MATTER JURISDICTION

This Court has subject matter jurisdiction under 28 U.S.C. § 1345, which grants district courts original jurisdiction over "all civil actions, suits or proceedings commenced by the United States."

### D.   LEGAL BACKGROUND

This action implicates principles of federalism and separation of powers that undergird federal election oversight. The Court begins by delineating the respective roles of state and federal government in election regulation and administration, focusing first on the Elections Clause and then on three federal statutes — the NVRA, the HAVA, and Title III of the CRA — that carve out the federal government's specific, narrow roles in regulating elections.

#### 1.   States' Role in Elections

The Constitution of the United States empowers states to regulate and administer elections. The Elections Clause provides that the "Time, Place, and Manner of holding Elections . . . shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." U.S. Const. art. I, § 4, cl. 1. "[T]imes, places and manner . . . [are] comprehensive words [that] embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of elections returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932) (citation modified). The Constitution's architects chose to delegate election administration to the states, recognizing that local governments have the deepest understanding of their constituents' circumstances. *See United States v. Oregon,* 828 F. Supp. 3d 1092, 1095 (D.

Or. 2026) (citing *United States v. Gradwell*, 243 U.S. 476, 484 (1917)). "All other things being equal, it is generally better for states to administer elections . . . . [L]ocal administration . . . allows for great individual input and accountability[.]" *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 715–16 (4th Cir. 2016). "In practice, the Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'" *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013) (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)). If it decides to do so, Congress exerts its preemptory authority through "positive and clear statutes." *Gradwell*, 243 U.S. at 485.

The Framers of the Constitution chose to embrace balance in crafting the Elections Clause. The diffusion of power between state and federal government was intended to "preserve and restore to the people their equal and sacred rights of election [against] the influence of ambitious or popular characters, or in times of popular commotion, and when faction and party spirit run high." *League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 45 (D.D.C. 2025) (quoting The Massachusetts Convention: Convention Debates (Jan. 16, 1788), *reprinted in 6 Ratification of the Constitution by the States: Massachusetts*, at 1217–18 (J. Kaminski, *et al.* eds., 2000)). Notably, the Executive Branch did not feature at all. *See* The Federalist No. 59 (Alexander Hamilton) ("[T]here were only three ways in which this power could have been reasonably modified and disposed: that it must either have been lodged wholly in the national legislature, or wholly in the State legislatures, or primarily in the latter and ultimately in the former.").

6

2.      Statutory Provisions

a)      The NVRA

In 1993, Congress exercised its Elections Clause authority to regulate federal elections by enacting the NVRA. Pub. L. No. 103-31, 107 Stat. 77 (codified, as amended, at 52 U.S.C. §§ 20501–20511). Congress enacted the NVRA to "(1) increas[e] the number of registered voters, (2) increas[e] participation in federal elections, (3) maintain[] current and accurate voter rolls, and (4) ensur[e] the integrity of the voting process." *Am. C.R. Union (ACRU) v. Phila. City Comm'rs*, 872 F.3d 175, 178 (3d Cir. 2017) (citing 52 U.S.C. § 20501). Congress was wary of "the devastating impact purging efforts previously had on the electorate" and how the misuse of such mechanisms had the potential to deprive citizens of their fundamental right to cast a ballot. *Id.*; *see also Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 668 (1966).

The main provisions of the NVRA instruct states to ensure that any eligible applicants are registered to vote, ensure registrants are not removed except under specified circumstances, and "conduct a general program that makes a reasonable effort to remove" from their VRLs registrants who have become ineligible by death or change in residence. 52 U.S.C. § 20507(a). Congress did not give any further guidance on what constitutes a "reasonable effort," but this requirement has been understood to be modest, affording states significant discretion so long as its program reflects a "serious attempt that is rational and sensible." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 1772 (2026). Relevant here, the NVRA also contains the following public disclosure provision:

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

7

> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

*Id.* § 20507(i). Either the Attorney General or a private individual can bring a lawsuit to enforce the NVRA. *Id.* § 20510(a)–(b).

### b)    The HAVA

Crafted in the wake of the 2000 Presidential election, *see generally Bush v. Gore*, 531 U.S. 98 (2000), Congress enacted the HAVA to modernize the electoral experience in both voter registration and at polling places. H.R. Rep. No. 107-329 at 32, 34 (2001). The "HAVA builds on the NVRA by requiring that each [S]tate maintain[ ] a computerized database for voter registrations" containing the name, registration information, and a unique identifier for each registered voter. *ACRU*, 872 F.3d. at 180–81; *see* 52 U.S.C. § 21083(a)(1)(A). It also requires states "to ensure that voter registration records in the State are accurate and are updated regularly," and to implement "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." § 21083(a)(4). Further, states must make "a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." § 21083(a)(4)(A). States may not remove voters from the computerized VRL other than "in accordance with the provisions of the [NVRA]." *ACRU*, 872 F.3d. at 181 (citation modified); *see* § 21083(a)(2)(A). Though the federal government provides states with the necessary funding to ensure compliance with these standards, Congress deferred to the states in the implementation of the HAVA, with "[t]he specific choices on the methods of complying with the requirements . . . [are] left to the discretion of the State." § 21085.

The HAVA provides that "[t]he Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive

8

relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under . . . this title." § 21111. The HAVA has no public disclosure requirements, nor does it provide the DOJ with subpoena authority.

c)    Title III of the CRA

Congress established the Civil Rights Act of 1960 to expand upon and facilitate the enforcement of the Civil Rights Act of 1957. Congress first enacted voting provisions in the Civil Rights Act of 1957 to aid the federal government in carrying out its responsibilities under the Fourteenth and Fifteenth Amendments. *United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964). However, persistent voter suppression, literacy tests, arbitrary registration tactics, voter ID laws, and poll taxes inhibited Black Americans' ability to effectively and safely access the polls. *United States v. Weber*, 816 F. Supp. 3d 1168, 1175 (C.D. Cal. 2026). Compounding voter suppression and intimidation, state officials "destroyed the records of Black Americans who had registered to vote, as well as . . . denied the opportunity to register" in order to thwart efforts by the federal government to investigate and enforce the Civil Rights Act of 1957. *Id.* Therefore, Congress "found it necessary to legislate again in 1960 with respect to this problem of assuring full rights of suffrage to all Americans." *Oregon,* 828 F. Supp. 3d at 1097 (quoting *Mayton,* 335 F.2d at 159).

To that end, Title III contains provisions requiring elections officials to retain certain records and authorizing the federal government to demand such records. 52 U.S.C. § 20701. It requires election officers to retain and preserve all records related to "any application, registration, payment of poll tax, or other act requisite to voting" for a period of twenty-two months after any federal election. *Id.* Title III mandates that "[a]ny record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative . . . be made available for inspection, reproduction, and copying." § 20703. Should

9

the Attorney General make such a demand, it must contain a statement of "the basis and the purpose therefor" to inspect state voting records. *Id.* District courts in which the demand is made have jurisdiction "by appropriate process" to compel record production required under the statute. § 20705. Should those records be made available or their production compelled, Title III forbids, unless otherwise ordered by a United States court, the Attorney General, the Attorney General's representatives, or any employee of the DOJ from "disclos[ing] any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury." § 20704.

## II.  LEGAL STANDARD

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (abrogated on other grounds)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore conclusory legal assertions or factually unsupported accusations. *Iqbal*, 556 U.S. at 662, 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Finally, the court must determine

10

whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 663). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

## III.   DISCUSSION

The Government argues that it is entitled under Title III of the CRA to a "special statutory proceeding" on its Motion to Compel, under which the court is restricted to a "severely limited" inquiry. (ECF No. 20-1 ("Motion to Compel Moving Br.") at 3, 13.) It maintains that the Attorney General's Motion to Compel is a demand that should be reviewed in a summary proceeding without discovery and thus is not subject to the Federal Rules of Civil Procedure ("FRCP"). (*Id.* at 3–9.) Plaintiff maintains that it has met the threshold requirements of this inquiry and that this Court must therefore grant its Motion to Compel.

This Court disagrees. Nothing in the CRA displaces the FRCP or precludes the Court from determining whether the DOJ's demand complies with all applicable statutory requirements. As a threshold but dispositive matter, the State's computerized VRL is outside the scope of Title III's

inspection provision.[2]  52 U.S.C. § 20703.  For the reasons set forth below, this Court therefore joins at least sixteen other district courts including a sister court — and one circuit — in dismissing Plaintiff's claim.[3]

### A.     THE PLAINTIFF'S RECORDS REQUEST & TITLE III

Plaintiff argues that requesting voting records under Title III of the CRA requires a "special statutory proceeding" rather than a traditional civil proceeding.  (Motion to Compel Moving Br. at 3–9.)  In taking this position, Plaintiff relies heavily on a line of Fifth Circuit cases from the 1960s, most notably *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), a set of consolidated cases that arose out of investigations into racially discriminatory election practices in Jim Crow-era Mississippi and Louisiana.  In *Lynd*, the Fifth Circuit held that the Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings," but rather resembles "a traditional order to show cause, or to produce in aid of an order of an administrative agency" that is to be treated as a "summary proceeding."  *Id.* at

---

[2] After the close of briefing, the Government filed a short letter in which it attached the DOJ's Civil Rights Division's July 21, 2026 letter to Defendant.  (ECF No. 100.)  In its July 21, 2026 letter, the DOJ notes that New Jersey Governor Mikie Sherrill announced that "approximately 6,600 self-identified noncitizens were . . . registered to vote in New Jersey between June 2023 and June 2024" and that "approximately 400 of these noncitizens voted[.]"  (ECF No. 100-1.)  The Government claims that this announcement "provides an additional basis" for its VRL request.  (ECF No. 100.)  Thereafter, on July 27, 2026, Defendant filed a response to the Government's letter, in which Defendant argues that this announcement "has no bearing on the Court's resolution" of the pending motions.  (ECF No. 105.)  Thereafter, the Government replied to Defendant's opposition in a July 28, 2026 letter.  (ECF No. 106.)  The Court acknowledges these letters from the parties, but whether the DOJ is acting in good faith is not relevant to this Court's analysis and has no bearing on whether Plaintiff is entitled to the information it seeks under 52 U.S.C. § 20703.

[3] *Weber*, 816 F. Supp. 3d; *Oregon*, 828 F. Supp. 3d; *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026), *aff'd*, 179 F.4th 470 (6th Cir. 2026); *United States v. Galvin*, Civ. No. 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, Civ. No. 25-639, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Fontes*, Civ. No. 26-66, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Bellows*, Civ. No. 25-468, 2026 WL 1430481 (D. Me. May 21, 2026); *United States v. Wisconsin Elections Comm'n*, Civ. No. 25-1036, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. DeMarinis*, Civ. No. 25-3934, 2026 WL 1780586 (D. Md. June 18, 2026); *United States v. Schmidt*, Civ. No. 25-1481, 2026 WL 1850016 (W.D. Pa. June 27, 2026); *United States v. Scanlan*, Civ. No. 25 -371, 2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. Bd. of Elections of the State of New York*, Civ. No. 25-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Warner*, Civ. No. 26-156, 2026 WL 2018877 (S.D.W. Va. July 13, 2026); *United States v. Oliver*, Civ. No. 25-01193, 2026 WL 2031479 (D.N.M. July 14, 2026); *United States v. Koski*, Civ. No. 26-42, 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Thomas*, Civ. No. 26-21, 2026 WL 2070437 (D. Conn. July 17, 2026); *United States v. Adams*, Civ. No. 26-19, 2026 WL 2123871 (E.D. Ky. July 23, 2026).

225–226. With such a proceeding, "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand . . . is not open to judicial review or ascertainment." *Id.* at 226 (citing 52 U.S.C. § 20703).

Contrary to this position, Title III does not transform an election records request by the DOJ — or any other statutorily empowered federal agency or actor pursuant to § 20703 — from an ordinary civil action into an action comparable to an order to show cause or an "administrative summons." (Motion to Compel Moving Br. at 5.) Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures. Title III merely states that should an election officer not comply with a CRA demand, the DOJ can seek judicial relief: "The United States district court for the district in which a demand is made" under 52 U.S.C. § 20703 "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705. Title III calls for "appropriate process," not a "special" statutory proceeding, as the DOJ contends. *Id.*

Indeed, after *Lynd*, the Supreme Court considered analogous statutory language in another context and held that the Federal Rules apply in those circumstances. *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). *Powell* involved a provision of the Internal Revenue Code that, like Title III, confers jurisdiction on district courts "by appropriate process to compel" the production of records. 26 U.S.C. § 7604(a). The Supreme Court held that because the statute referenced "appropriate process" but "contain[ed] no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 58 n.18. Plaintiff's attempts to distinguish the statute at issue in *Powell* from Title III of the CRA are unavailing.[4]

---

[4] Although Plaintiff attempts to distinguish *Powell* on the basis that *Powell* addresses a different statute (Motion to Compel Moving Br. at 7), it offers no compelling argument that the same language — that courts "shall have

Moreover, in *United States ex rel. Polansky v. Exec. Health Res., Inc.*, the Supreme Court reaffirmed that the "Federal Rules are the default rules in civil litigation," and though Congress may exempt a statutory proceeding from the Rules, courts "[may] not lightly infer that Congress has done so; and silence on the subject is seldom enough."  599 U.S. 419, 436 (2023) (citing *Jones v. Bock*, 549 U.S. 199, 212 (2007); *Marek v. Chesny*, 473 U.S. 1, 11–12 (1985)).  Nothing in the CRA's text exempts this case from the Federal Rules.

**B.  THE SCOPE OF TITLE III**

52 U.S.C. § 20703 requires the production of "[a]ny record or paper required by § 20701 . . . to be retained and preserved."  Relevant here, § 20701 requires the retention and preservation of "all records and papers which come into [an election officer's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . ." for federal office within the preceding twenty-two months.  Defendant argues that the requested statewide, computerized VRL is not such a record or paper.  (*See* ECF No. 50 at 15.)  This Court agrees.

The plain text of Title III applies only to records "which come into" election officers' "possession" and thus does not extend to New Jersey's computerized VRL — a document the State itself created. 52 U.S.C. § 20701.  As another federal district court that analyzed this question reasoned:

> The phrase "come into [their] possession" naturally refers to a process by which someone acquires an item from an external source. *See, e.g., Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting Random House Dictionary of the English Language 995 (1966))); Receive, Black's Law Dictionary (11th ed. 2019) (defining "receive" as "to come into possession of or get from some outside source"); 16

---

jurisdiction by appropriate process" — has a different meaning in the Internal Revenue Code than in the Civil Rights Act. No other federal district court faced with this question has affirmed the Government's position. *See, e.g., Oregon*, 828 F. Supp. 3d at 1102–1103; *Demarinis*, 2026 WL 1780586, at *3; *Koski*, 2026 WL 2032532, at *2 n.2.

14

> U.S.C. § 620e (defining "acquire" as "to come into possession of"). As Intervenors observe, Congress frequently uses the phrase "come into possession" to refer to items that a person obtains rather than creates. *See, e.g.*, 18 U.S.C. § 1703(a) (prohibiting postal employees from destroying letters that "come into [their] possession"); 50 U.S.C. § 217 (requiring soldiers to report when abandoned property "comes into [their] possession"); 13 U.S.C. § 214 (prohibiting census takers from disclosing information that "comes into [their] possession"); 18 U.S.C. § 654 (prohibiting embezzlement of property that "comes into [one's] possession"); 46 U.S.C. § 10705 (describing process to follow "[w]hen money, property, or wages of a deceased seaman comes into possession of a consular officer"); 44 U.S.C. § 3572 (imposing limits on federal employees' use of confidential information that they "come[ ] into possession of"). Indeed, at least one federal statute draws an explicit distinction between possessing something and having something come into one's possession.  *See* 8 U.S.C. § 1454 ("If the certificate or declaration has been lost, the applicant or any other person who shall have, or may come into possession of it is required to surrender it . . . .").

*Benson*, 819 F. Supp. 3d at 768 (emphasis omitted) (alterations in original).

In straining to extend Title III to an internal VRL that the State itself creates, Plaintiff fails to give effect to every word in the statute and renders certain language surplusage.  This is almost never a path to a proper statutory construction.  *See Tavarez v. Klingensmith*, 372 F.3d 188, 190 (3d Cir. 2004) (statutory terms should not be treated as surplusage).  This surplusage canon of construction "can be meaningful when a competing interpretation would avoid superfluity." *Benson*, 179 F.4th at 180 (quoting *Bufkin v. Collins*, 604 U.S. 369, 387 (2025) (internal quotation marks omitted)).  Again, as the *Benson* district court ably articulated:

> Congress could have referred simply to "records in the possession of" election officials, or even just "records" without any qualifier, which is the language used in the NVRA, *see* 52 U.S.C. § 20507(i)(1). In order to give effect to the phrase "come into [their] possession" and prevent it from being surplusage, the Court interprets the phrase as referring to only those documents that state election officials receive from prospective voters.  This interpretation of "come into [their] possession" is bolstered by the next words in the sentence: "relating to any application, registration,

> payment of poll tax, or other act requisite to voting in such election." Each of these terms refers to something that the voter submits or does as part of the registration process.

819 F. Supp. 3d at 768–69 (alteration in original) (citation omitted).

At first glance, this distinction between voter registration applications (which do fall within the scope of § 20701) and a VRL (which is, in large part, a "compilation of information from those applications") may appear "needlessly pedantic." *Id.* at 769. However, the requested VRL is not a static "compilation" of information from voter registration applications, but rather, is a "live, dynamic database" that includes information from other state agencies and is altered by state officials. *Id.* (ECF No. 50-1 ("Motion to Dismiss Moving Br.," at 18.) Not only are states *permitted* to alter computerized VRLs, but they are also *required* to do so on a continuous basis to remain compliant with the HAVA and the NVRA. *See* 52 U.S.C. § 21083(a)(4) (computerized statewide voter registration lists "shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly."). The State's obligation to continuously update its VRL clearly contrasts with Title III of the CRA, which criminally penalizes "[a]ny person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701." 52 U.S.C. § 20702.

Simply stated, this creates a conflict. The records to which the DOJ has access under Title III are necessarily those that the State may not otherwise modify, like the records of voter registration it receives. However, the VRL *must* be modified regularly as a matter of federal election law. This would place Title III on a "collision course with the NVRA and [the] HAVA." *Benson,* 179 F.4th at 480. Thus, Plaintiff's position that it is entitled to access New Jersey's statewide, computerized VRL quickly becomes untenable due to the inter-statutory conflict it would necessarily engender. *See id.* ("This runs afoul of the harmonious-reading canon of

16

statutory interpretation."); *see also Jones v. Hendrix*, 599 U.S. 465, 478 (2023) ("Basic principles of statutory interpretation require that we construe [statutory provisions] in harmony, not set them at cross-purposes."). Accordingly, this Court concludes that New Jersey's computerized, statewide VRL is not a record or paper that the state must produce to the United States under Title III of the CRA.

## IV.    CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss will be **GRANTED** and Plaintiff's Motion to Compel will be **DENIED AS MOOT**. Insofar as the Court reaches its conclusion as a matter of law, the Complaint will be **DISMISSED WITH PREJUDICE**. An appropriate Order will follow.

Date: July 29, 2026

ZAHID N. QURAISHI
UNITED STATES DISTRICT JUDGE